**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| ELI LILLY AND COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No.: |
| EMPOWER CLINIC SERVICES, LLC d/b/a | ) | Jury |
| EMPOWER PHARMACY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## COMPLAINT

1.      Empower Clinic Services, LLC (d/b/a Empower Pharmacy) ("Empower") claims to be a Texas pharmacy engaged in lawful compounding of "personalized" drugs.  In reality, Empower is not "compounding," but unlawfully manufacturing and selling untested, unapproved weight loss drugs on a large scale, which endangers patients given its long history of cutting corners and leaving serious safety risks in its wake.

2.      Tirzepatide is the active ingredient in Plaintiff Eli Lilly and Company's MOUNJARO® and ZEPBOUND®, which are the only tirzepatide medicines that have been approved by the U.S. Food and Drug Administration ("FDA").  After nearly a decade of development, FDA approved MOUNJARO® and ZEPBOUND® to treat type 2 diabetes and to help certain adults with weight management and obstructive sleep apnea, respectively.  To date, Lilly's medicines have undergone 37 completed clinical trials with more under way.

3.      Lilly is the only company that has sought—and received—FDA's approval to market and sell tirzepatide.  Lilly's tirzepatide medicines were tested and are approved only for

1

subcutaneous (that is, under-the-skin) injection—not for any other route of administration, such as oral use—and there are meaningful differences between an oral product and a subcutaneous injection. Lilly's tirzepatide medicines also were tested and are approved only as single-ingredient medicines.

4.    Empower makes and sells two knockoff versions of tirzepatide—supposedly dissolving oral tablets that Empower calls "Tirzepatide ODT" and injections containing fixed-dose combinations of tirzepatide and niacinamide (a form of vitamin B-3).[1]

5.    Empower's tirzepatide drugs have never been approved by FDA, and Empower has never tested them in clinical trials—even while manufacturing them in a facility with a well-established record of safety violations. Empower failed ten separate state and FDA inspections in the last ten years—a pace of one failed inspection per year—with regulators repeatedly citing the same problems: contamination of purportedly sterile products, unsanitary conditions in drug processing areas, and use of non-pharmaceutical grade ingredients in purportedly sterile drugs. During that same time, FDA has sent Empower four formal warning letters and one untitled letter, again repeating concerns regarding deficient sterile drug production practices and unsanitary conditions. Empower has also been subject to disciplinary proceedings in at least eight states, also raising concerns regarding failures in quality of sterile compounded drugs and the use of non-pharmaceutical grade ingredients.

6.    And although manufacturers of FDA-approved drugs cannot begin production until they have remedied a failed inspection, Empower has continued to manufacture supposedly sterile products while these egregious deficiencies are unresolved. It shows: Empower itself has initiated

---

[1]    A "fixed-dose combination" drug product, as used here, includes one where two or more active ingredients are combined in a single dosage form. *See, e.g.*, 21 C.F.R. § 300.50.

at least four nationwide recalls in the last three years for its own compounded drugs, including three for lack of assurance of sterility.  Former employees have repeatedly blown the whistle, explaining that Empower's violations are intentional and a result of guidance by Empower executives to, for example, maintain inadequate records and order non-pharmaceutical grade ingredients shortly after FDA inspections, when the likelihood of reinspection is at its lowest.

7.    Lilly files this action to stop Empower from engaging in false and deceptive sales practices and selling its knockoff, unapproved tirzepatide drugs in violation of state and federal law.  With Empower's history of dangerous practices and risks to consumers, the stakes could not be higher.

8.    ***First***, despite advertising itself as a "compounding pharmacy," the scale of Empower's operations make it clear that Empower is not "compounding" tirzepatide. "Compounding" refers to the individualized preparation of a drug product for a specific patient who, for a clinical reason, cannot take an FDA-approved form of an existing drug (for example, because of an allergy to one ingredient).  Empower instead is mass-manufacturing its untested tirzepatide products at commercial scale without seeking, or obtaining, approval from FDA or any state agency.

9.    In doing so, Empower violates the laws of several of the states in which it operates, including at least Alaska, Colorado, Connecticut, Hawaii, North Carolina, South Carolina, Tennessee, Texas, and Washington, by selling drugs that have never been tested or approved for safety or effectiveness.  By unlawfully selling unapproved compounded tirzepatide products in these states, Empower engages in unfair competition in violation of state statutes and common law.

10. **Second,** Empower falsely and deceptively advertises that its compounded tirzepatide drugs are safe and effective. Empower claims that its Tirzepatide ODT safely and effectively "activates both glucagon-like peptide-1 (GLP-1) and glucose-dependent insulinotropic polypeptide (GIP) receptors" and thereby "enhances insulin production and secretion from pancreatic beta cells in response to elevated blood glucose levels" and "support[s] glycemic control after meals." Empower's claim that Tirzepatide ODT is safe or has those effects is false and deceives consumers, luring them into taking an unapproved prescription drug that has never been studied clinically.

11. Similarly, Empower claims that its tirzepatide and niacinamide combinations are safe and effective drugs. For instance, Empower claims that the niacinamide in its drugs has "metabolic and stabilizing properties," will "support[] cellular processes throughout the body," will "contribute[] to overall metabolic support while also helping maintain formulation integrity," and will "act[] as a cofactor without producing the flushing effects associated with higher-dose niacin therapies." Again, Empower's express claims regarding its combination drug are false and deceive consumers, luring them into taking an unapproved combination drug that has never been studied clinically.

12. By marketing its combination, Empower necessarily suggests and implies to patients that niacinamide provides an added usefulness over tirzepatide alone. Because "[i]nformation on how each ingredient in a combination contributes to the effect of the combination is a fact 'material' to the consequences that may result from" taking it,[2] it is inherently deceptive to market "a combination of drugs" unless each ingredient makes a clinically significant

---

[2]    80 Fed. Reg. 79776, 79777 (Dec. 23, 2015).

4

contribution to the product's effectiveness.[3]  When FDA evaluates fixed-dose combination drugs, for example, it requires specific clinical data that the combination produces superior benefits versus both each ingredient taken alone and when taken as separate products.[4]  FDA further requires specific clinical data showing "that the pharmaceutical compounding of the fixed combination does not interfere with the bioavailability of each of the ingredients as compared with administration of the individual ingredients separately but concurrently."[5]  Empower has none of that and instead deceives patients into needlessly taking an untested combination.

13.    To the extent that Empower has based these and other claims about its unapproved drugs on the many clinical trials *Lilly* ran to evaluate *Lilly's* FDA-approved medicines, it is clearly wrong: (a) Tirzepatide ODT uses a different and untested route of administration without *any* clinical data showing that it even works, and (b) tirzepatide combined with niacinamide is a different drug with unknown safety, effectiveness, and quality.  No clinical study says or even suggests that Empower's unapproved drugs are safe or effective.

14.    ***Third***, Empower makes and sells both its Tirzepatide ODT and tirzepatide/niacinamide injection with the promise that they are custom-made, "personalized" drugs that have been tailored to the individual patient.  But Empower does not sell "personalized" tirzepatide at all.  Instead, Empower mass manufactures three standardized strengths of Tirzepatide ODT and two standardized concentrations of tirzepatide in combination with niacinamide and does not deviate from or alter these standard formulations for individual patients.  Instead, Empower's drugs are simply mass-produced alternative drugs containing tirzepatide that compete unfairly and illegally with Lilly's approved medicines.

---

[3]    21 C.F.R. § 202.1(e)(6)(xii).

[4]    *Id.* § 300.50(a).

[5]    36 Fed. Reg. at 3127.

15.    **Fourth**, to further entice consumers to buy and use its untested and unapproved drugs, Empower falsely advertises that it adheres to state and federal regulations and that it goes above and beyond to ensure safety and quality.  But that is not remotely true.  Since 2015, and as recently as April 2025, a steady stream of state and federal regulators have observed, documented, and cited Empower's repeated failures to maintain manufacturing procedures and conditions that adhere to regulatory standards.  Empower's own former Director of Supply Chain has alleged that Empower's violations are intentional and that it also intentionally conceals violations from regulators.  Empower creates hazards for consumers—failures to maintain sanitary conditions; failures to assure that drugs intended to be sterile are, in fact, sterile; failures to use pharmaceutical grade ingredients; and failures to report adverse events, among others.

16.    By selling these unapproved and untested drugs, Empower is conducting "a giant, uncontrolled, unconsented human experiment" in which consumers receive drugs that have not been demonstrated to be safe or effective, without any disclosure of the risks entailed, and without the guardrails that are part of any proper clinical trial.[6]  And in doing so, Empower trades on the reputation of Lilly, an international medicine company with 150 years' experience as a pharmaceutical manufacturer, and with whom Empower has no affiliation.

17.    Empower's actions create dangerous patient safety risks.  Empower's practices lure consumers away from Lilly's safe and effective FDA-approved medicines in favor of Empower's untested and unapproved products that are mass produced in unsanitary, noncompliant conditions—all under false and unfair practices.  To protect patient safety and stop Empower's deception, Lilly brings this action pursuant to state laws and the Lanham Act.

---

[6]    Richard Payerchin, *Deceptive information and online sales of compounded GLP-1 drugs put consumers at risk, advocates say*, Medical Economics (May 1, 2025), https://www.medicaleconomics.com/view/deceptive-information-and-online-sales-of-compounded-glp-1-drugs-put-consumers-at-risk-advocates-say.

**THE PARTIES**

18.     Plaintiff Eli Lilly and Company is a corporation organized and existing under the laws of Indiana and has its principal place of business in Indiana.

19.     Defendant Empower Clinic Services, LLC (d/b/a Empower Pharmacy) ("Empower") is a Texas limited liability company with a principal place of business at 7601 North Sam Houston Parkway, Suite 100, Houston, Texas, 77064.  That location is a 86,000 square foot drug manufacturing plant that Empower claims is "capable of storing at least nine months of raw pharmaceutical ingredients" and "generat[ing] purified water, clean steam, and clean compressed air."[7]  It uses automated, commercial-scale equipment to reportedly produce 70,000 drugs per week (more than 3.6 million drugs per year).[8]  That location is where Empower manufactures both Tirzepatide ODT and its tirzepatide/niacinamide combinations.[9]

20.     Empower owns a second, smaller drug manufacturing facility located at 5980 W Sam Houston Parkway N, Suite 300, Houston, Texas 77041.  This is a smaller facility of approximately 15,000 square feet.

21.     Empower states that it is "licensed to ship in most states" and that it can ship its compounded medications to every state but California.[10]

---

[7]    Empower Pharmacy, *Empower Pharmacy Opens $55M Facility for Pharmaceuticals*, https://www.empowerpharmacy.com/compound-medication/news/empower-opens-55m-facility/ (last visited July 22, 2025).

[8]    CISION PR Newswire, *Empower Announces Expansion of Executive Team to Drive Growth and Innovation in Compound Pharmacy* (Apr. 11, 2024), https://www.wane.com/business/press-releases/cision/20240411DA84523/empower-announces-expansion-of-executive-team-to-drive-growth-and-innovation-in-compound-pharmacy/ (last visited July 22, 2025).

[9]    Empower Pharmacy, *Navigating the Post-Shortage Era*, https://www.empowerpharmacy.com/compound-medication/weight-management/navigating-the-post-shortage-era/ (last visited July 22, 2025).

[10]   Empower Pharmacy, *Shipping and Licensure*, https://www.empowerpharmacy.com/compounding-pharmacy-shipping-coverage/ (last visited July 22, 2025).

## JURISDICTION AND VENUE

22.    The Court has subject matter jurisdiction on diversity grounds pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different states.  Plaintiff is a citizen of Indiana and Empower is a limited liability company whose member is a natural person domiciled in Texas.[11]  The Court also has subject matter jurisdiction over the Lanham Act cause of action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. § 1331.  Alternatively and in addition to diversity jurisdiction, the Court has supplemental jurisdiction over the state law causes of action pursuant to 28 U.S.C. § 1367(a), as they are part of the same case or controversy as the federal claim.

23.    Empower is subject to personal jurisdiction in Texas.  Empower is organized under Texas law and its principal place of business is located in Texas.

24.    Empower owns and operates an 86,000 square foot drug manufacturing facility located in Northwest Houston.  Empower employs more than 500 people at its Northwest Houston facility and claims "to prepare thousands of custom prescriptions each day for millions of patients across the country."[12]

25.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claim occurred in this District.  Empower operates and conducts business in this District, including by engaging in its unlawful and deceptive manufacture, promotion, and sale of tirzepatide products here pursuant to several Texas professional licenses and by shipping the at-issue products here.

---

[11]    *See* Defendants' Certificate of Interested Parties, *Mitsubishi Tanabe Pharma Corp et al. v. Empower Clinic Services LLC et al.*, No. 4:18-cv-04344 (S.D. Tex. Dec. 4, 2018) (ECF No. 23).

[12]    PR Newswire, *Empower Pharmacy Opens North America's Most Advanced Compounding Pharmacy in Houston* (Aug. 26, 2021), https://www.prnewswire.com/news-releases/empower-pharmacy-opens-north-americas-most-advanced-compounding-pharmacy-in-houston-301364032.html.

**GENERAL ALLEGATIONS**

I.    **FDA APPROVES PRESCRIPTION MEDICINES, FOLLOWING CLINICAL TRIALS AND THE DRUG APPROVAL PROCESS, TO SAFELY BRING MEDICINES TO MARKET**

26.    Drug approval is crucial for public health. As FDA explains, "American consumers benefit from having access to the safest and most advanced pharmaceutical system in the world."

27.    Before a new prescription medication can be brought to market, it must be clinically tested through a rigorous series of studies designed to determine whether the medication is safe and effective for use under specific conditions and for specific indicated purposes.

28.    To achieve FDA approval, companies must provide FDA with evidence proving the drug is safe and effective for its intended use.  That evidence is subjected to a structured, multi-disciplinary review involving physicians, statisticians, chemists, pharmacologists, and other scientists.  Approval is granted only if this independent and unbiased review establishes that a drug's health benefits outweigh its known risks.

29.    Drug approval is notoriously hard to achieve.   More than 90% of drug candidates ultimately fail.  It is also an enormously costly and time-intensive process.  On average, it takes 10–15 years and costs $2.6 billion to develop one new FDA-approved medicine.

30.    To begin, drug sponsors must first identify a potential drug candidate through rigorous laboratory and analytical work.  That work alone can take years, and usually requires consideration of scores, if not hundreds, of molecules before finding one with the desired therapeutic potential.

31.    Once identified, the drug candidate must be evaluated through preclinical testing to determine if the product is reasonably safe for initial use in humans and to confirm that the candidate exhibits the expected pharmacological activity that justifies proceeding to human studies.

32.    Based on laboratory, analytic, and preclinical testing, the drug sponsor is permitted to move the drug candidate into the clinical trial stage, in which it is tested in human subjects through a series of increasingly complex phases of studies, typically culminating in double-blind, multi-center, placebo-controlled clinical trials.

33.    Phase I clinical trials typically involve administering the drug to healthy volunteers. These are small studies that evaluate the drug candidate's safety and generate data to identify one or more doses that are sufficiently safe to be further tested.  This determination typically culls a large portion of drug candidates—for example, averaging across diseases, only 52% of drug candidates that make it to Phase I testing will progress to Phase II.

34.    Phase II trials are typically the first studies in which the drug is given to patients with the disease or condition to be treated.  These studies vary in size and design but are generally designed to preliminarily establish that the drug will have its intended effect, while also generating additional safety data.  Another swath of drug candidates is eliminated in Phase II; drug candidates for various diseases that make it to Phase II only progress to Phase III at rates between 15% and 48.1% depending on disease type.

35.    Phase III trials are the pivotal step.  These are typically large, multicenter studies that are double blind and well-controlled.  These pivotal trials are required to confirm that the drug actually works, that the drug is safe for the intended patient population, and to identify and monitor potential side effects.

36.    With the data assembled from the lab through Phase III, a sponsor is finally ready to seek FDA approval.  To do so, the sponsor generally must pay a significant user fee (presently $4.31 million), on top of the investments in research and development, and must submit a new drug application ("NDA") or biologics licensing application ("BLA") that must contain full reports

10

of every study conducted, must propose detailed labeling and risk management measures, and must detail every ingredient, every component, every facility, and every process or procedure involved in making the drug.

37.    FDA then reviews the application, a process that usually takes between six to ten months.    FDA's review is a structured, multi-disciplinary process involving physicians, statisticians, chemists, pharmacologists, epidemiologists, and other scientists.    It is a highly detailed process in which FDA evaluates and must approve every aspect of the drug or biologic, including its delivery mechanism, its packaging, and its label—even down to the trade name that the sponsor proposes to use to market the drug.  FDA's review almost always involves preapproval inspections of every facility involved in the production of the drug to ensure that they operate in conformance with current good manufacturing practice (cGMP), and if any inspection is failed, approval is withheld until FDA's observations are addressed.  FDA will ultimately approve the application only if this independent and unbiased review establishes that the drug's health benefits outweigh its known risks.

38.    After approval, FDA's vigorous oversight continues.    All drug manufacturing establishments remain subject to routine or for-cause inspections to monitor compliance with cGMP.  Sponsors must report all of their promotional materials to FDA.  Sponsors must track and trace each finished product and report any deviations to the agency.  Sponsors also must promptly report all adverse events to FDA.  All of this is to ensure that—in FDA's words—"American consumers benefit from having access to the safest and most advanced pharmaceutical system in the world."

39.    States also play an important role in regulating the sale of drugs and medicines within their borders.  Before the federal government began its comprehensive regulation of the

11

sale of drugs and medicines with the 1906 Food and Drug Act and the 1938 passage of the federal Food, Drug, and Cosmetic Act ("FDCA"),[13] this area was primarily regulated by the states. Indeed, "[b]y 1888, every state and territory except Washington Territory had a pure-food law, a pure-drug law, or both."[14] Even after the passage of the federal FDCA, states have maintained an important role in regulating the sale of drugs within state borders through state law "mini-FDCAs," many of which parallel or incorporate the federal FDCA. These overlapping laws allow states to protect consumers and the public health within their borders, including through authorizing private enforcement.[15] This benefits a state's consumers and the public health given FDA's "limited resources to monitor the thousands of drugs on the market after they have been approved," let alone "the vast marketplace of consumer products that have never been submitted to FDA for pre-market review."[16]

40.     Today, state laws generally prohibit the sale of drugs that are misbranded or adulterated, and many states prohibit the sale of prescription drugs that lack required approval.

41.     For example, Alaska's Food, Drug, and Cosmetic Act prohibits the sale of a "new drug" unless "an application for it has become effective under the federal act" or an application has been submitted to the Alaska health commissioner. Alaska Stat. Ann. § 17.20.110(a)(1)-(2).

---

[13]    FDA, *A History of the FDA and Drug Regulation in the United States* (2006), https://www.fda.gov/files/drugs/published/A-History-of-the-FDA-and-Drug-Regulation-in-the-United-States.pdf.

[14]    Kara W. Swanson, *Food and Drug Law as Intellectual Property Law: Historical Reflections*, 2011(2) WISCONSIN L. REV. 331, 349 (2011).

[15]    *See Wyeth v. Levine*, 555 U.S. 555, 574-75 (2009) (finding that the lack of an express preemption clause in the FDCA for prescription drugs "is powerful evidence that Congress did not intend FDA oversight to be the exclusive means of ensuring drug safety and effectiveness").

[16]    Brief for the United States as Amicus Curiae, *Athena Cosmetics, Inc. v. Allergan, Inc.*, 576 U.S. 1054 (2015) (No. 13-1379), 2015 WL 2457643.

42.    Colorado law prohibits the sale of "any new drug not authorized to move in interstate commerce under appropriate federal law."  Colo. Rev. Stat. Ann. § 12-280-131(1).

43.    Connecticut's Uniform Food, Drug and Cosmetic Act prohibits the sale of "any new drug unless an application with respect thereto has been approved under Section 355 of the federal act or, when not subject to the federal act . . . there has been filed with the commissioner an application."  Conn. Gen. Stat. Ann. § 21a-110(a).

44.    Hawaii's Food, Drug, and Cosmetic Act prohibits the sale of any new drug unless "an application with respect thereto has been approved and the approval has not been withdrawn under section 505 of the Federal Act, or when not subject to the Federal Act . . . there has been filed with the director of health an application."  Haw. Rev. Stat. Ann. § 328-17(a)(1)-(2).

45.    North Carolina's Food, Drug and Cosmetic Act prohibits the sale of a "new drug" unless "an application for with respect thereto has been approved and said approval has not been withdrawn under section 505 of the federal act" or an application has been submitted to the North Carolina health commissioner.  N.C. Gen. Stat. Ann. § 106-135.

46.    South Carolina prohibits "introduction into intrastate commerce any new drug unless an application filed [with the Director of Health and Environmental Control] is effective with respect to such drug, or an application with respect thereto has been approved and such approval has not been withdrawn under Section 505 of the Federal act."  S.C. Code Ann. § 39-23-70(a).

47.    Tennessee's Food, Drug and Cosmetic Act prohibits the sale of "any new drug unless an application with respect to the drug has become effective under § 505 of the federal act."  Tenn. Code Ann. § 53-1-110.

48.    The Texas Food, Drug, and Cosmetic Act states that "A person shall not sell, deliver, offer for sale, hold for sale or give away any new drug unless: [] an application with respect thereto has been approved and the approval has not been withdrawn under Section 505 of the [Federal Food, Drug, and Cosmetic Act]" and "a copy of the letter of approval or approvability issued by the United States Food and Drug Administration is on file with the department if the product is manufactured in this state."  Tex. Health & Safety Code § 431.114(a).

49.    Finally, Washington law prohibits "introduction into intrastate commerce any new drug which is subject to section 505 of the federal act unless an application with respect to such drug has become effective thereunder."  Wash. Rev. Code § 69.04.570.

## II.    DRUG COMPOUNDING

### A.    Compounded Drugs Are Neither Tested Nor FDA-Approved

50.    Compounded drugs live at the other end of the regulatory spectrum:  they are not FDA approved, do not undergo clinical trials, are not made pursuant to cGMP, and are not subject to pharmacovigilance requirements like adverse event reporting.  Indeed, FDA generally does not even know what compounded drugs are produced or sold in the United States, where they are made, or by whom.[17]

51.    Drug compounding is a "practice in which a licensed pharmacist, a licensed physician or, in the case of an outsourcing facility, a person under the supervision of a licensed pharmacist, combines, mixes or alters ingredients of a drug to create a medication tailored to the needs of an individual patient."[18]  For example, if an individual patient is allergic to an ingredient

---

[17]    *See, e.g.*, Congressional Research Service, *Drug Compounding: FDA Authority and Possible Issues for Congress* (Jan. 5, 2018) ("[T]he majority of compounding facilities in the United States do not register with FDA …. This means that FDA often is unaware of potential problems with the drug products or facility conditions unless the agency receives a complaint.").

[18]    FDA, *Human Drug Compounding* (May 15, 2025), https://www.fda.gov/drugs/guidance-compliance-regulatory-information/human-drug-compounding.

in an FDA-approved medicine, a compounding pharmacy could produce a version of that medication that does not contain the allergen for that individual patient.

52.     As FDA has made clear, "[c]ompounded drugs are not FDA-approved."[19]  FDA does not review compounded drugs to evaluate their safety, effectiveness, or quality before they reach patients.

53.     Unlike FDA-approved medications, compounded drugs are also not tested in preclinical studies or in clinical trials.  Further, compounding pharmacies are not subject to many prescription drug labeling requirements and need not comply with cGMP.  Additionally, they are not subject to any federal reporting requirements for adverse events.

54.     For these and other reasons, FDA has warned that "[c]ompounded drugs . . . do not have the same safety, quality, and effectiveness assurances as approved drugs.  Unnecessary use of compounded drugs . . . exposes patients to potentially serious health risks."[20]  FDA further advises that "compounded drugs should only be used to meet a patient's needs if the patient's medical needs cannot be met by an available FDA-approved drug."[21]

### B.     Compounded Drugs Expose Patients to Serious Health Risks

55.     Drug compounding exposes patients to serious health risks, and compounded drugs have caused serious patient harm.  For this reason, Congress has repeatedly narrowed the scope of permissible compounding to ensure that (1) the mass production of prescription drugs only occurs in facilities that are required to follow cGMP, and (2) that mass-produced prescription

---

[19]   FDA, *Compounding and the FDA: Questions and Answers* (Nov. 15, 2024), https://www.fda.gov/drugs/human-drug-compounding/compounding-and-fda-questions-and-answers.

[20]   FDA, *Compounding and the FDA:  Questions and Answers* (June 29, 2022), https://web.archive.org/web/20240803214713/https://www.fda.gov/drugs/human-drug-compounding/compounding-and-fda-questions-and-answers.

[21]   FDA, *FDA Alerts Health Care Providers, Compounders and Patients of Dosing Errors Associated with Compounded Injectable Semaglutide Products* (July 26, 2024), https://www.fda.gov/drugs/human-drug-compounding/fda-alerts-health-care-providers-compounders-and-patients-dosing-errors-associated-compounded

drugs undergo the rigorous FDA review and approval process to ensure that they are safe and effective *before* they are dispensed to patients.

56.    In the late 1950s, an unapproved drug called thalidomide led to a public health crisis after it had been prescribed and dispensed "to ease morning sickness caused by pregnancy" but caused a "rash of birth defects" in the United States and around the globe.[22]  In response to the thalidomide tragedy, Congress declared "that in order to make regulation of interstate commerce in drugs effective, it is necessary to provide for registration and inspection of *all establishments* in which drugs are manufactured, prepared, propagated, *compounded*, or processed."[23]  *Cf.* 21 U.S.C. § 360(b)(1), (c), (j)(1).  Congress created a narrow exception for pharmacy compounding, permitting law-abiding local pharmacies engaged in the regular dispensing of prescription drugs to compound medicines only in the regular course of their business or for sale at retail. *See id.* § 360(g)(1).

57.    In the late 1980s, after the Supreme Court[24] and Congress[25] confirmed that all copies of innovative drugs require FDA approval, some scoff-law entities sought to evade that requirement under the guise of "pharmacy compounding."  These entities claimed that a state license to act as a pharmacy allowed them to mass-manufacture knockoffs of approved medicines without FDA oversight.  Their mass-produced, unapproved prescription drugs quickly caused serious harm.  For example, in 1990, four patients died after contracting bacterial infections from a knockoff cardioplegia solution, while two patients lost an eye and 10 more were hospitalized

---

[22]    *Abigail Alliance For Better Access to Developmental Drugs v. von Eschenbach*, 495 F. 3d 695, 725 (D.C. Cir. 2007).

[23]    21 U.S.C. 360, note (emphasis added); *see* S. Rep. 87-1744 at 13 (July 19, 1962) ("drugs should not be on the market unless the [FDA] knows who is making them, and where they are being made, and is able to inspect the facilities in which they are being made").

[24]    *United States v. Generix Drug Corp.*, 460 U.S. 453 (1983).

[25]    Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585.

after contracting bacterial infections from knockoff eye drops.[26]  In 1997, a patient experienced an overdose of atropine because the knockoff he received was 100 times superpotent, while two patients were hospitalized after receiving contaminated knockoff riboflavin injections.  Testifying before Congress in 1996, then-FDA Commissioner David Kessler warned that allowing drug manufacturing to continue to occur under the guise of pharmacy compounding would spawn a "shadow industry" of unapproved prescription drugs that "could result in serious adverse effects, including death."[27]

58.     Accordingly, in 1997, Congress added section 503A to the FDCA to eliminate the phenomenon of "large-scale bulk compounding."[28]  Congress intended to eliminate even "small-scale manufacturing under the guise of compounding."  S. Rep. 105-43, 67 (July 1, 1997).  This section imposed significant limitations on permissible compounding, including requirements that a prescriber must first determine that a compounded drug is necessary for an identified patient, that a compounding pharmacy may only create drugs in advance of receiving a prescription in limited quantities, that a compounding pharmacy may not distribute or dispense more than 5% of their total volume of compounded drugs over state lines, and that they may not compound "regularly or in ordinate amounts … any drug products that are essentially copies of a commercially available product." 21 U.S.C. § 353a(a), (b)(1)–(3).

59.     The congressional conference report on the statute emphasized Congress's focus was to ensure compounded drugs are available "as a component of individualized therapy, while limiting the scope of compounding so as to prevent manufacturing under the guise of

---

[26]  Institute for Safe Medication Practices, S*terile Compounding Tragedy is a Symptom of a Broken System on Many Levels* (Oct. 18, 2012), https://tinyurl.com/34d7c6cs.

[27]  Hearings Before the Subcommittee on Health and Environment of the Committee on Commerce, *FDA Reform Legislation*, 31 (May 1, 1996).

[28]  *Med. Ctr. Pharm. v. Mukasey*, 536 F.3d 383, 389-90 (5th Cir. 2008).

compounding."[29]   Congress sought to emphasize the nature of the "essentially a copy" language

as an attempt to mitigate the "readily apparent . . . pretext" many compounders could utilize to

manufacture drugs without the rigors of the FDA-approval process.[30]

60.     The compounding industry then successfully challenged certain advertising

restrictions present in the 1997 version of section 503A, causing the statute to be struck down by

the Supreme Court in 2002.[31]   The Court notably did not contest the need "to draw a line between

small-scale compounding and large-scale drug manufacturing."[32]   The Court agreed that if

compounded drugs are "sold on a large enough scale that they could undergo [safety and efficacy]

testing" then "they must do so."[33]

61.     Following the law's invalidation, unapproved prescription drugs that were mass-

manufactured under the guise of compounding continued to cause significant harm:

- In 2004, 16 patients developed acute hepatitis C from a compounded radiopharmaceutical agent.

- In 2005, 19 patients experienced blood infections, and one patient died from contaminated compounded magnesium injections.

- Between 2004 and 2006, 80 patients around the country were infected with bacteria from compounded heparin.

- In 2006, at least 70 patients had severe hypersensitivity reactions to a compounded betamethasone injection.

- In 2007, three patients were killed by compounded colchicine injections, while eight patients were infected with bacteria, and one patient died from compounded fentanyl.

---

[29]   Conference Report, Food and Drug Administration Modernization Act of 1997, 105th Congress, House Report 105-399 (Nov. 9, 1997), at 94; *see also* Conference Report, Food and Drug Administration Modernization Act of 1997, 105th Congress, Senate Report 105-43 (Nov. 9, 1997), at 67.

[30]   *Id.*

[31]   *See Thompson v. W. States Med. Ctr.*, 535 U.S. 357 (2002).

[32]   *Id.* at 370.

[33]   *Id.*

- In 2009, nine patients contracted eye infections and one was blinded by compounded hyaluronidase injection.

- In 2011, five patients were blinded by compounded bevacizumab, 15 patients contracted blood infections from compounded saline, and nine patients died from contaminated parenteral nutrition solution.

- In 2012, 47 patients contracted fungal eye infections and the majority lost their vision due to contaminated retinal dye.

62.    In 2012, the New England Compounding Center ("NECC") catastrophe occurred when a compounding pharmacy contaminated copies of a steroid injection that killed more than 100 Americans and sickened hundreds more.[34]  Prompted by this tragedy, Congress reenacted the limitations on pharmacy compounding in Section 503A of the FDCA without the invalidated advertising restrictions.

63.    Even under these more stringent requirements, concerning and serious harm from compounded products continues:

- In 2013, eight patients contracted fungal eye infections from compounded bevacizumab, and 15 patients were infected with bacteria from compounded calcium gluconate injections.

- In 2015, seven patients contracted hepatitis C from a contaminated compounded injection therapy.

- In 2016, three children were hospitalized when they received compounded morphine injections that were 2,500 percent superpotent, while 17 patients contracted fungal infections, and two patients died, after receiving tainted compounded IV medications.

- In 2017, 43 patients reported issues including vision impairment and loss of color perception after receiving tainted compounded eye injections after cataract surgery, while 41 patients reported septic arthritis from contaminated compounded injections.

---

[34]    United States Department of Justice, *Press Release: Former Director of Operations for New England Compounding Center Sentenced* (Dec. 14, 2022), https://www.justice.gov/usao-ma/pr/former-director-operations-new-england-compounding-center-sentenced.

- In 2019, four patients developed eye infections from compounded bevacizumab, while seven patients became ill from contaminated compounded glutathione.

- Between 2019 and 2020, 29 patients contracted toxic anterior segment syndrome from compounded moxifloxacin.

- And in 2021, a compounding pharmacist pled guilty to providing adulterated compounded drugs to surgery patients that contained an excessive amount of an inactive ingredient that can cause eye damage; at least 68 patients were injected with the adulterated drugs leading to near-immediate adverse events, including permanent blindness.

64.    Many more harmful incidents likely remain unknown—because unlike manufacturers of FDA-approved medicines, compounding pharmacies do not have any federal reporting requirements for adverse events that occur when patients take their drugs.

## III.    LILLY'S INJECTABLE TIRZEPATIDE MEDICINES

### A.    Lilly's Long History of Developing and Manufacturing Safe and Effective Medicines

65.    Lilly is an international medicine company and pharmaceutical manufacturer. Throughout its nearly 150-year existence, Lilly has pioneered countless life-changing discoveries. Today, Lilly's medicines help tens of millions of patients across the globe.

66.    Lilly manufactures its medicines under strict controls in state-of-the-art facilities, which employ thousands of highly specialized personnel to ensure that Lilly's medicines meet its rigorous quality and safety standards.  Producing active pharmaceutical ingredients ("APIs") is a complex, methodical, and science-based process.  So is transforming API into a finished medicine.

67.    As an FDA-registered drug manufacturer, Lilly must and does follow cGMP across the design, monitoring, and control of manufacturing processes and facilities—from establishing robust quality management systems to obtaining quality raw materials and detecting and investigating product quality deviations.  Each step—from chemical synthesis of the API to formulation, device assembly, and packaging—requires extensive testing and controls and

specialized equipment.  The result is high-quality, innovative medicines that meet FDA's gold standard and have been approved for distribution in compliance with state laws.

      **B.**    **MOUNJARO® and ZEPBOUND®**

      68.    FDA approved MOUNJARO® and ZEPBOUND® pursuant to Lilly's new drug applications, which were the culmination of the lengthy and expensive clinical trial process described above that is designed to develop, study, and bring safe medicines to patients.

      69.    MOUNJARO® and ZEPBOUND® were approved after nearly a decade of development and have undergone testing in 37 completed clinical trials, with more ongoing.  They are groundbreaking medicines containing a macromolecule Lilly discovered called tirzepatide. Lilly's tirzepatide medicines target patients' GLP-1 (glucagon-like peptide-1) and GIP (glucose-dependent insulinotropic polypeptide) receptors.  These medicines activate both receptors to improve blood sugar control and reduce appetite and food intake.

      70.    Both medicines meet critical patient needs.  MOUNJARO® is FDA-approved to treat type 2 diabetes, and ZEPBOUND® is approved to treat chronic weight management and obstructive sleep apnea in certain adults.  Today, Lilly manufactures, markets, and sells MOUNJARO® and ZEPBOUND® throughout the United States, among other places.

      71.    Lilly is the only lawful source of mass-produced tirzepatide in the United States. Because tirzepatide was a new active ingredient not previously approved by FDA, Lilly earned new chemical entity exclusivity for tirzepatide.  Through at least May 13, 2027, FDA cannot even accept an application from any other person for any other tirzepatide product.

      72.    MOUNJARO® and ZEPBOUND® are approved only as subcutaneous injections. FDA has not approved, and Lilly does not sell, any tirzepatide in oral form and is unaware of any clinical studies demonstrating the safety and effectiveness of that route of administration.

73.     MOUNJARO® and ZEPBOUND® are also approved only as single-active-ingredient drugs, and Lilly is not aware of any clinical studies on tirzepatide as a fixed-dose combination drug product or scientific support for the effectiveness of combining tirzepatide with niacinamide or any other vitamin.

74.     In addition, should a doctor decide that an individual patient needs a vitamin like niacinamide in addition to tirzepatide, there exist numerous vitamin products currently available on the market, in both pill and injectable formulations.  Lilly is unaware of any clinical studies or scientific support indicating that it is necessary to combine niacinamide—or any other additive— with tirzepatide into a fixed-dose combination injection to achieve superior and clinically significant effects or results as compared to tirzepatide alone or taken with a separate over-the-counter product.

## IV.     EMPOWER SELLS UNLAWFUL, UNAPPROVED COMPOUNDED TIRZEPATIDE

### A.     Empower's Compounded Tirzepatide Is Not FDA-Approved and Its Sale Is Unlawful

75.     Empower is engaged in large-scale drug manufacturing under the guise of pharmacy compounding.  Empower boasts that it engages in "commercial-scale production" at its purported "compounding pharmacy" facility and claims to produce over 70,000 drugs per week.[35] Empower's website touts its "High-Volume Production" and asserts that its "streamlined

---

[35]   PR Newswire, *Empower Announces Expansion of Executive Team to Drive Growth and Innovation in Compound Pharmacy* (Apr. 11, 2024), https://www.prnewswire.com/news-releases/empower-announces-expansion-of-executive-team-to-drive-growth-and-innovation-in-compound-pharmacy-302114381.html; PR Newswire, *Empower Pharma to Purchase Eugia Manufacturing Facility in New Jersey for Large Scale Expansion of Personalized Compounded Medicine* (Feb. 5, 2024), https://www.prnewswire.com/news-releases/empower-pharma-to-purchase-eugia-manufacturing-facility-in-new-jersey-for-large-scale-expansion-of-personalized-compounded-medicine-302053371.html.

operations and innovative manufacturing solutions enable efficient large-scale production."[36] Elsewhere, Empower boasts that it operates "global-scale manufacturing facilities"[37] that employ "cutting-edge pharmaceutical technologies to efficiently manufacture custom compounded medications on a large scale."[38]   Indeed, Empower describes itself as a "pharmaceutical manufacturing" business, as well as a "manufacturer" and "wholesaler" that produces "over 400 medications for millions across all 50 states and internationally."[39]

76.    Empower's compounding facility produces injectable drugs in commercial scale batches significantly larger than 250 units.  In August 2024, Empower's compounding pharmacy had to conduct a nationwide recall of over 2,700 units of its estradiol cypionate injections from a single lot due to a lack of assurance of sterility.[40]  And in May 2025, Empower's compounding pharmacy had to conduct a nationwide recall of over 8,200 units of its testosterone cypionate injections from a single lot for a lack of assurance of sterility.[41]

77.    Empower sells compounded tirzepatide in the following forms—and only in the following forms:  3 mg tablets; 4 mg tablets; 5 mg tablets; 4 mL multi-dose vials containing a fixed-dose combination of 68 mg of tirzepatide and 8 mg of niacinamide; 2 mL multi-dose vials containing a fixed-dose combination of 34 mg of tirzepatide and 4 mg of niacinamide; and 2.5 mL

---

[36]   Empower Pharmacy, *IV Therapy Medications*, https://www.empowerpharmacy.com/compound-medication/iv-therapy (last visited July 21, 2025).

[37]   Empower Pharmacy, *Empower Pharmacy is Helping Communities Around the Nation*, https://www.empowerpharmacy.com/compound-medication/empower-news/kprc/ (last visited July 21, 2025).

[38]   Empower Pharmacy, *Our 503B Facility*, https://www.empowerpharmacy.com/about/technology-innovation/facilities/503b/ (last visited July 21, 2025).

[39]   LinkedIn, *Empower Pharmacy*, https://www.linkedin.com/company/empower-pharmacy/ (last visited July 21, 2025).

[40]   FDA Enforcement Report re Empower Pharmacy (Aug. 2, 2024), https://www.accessdata.fda.gov/scripts/ires/?Product=209417.

[41]   FDA Enforcement Report re Empower Pharmacy (May 2, 2025), https://www.accessdata.fda.gov/scripts/ires/?Product=213704.

multi-dose vials containing a fixed-dose combination of 20 mg of tirzepatide and 5 mg of niacinamide. Empower markets the three tablets using the tradename "Tirzepatide ODT" and markets the three injections using the name "Tirzepatide / Niacinamide Injection."[42]

78.    In December 2024, FDA reiterated that compounded drugs that purport to contain tirzepatide (which includes Empower's), "have not undergone FDA premarket review for safety, effectiveness, and quality, and lack a premarket inspection and finding of manufacturing quality that is part of the drug approval process,"[43] and are thus not FDA-approved.

79.    Multiple states prohibit the sale of unapproved drugs and require manufacturers to demonstrate their drugs are safe and effective to sell them. These states include at least Alaska, Colorado, Connecticut, Hawaii, North Carolina, South Carolina, Tennessee, Texas, and Washington. Empower's sale of unapproved compounded tirzepatide is unlawful and constitutes unfair competition in each of these states.

80.    Empower cannot defend its conduct by claiming that its sale of unapproved compounded tirzepatide is authorized by Section 503A of the FDCA. Section 503A allows true compounders to compound and sell prescription drugs under narrowly confined conditions. Empower routinely and regularly does not comply with several of those conditions.

81.    Among other things, Empower fails to follow pharmacy compounding standards established by the United States Pharmacopeia (USP), uses substandard ingredients, fails to obtain necessary prescriptions, fails to maintain true and accurate records, produces more than limited quantities of prescription drugs in advance of prescriptions, distributes or dispenses more than 5%

---

[42]    Empower Pharmacy, *Weight Management Medications*, https://www.empowerpharmacy.com/compound-medication/weight-management/ (last visited July 21, 2025).

[43]    FDA, *Declaratory Order: Resolution of Shortages of Tirzepatide Injection Products (Mounjaro & Zepbound)*, at 10 (Dec. 19, 2024), https://www.fda.gov/media/184606/download.

of its total prescription volume across state lines, and regularly produces large volumes of prescription drugs that are essentially copies of FDA-approved medicines.

82.     In sum, Empower's operations fall outside the scope of lawful compounding, and Empower is unlawfully engaged in the illegal mass-production of unapproved prescription drugs in violation of state laws prohibiting distribution of unapproved drugs.

### B.     Unapproved Compounded Tirzepatide Exposes Patients to Serious Safety Risks

83.     FDA and related state law drug approval requirements exist for good reason.  Drug approval is essential to ensure the quality, safety, and effectiveness of medications available to patients in the United States.  But because of the cost of developing new drugs and the regulatory and financial burden of applying for drug approvals, there exist real financial incentives for companies to engage in large-scale manufacturing of a popular drug without paying the costs of research, clinical studies, or fees and regulatory review associated with drug approval.  When companies circumvent the drug-approval process, safety and effectiveness are, at best, unknown. The danger is not merely theoretical, as manufacturing and distribution of unapproved new drugs as simple as *saline* have caused severe patient injuries, as discussed in Section II.B, *supra*.

84.     Compounded versions of tirzepatide can and have caused real harm.  In July 2024, FDA sent a letter to compounding advocacy organizations warning that it has received "reports describing patients who experienced adverse events following the administration of compounded . . . tirzepatide."[44]  An October 2024 FDA statement warned of "multiple reports of

---

[44]   Letter from Shannon Glueck, Branch Chief, FDA Compounding Branch 4, to Philip Dickison, CEO, Nat'l Council of State Boards of Nursing (July 16, 2024), https://www.pa.gov/content/dam/copapwp-pagov/en/dos/department-and-offices/bpoa/nursing/fda-safety-alert.pdf.

adverse events, some requiring hospitalization, that may be related to dosing errors" associated with compounded tirzepatide injections.[45]

85.    FDA's Adverse Event Reporting System ("FAERS") database includes numerous events reported by patients and healthcare providers identifying serious reactions patients experienced while taking compounded tirzepatide, including tirzepatide compounded with niacinamide, that resulted in disability and hospitalization.[46]    As of April 30, 2025, FDA had received at least one thousand reports of adverse events related to compounded GLP-1 medications, including 480 reports related to the use of compounded tirzepatide.[47]    Crucially, these numbers almost certainly undercount the total harm to patients by a significant margin, because compounding pharmacies in the United States are not required to report adverse events to FDA.

86.    A 2025 study compared FAERS data for compounded GLP-1 medications to that for FDA-approved products, finding that the reporting of prescribing and prescription errors was higher for compounded products, hospitalization associated with adverse effects was reported more frequently for compounded products, and that the reporting of certain adverse effects including abdominal pain, nausea, diarrhea, gallbladder inflammation, and suicidality was higher for compounded drugs.[48]

---

[45]    FDA, *FDA's Concerns with Unapproved GLP-1 Drugs Used for Weight Loss* (May 30, 2025), https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/fdas-concerns-unapproved-glp-1-drugs-used-weight-loss.

[46]    FDA Adverse Events Reporting System (FAERS) Public Dashboard – Tirzepatide Adverse Events, https://fis.fda.gov/sense/app/95239e26-e0be-42d9-a960-9a5f7f1c25ee/sheet/45beeb74-30ab-46be-8267-5756582633b4/state/analysis; https://fis.fda.gov/sense/app/95239e26-e0be-42d9-a960-9a5f7f1c25ee/sheet/45beeb74-30ab-46be-8267-5756582633b4/state/analysis (last visited July 21, 2025).

[47]    FDA, *FDA's Concerns with Unapproved GLP-1 Drugs Used for Weight Loss* (May 30, 2025), https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/fdas-concerns-unapproved-glp-1-drugs-used-weight-loss.

[48]    Kenneth L. McCall et al, *Safety Analysis of Compounded GLP-1 Receptor Agonists: A Pharmacovigilance Study Using the FDA Adverse Event Reporting System*, Expert Opinion on Drug Safety (Apr. 29, 2025), https://doi.org/10.1080/14740338.2025.2499670.

87.    As compounding of tirzepatide has become more prevalent, government agencies have warned the public as to the risks of such products.  Thirty-eight state and territory Attorneys General and State Drug Task Forces have all warned the public about the dangers of these unsafe and unapproved products, including compounders using "non-sterile ingredients" and taking "no steps to sterilize them."[49]  The Obesity Society, Obesity Action Coalition, and Obesity Medicine Association issued a joint statement regarding compounded GLP-1 medications, stating, "[u]nfortunately, many of the available alternatives [to GLP-1 therapies], like compounded versions of semaglutide and tirzepatide, are not what they are advertised to be."[50]  The Pediatric Endocrine Society has also advised that "[c]linicians and patients [] should exercise caution when exploring options for non-brand name medications, particularly avoiding the use of non-FDA approved medications and those that come from non-FDA-approved compounding pharmacies."[51]  Similarly, the JAMA Health Forum published a study that most websites selling compounded anti-obesity medications exclude important safety information and mislead consumers about the safety and effectiveness of their products.[52]  Other patient and consumer groups have issued similar warnings, including the National Consumers League and the American Diabetes Association,

---

[49]    Nat'l Ass'n of Attorneys General, *State and Territory Attorneys General Urge FDA to Take Action Against Counterfeit and Illegally Sold GLP-1 Drugs*, (Feb. 19, 2025), https://www.naag.org/policy-letter/state-and-territory-attorneys-general-urge-fda-to-take-action-against-counterfeit-and-illegally-sold-glp-1-drugs/; FDA, *FDA warns patients and health care professionals not to use compounded drugs from Fullerton Wellness* (Nov. 1, 2024), https://www.fda.gov/drugs/drug-safety-and-availability/fda-warns-patients-and-health-care-professionals-not-use-compounded-drugs-fullerton-wellness.

[50]    Obesity Medicine Ass'n, *Leading Obesity Expert Organizations Release Statement to Patients on Compounded GLP-1 Alternatives* (Jan. 8, 2024), https://obesitymedicine.org/blog/leading-obesity-expert-organizations-release-statement-to-patients-on-glp-1-compounded-alternatives/.

[51]    Pediatric Endocrine Society, *Statement on use of compounded semaglutide and other GLP-1 receptor agonists* (Jan. 16, 2024), https://pedsendo.org/drug-shortages/statement-on-use-of-compounded-semaglutide-and-other-glp-1-receptor-agonists/.

[52]    Ashwin Chetty, et al., *Online Advertising of Compounded Glucagon-Like Peptide-1 Receptor Agonists*, JAMA HEALTH FORUM (Jan 17, 2025), available at https://jamanetwork.com/journals/jama-health-forum/fullarticle/2829225.

which recommended that patients avoid compounded products "due to uncertainty about their content, safety, quality, and effectiveness."[53]

88.    Safety concerns related to unapproved compounded tirzepatide products are exacerbated when it comes to compounders, like Empower, that demonstrate a long history of safety and regulatory violations.

89.    As detailed in Section V.C, *infra*, Empower has failed nine FDA inspections and one state inspection in the last ten years (three in 2024), received an untitled letter and four formal warning letters from FDA (two this year), initiated at least four nationwide recalls of its own injectable drugs (three for lack of assurance of sterility), and been subject to state disciplinary proceedings by at least eight state Boards of Pharmacy.  Further, multiple former employees claim that Empower's regulatory noncompliance is an intentional scheme and that Empower has concealed from regulators additional safety violations.

## V.    EMPOWER'S DECEPTIVE PRACTICES AND FALSE CLAIMS

90.    Empower has also made false claims and engaged in deceptive practices in selling its products in violation of the Lanham Act and state laws.

91.    Specifically, Empower has made and continues to make numerous false and deceptive statements about—and engaged in deceptive trade practices regarding—its tirzepatide products, including: (1) that its untested, unapproved products are safe and effective treatments, despite the fact that these products have never been tested; (2) that its Tirzepatide ODT and tirzepatide/niacinamide injection combination products are custom-made, "personalized"

---

[53] Nat'l Consumers League, *NCL urges the public to heed warnings about unregulated versions of GLP-1 weight loss drugs* (Feb. 4, 2025), https://nclnet.org/the-national-consumers-league-urges-the-public-to-heed-warnings-about-unregulated-versions-of-glp-1-weight-loss-drugs/; Am. Diabetes Ass'n, *The American Diabetes Association Announces Statement on Compounded Incretin Products* (Dec. 2, 2024), https://diabetes.org/sites/default/files/2024-12/24.11.8%20compounding%20statement%20press%20release_FINAL.pdf.

products, when they are not; and (3) that Empower adheres to regulatory requirements and maintains high-quality standards, when it does not.

92.    These statements necessarily deceive consumers as to the nature and quality of Empower's products.  They have the tendency to lure the unassuming public away from using safe, clinically tested medicines like those made by Lilly.

## A.    Empower Deceptively Promotes Knockoff Tirzepatide Drugs as Safe and Effective Treatments for Weight Management and Type 2 Diabetes

93.    Empower deceptively promotes its Tirzepatide ODT and tirzepatide/niacinamide combination drugs to providers and consumers as safe and effective treatments for both type 2 diabetes and weight management.[54]

### 1.    Empower's False and Deceptive Claims Regarding Tirzepatide ODT

94.    Empower tells providers and consumers that Tirzepatide ODT safely and effectively "activates both glucagon-like peptide-1 (GLP-1) and glucose-dependent insulinotropic polypeptide (GIP) receptors" and thereby "enhances insulin production and secretion from pancreatic beta cells in response to elevated blood glucose levels" and "support[s] glycemic control after meals."[55]  Empower has also told consumers and providers that its oral tirzepatide tablets "play a role in blood sugar regulation," "contribute to a decreased lead[] to a reduction in appetite," "support the body's natural metabolic process" and even "influence fat metabolism."[56]  Without

---

[54]    *See, e.g.*, Empower Pharmacy, *Products,* https://www.empowerpharmacy.com/compounding-pharmacy/ (last visited July 21, 2025); Empower Pharmacy, *Understanding GLP-1s*, https://www.linkedin.com/posts/empower-pharmacy_glp1s-semaglutide-tirzepatide-activity-7239043379265708032-tsvG/ (last visited July 21, 2025); Empower Pharmacy, *Understanding GLP-1s*, https://www.empowerpharmacy.com/compound-medication/weight-management/understanding-glp-1-receptor-agonists/ (last visited July 21, 2025).

[55]    Empower Pharmacy Tirzepatide ODT Product Page, https://www.empowerpharmacy.com/compounding-pharmacy/tirzepatide-odt/ (last visited July 21, 2025).

[56]    Empower Pharmacy Tirzepatide ODT Product Page (Apr. 17, 2025), https://web.archive.org/web/20250417204005/https://www.empowerpharmacy.com/compounding-pharmacy/tirzepatide-odt/.

any clinical trials of oral tirzepatide, however, or even any bioavailability analysis, Empower cannot claim that its oral tirzepatide is safe and effective.

95.    Empower knows and understands that these claims are false and deceptive. Until recently, Empower's CEO was a longstanding board member of the Alliance for Pharmacy Compounding ("APC"), which was formerly known as the International Academy of Compounding Pharmacies ("IACP"), and before that as Professionals and Patients for Customized Care ("P2C2").

96.    For decades, these entities have claimed to be the leading trade associations for the compounding industry. Throughout that time, they have cautioned that compounders "should not make claims as to safety and effectiveness of compounded medications … including performance claims" because those claims "would be false or misleading"[57] and that compounders "should avoid *any* claims, overt or implied, of safety or effectiveness of compounded medications."[58] Most recently, they explained, "*[u]nless a drug is approved by the FDA to treat a specific condition, it cannot be promoted as safe and effective for treating that condition*. This holds true for compounded medications. [Pharmacies] cannot claim that [their] medications and services are *safe* or *effective* treatments."[59] They further warned, "**DON'T** … Make claims as to safety and effectiveness of compounded medications … [or] Make statements, including performance claims, that are false or misleading. A claim is considered misleading if it lacks an adequate documented factual foundation."[60]

---

[57]    IACP, *Legal and Ethical Advertising of Compounded Medications* (archived Aug. 23, 2000).

[58]    IACP, *Legal and Ethical Issues for Pharmacy Websites* (archived Feb. 1, 2004).

[59]    APC, *Best Practices for Marketing Compounded Medications*, 1 (Oct. 9, 2024), https://join.a4pc.org/hubfs/PDFs/2024-10_Best-Practices-for-Marketing-Compounded-Drugs.pdf?hsLang=en (emphasis in original).

[60]    *Id.* at 4 (emphasis in original).

97. Empower's CEO also appears to be the founder and only member of the Coalition for Responsible Compounding ("CRC").[61] He caused CRC to submit complaints to several state agencies against other compounders alleging that their marketing of unapproved peptides was false and misleading.[62]

98. Healthcare providers have repeated Empower's false and deceptive claims, demonstrating that it has deceived the marketplace. For instance, in reliance on Empower's promotion, one provider misleadingly advertises Tirzepatide ODT as "a powerful tool for patients" and "an innovative way to help regulate blood sugar, control appetite" that "offers the same powerful benefits" as Lilly's approved medicines.[63] Again, these claims are not true, and the fact that a provider fell for them underscores the materiality of Empower's false statements.

99. In addition to being deceptive, Empower's promotion of Tirzepatide ODT risks causing significant patient harm. Patients who are duped into taking a potentially ineffective drug do not receive the medicine that they need. Patients who take Empower's drug to help with weight management may not actually lose weight. Patients who take Empower's drug to help treat Type 2 diabetes will likely not see any benefits and may experience a loss of glycemic control with significant adverse consequences.

## 2. Empower's False and Deceptive Claims Regarding Its Combination Tirzepatide/Niacinamide Injection

100. Empower's promotion of its fixed-dose combination product is likewise false and deceptive. Empower has claimed that its combination drugs are safe and effective treatments for

---

[61] Defendants' Third Amended Rule 7.1 Corporate Disclosure Statement, *TMC Acquisitions LLC v. Coalition for Responsible Compounding, et al.*, No. 1:24-cv-00852 (D. Del. Nov. 5, 2024), ECF No. 19.

[62] Complaint, *TMC Acquisitions LLC v. Coalition for Responsible Compounding, et al.*, No. 1:24-cv-00852 (D. Del. July 22, 2024), ECF No. 1.

[63] Ageless Center, *Tirzepatide ODT: Needle-Free Weight Management Now at Ageless Center*, https://agelesscenter.net/blog/tirzepatide-odt-weight-management/ (last visited July 21, 2025).

both diabetes and weight management. For example, Empower has told consumers that its tirzepatide/niacinamide fixed-dose combination drug can be "implemented as a second-line defense against type 2 diabetes for glycemic control," "significantly reduce[] body weight," and "help people with non-alcoholic fatty liver disease."[64] But Empower has not conducted any preclinical studies or clinical trial of any of its combination drugs.

101.    By marketing a fixed-dose combination to providers and consumers, Empower necessarily implies that the added niacinamide has clinically significant therapeutic benefits over and above both tirzepatide alone and tirzepatide and niacinamide taken separately. But there are no studies showing that adding a small amount of niacinamide to tirzepatide has any meaningful, additive effect. Empower certainly has no evidence that the small amount of niacinamide in its drug provides a benefit that cannot be achieved by taking an oral vitamin.

102.    Nevertheless, Empower claims that the niacinamide in its drugs acts as a "metabolic co-factor" and is "essential for the formation of NAD and NADP, which are required for numerous enzymatic reactions related to energy production." Empower also claims that the niacinamide in its drugs "support[] cellular function" and "contribute[] to overall metabolic health."[65]

103.    These statements are unsupported and deceptive. Because of the way different ingredients might interact with each other when combined in a particular fixed-dose combination, even relying on studies or data addressing how each ingredient operates independently does not establish or support claims about the results of both when combined into a single product.[66]

---

[64]    Empower Pharmacy Tirzepatide/Niacinamide Injection Product Page (Mar. 21, 2025), https://www.empowerpharmacy.com/compounding-pharmacy/tirzepatide-niacinamide-injection/.

[65]    Empower Pharmacy Tirzepatide/Niacinamide Injection Product Page, https://www.empowerpharmacy.com/compounding-pharmacy/tirzepatide-niacinamide-injection/ (last visited July 22, 2025).

[66]    For this reason, when FDA evaluates an application for a fixed-dose combination product, it requires the sponsor to demonstrate with specific clinical data that the combination of the two active ingredients produces superior safety and effectiveness to either ingredient if taken alone or as separate single-dose products. *See, e.g.*,

104.    Adding niacinamide to tirzepatide also introduces new risks that Empower fails to disclose to consumers.  Hypersensitivity and other adverse reactions to niacinamide are relatively common,[67] and there have been reports of Empower consumers experiencing adverse events caused by the inclusion of niacinamide in tirzepatide.[68]  Empower's failure to disclose these additional risks also is false and deceptive.

105.    Empower's false claims have actually deceived the marketplace.  For instance, healthcare providers repeat Empower's false and deceptive claims.  In reliance on Empower's promotion, one provider falsely advertises that Empower's combination drug is a clinically effective treatment for type 2 diabetes, and that the addition of niacinamide "serves several important functions."[69]  Consumers also have been deceived, and they have voiced complaints about ineffective Empower tirzepatide products.[70]

### 3.    Empower's False and Deceptive Citation to Lilly's Clinical Trials

106.    In an attempt to substantiate its false and deceptive claims about its unapproved drugs, Empower has made matters worse by citing to Lilly's clinical trials of MOUNJARO® and ZEPBOUND®.[71]

---

21 C.F.R. § 300.50; *cf. United States v. 225 Cartons*, 871 F.2d 409, 416–17 (3d Cir. 1989); *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 571 (S.D.N.Y. 2016).

[67]    Michael N. Habibe and Jesse Z. Kellar, *Niacin Toxicity* (July 25, 2023), https://www.ncbi.nlm.nih.gov/books/NBK559137/.

[68]    Maleficent_Time5917, *Niacinamide in Empower Compound* (May 2024)*,* https://www.reddit.com/r/tirzepatidecompound/comments/1cy85pw/niacinamide_in_empower_compound/.

[69]    Lazar Medical Group, *Empower Pharmacy Tirzepatide* (Nov. 5, 2024), https://www.lazarmedicalgroup.com/post/empower-pharmacy-tirzepatide.

[70]    *See* https://www.tiktok.com/@breezybreese/video/7520737172278742303; https://www.tiktok.com/@breezybreese/video/7520737172278742303?is_from_webapp=1&sender_device=pc&web_id=7519975540145751607.

[71]    Empower Pharmacy Tirzepatide/Niacinamide Injection Product Page (Mar. 21, 2025), https://web.archive.org/web/20250321033524/https://www.empowerpharmacy.com/compounding-pharmacy/tirzepatide-niacinamide-injection/ (citing https://pmc.ncbi.nlm.nih.gov/articles/PMC7843845/; https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8826179/; https://www.ncbi.nlm.nih.gov/books/NBK585056/; https://pubmed.ncbi.nlm.nih.gov/33325008/)

107.    For instance, in its "Product Overview" for its tirzepatide/niacinamide injections, Empower previously claimed that "[a]ccording to recent *clinical studies*, tirzepatide decreases hemoglobin A1C levels more effectively than a placebo."[72]   Empower went on to state the "SURPASS-5 clinical trial revealed a -2.11% drop in hemoglobin A1C levels at per 5mg per week dose."[73]   Empower stated "[t]his was *proven* during a 40-week period."[74]   Empower also stated "[t]irzepatide has been *demonstrated* to function similarly to GLP-1 medicines but more effectively."[75]

108.    It is inherently false and deceptive to claim that clinical studies of an approved medicine say anything at all about an unapproved knockoff.  Empower's references to "clinical trial[s]," "demonstrated [] function," and "proven" results are establishment claims (*i.e.*, a "tests prove" type of claim).  Such claims must be supported by the kind of testing described in the advertisement.  Because Empower lacks the testing discussed in its statement, its claims were false. Empower does not have any clinical data assessing the safety or effectiveness of its unapproved drugs.  Again, because of differences in formulation, clinical studies of an active ingredient in one specific formulation do not establish or support the same results in a different formulation.

### 4.    Empower's False and Deceptive Claims of Equivalence and Superiority

109.    Empower also deceives providers and consumers by telling them that its Tirzepatide ODT is **better** than Lilly's injectable products, stating that its oral tablet is more convenient and easier to use than Lilly's FDA-approved medicines—all while falsely suggesting

---

[72]   Empower Pharmacy Tirzepatide/Niacinamide Injection Product Page (Mar. 21, 2025), https://web.archive.org/web/20250321033524/https://www.empowerpharmacy.com/compounding-pharmacy/tirzepatide-niacinamide-injection/.

[73]   *Id.*

[74]   *Id.*

[75]   *Id.*

equivalent safety and effectiveness to Lilly's injectable tirzepatide medicines.  For example, on its website, Empower claims that its Tirzepatide ODT offers the benefit of "[n]o needles, no refrigeration, no preparation" and "[j]ust an easy, consistent routine."[76]  This statement explicitly and necessarily communicates to patients that they can receive the same health benefits in a more convenient format.

NEW, LOW PRICE

## Tirzepatide *ODT*

Our newest, needle-free GLP-1 - now available at a reduced price - offers an additional option to support weight management.

No needles, no refrigeration, no preparation. Just an easy, consistent routine. Available in three strengths.

110.    Similarly, on its social media channels, Empower tells consumers they can "[s]kip the needle and get customized weight management support with the new Tirzepatide ODT,"[77] suggesting to consumers that they can receive the benefits of an injectable medicine without any of the alleged drawbacks.

---

[76]    Empower Pharmacy Tirzepatide ODT Launch, https://www.empowerpharmacy.com/tirzepatide-odt-launch/. (Last visited July 21, 2025).

[77]    Empower Pharmacy (empowerpharmacy), *Your Weight, Your Way*, INSTAGRAM (Dec. 18, 2024), https://www.instagram.com/empowerpharmacy/p/DDu35cbxfFv/?locale=es_US%3FICID%3DBLOG_MBF_E S.



111.    Empower's advertising therefore falsely promotes Tirzepatide ODT as better (*i.e.*, more convenient and less painful) yet just as safe and effective as Lilly's FDA-approved and clinically tested medicines.    But again, the only FDA-approved and clinically tested route of administration for tirzepatide is via subcutaneous injection, and differences in route of administration—such as injectable versus oral—may produce significant differences in bioavailability and effect.

**B.    Empower Deceptively Promotes Mass-Produced Tirzepatide Drugs as "Personalized" Products**

112.    Empower also falsely promotes that it offers "personalized" "Weight Management" "products for specific patients," including Empower's Tirzepatide ODT and combination tirzepatide/niacinamide injection.[78]   But Empower is not selling custom-made or "personalized" products; in fact, Empower is mass-manufacturing compounded drugs that are pre-determined in standardized formulations that are not specifically designed or altered for the patients who are

---

[78]    Empower Pharmacy, *What Is a Compounding Pharmacy? 503A vs 503B*, https://www.empowerpharmacy.com/compound-medication/news/what-is-a-compounding-pharmacy/ (last visited July 21, 2025).

prescribed them.  Again, Empower's deception lures the unassuming public away from using clinically tested and FDA-approved medicines like Lilly's under the false impression that Empower's medicines are "customized."

113.    The foundation for this deception is Empower's boast that it is "at the forefront of personalized healthcare," "tailoring medications to meet [patients'] unique needs."[79]

> ## Article Summary
>
> At Empower Pharmacy, we take pride in being at the forefront of personalized healthcare, where compounding pharmacies like ours play a crucial role in tailoring medications to meet your unique needs. Understanding the fundamentals is essential for doctors and patients seeking tailored healthcare solutions. Through this blog, we will take you through the fundamentals of compounding, compounded medicines, and their distinct advantages.

114.    Empower has extended this claim to its "weight management" offerings, which it claimed were "custom, high-quality prescriptions" and "patient specific medications."[80]

> Empower supports patients with weight management and body composition concerns. We provide custom, high-quality prescriptions and office-use medications that help people live healthier, happier lives.

---

[79]    Empower Pharmacy. Compounding Pharmacies' Vital Role in Patient Care, https://www.empowerpharmacy.com/compound-medication/news/compounding-empowers-patient-care/ (last visited July 21, 2025).

[80]    Empower Pharmacy, *Weight Management Medications* (Feb. 9, 2025), https://web.archive.org/web/20250209194339/https://www.empowerpharmacy.com/compound-medication/weight-management/.

115.    It asserts that it utilizes "the latest pharmaceutical technology-driven processes to produce compounded drugs tailored to fit individual patients."[81]

116.    But, in reality, there is nothing "personalized" about Empower's compounded Tirzepatide ODT or its tirzepatide/niacinamide combination.  Empower produces the same Tirzepatide ODT and tirzepatide/niacinamide combination in predetermined dosages.  Upon information and belief and online consumer reviews, Empower does not tailor its products to meet unique patient needs; rather, it makes standardized tirzepatide products.

117.    On its website, Empower sells a single Tirzepatide ODT product at fixed dosages.[82] Contrary to its claims of personalization, Empower's website does not offer any opportunity to select additives or adjust dosage to fit a patient's specific needs.



---

[81]    Empower Pharmacy, *Our 503A Facility,* https://www.empowerpharmacy.com/about/technology-innovation/facilities/503a/ (last visited July 21, 2025).

[82]    Empower Pharmacy Tirzepatide ODT Product Page, https://www.empowerpharmacy.com/compounding-pharmacy/tirzepatide-odt/ (last visited July 21, 2025).

118.    Similarly, Empower offers a single combination of tirzepatide and niacinamide at fixed dosages.[83]  Again, Empower's website offers no opportunity to select a different additive or adjust dosage to fit a patient's specific needs.



119.    Online consumer posts confirm that Empower's tirzepatide/niacinamide product is not personalized.   On Reddit, consumers discuss the need to change pharmacies to obtain tirzepatide without niacinamide, because the niacinamide was causing them skin-related issues.[84] If Empower were "personalizing" its tirzepatide/niacinamide injection, consumers would not need to change pharmacies; they would be able to simply request a different combination.   In other words, on information and belief, the *only* injectable tirzepatide product Empower produces contains niacinamide, and there is no personalized, tailored, or customized product for those patients.

---

[83]    Empower Pharmacy Tirzepatide/Niacinamide Injection Product Page, https://www.empowerpharmacy.com/compounding-pharmacy/tirzepatide-niacinamide-injection/ (last visited Mar. 20, 2025).

[84]    Maleficent_Time5917, *Niacinamide in Empower Compound* (May 2024)*,* https://www.reddit.com/r/tirzepatidecompound/comments/1cy85pw/niacinamide_in_empower_compound/.

120.    Nor is Empower individually manufacturing its products for specific patients. Instead, it is mass manufacturing tirzepatide products in large-scale manufacturing facilities. Indeed, Empower's so-called pharmacy facility is specifically designed for mass production—not for "personalization." That facility manufacturers over 70,000 drugs per week,[85] which Empower itself describes as providing "commercial-scale production."[86]

121.    In short, Empower's practice of marketing (sham) "personalized" products is deceptive, because in fact, Empower is mass-manufacturing standardized knockoffs of Lilly's commercially available and FDA-approved medicines.

### C.    Empower Falsely Advertises Regulatory Compliance

122.    Empower also falsely claims to be in compliance with regulatory requirements.

123.    On its website, Empower states to consumers that it "adheres to stringent regulations set by State Boards of Pharmacy, the FDA, and USP standards, and even voluntary quality testing."[87] Elsewhere on its website, Empower again advertises its "multi-pronged quality process adheres to stringent regulatory standards across every step—from ingredient sourcing to fulfilment [*sic*]—so the medications [it] send[s] out are of the highest caliber every time."[88] These advertising statements are literally false.

---

[85]    PR Newswire, *Empower Announces Expansion of Executive Team to Drive Growth and Innovation in Compound Pharmacy* (Apr. 11, 2024), https://www.prnewswire.com/news-releases/empower-announces-expansion-of-executive-team-to-drive-growth-and-innovation-in-compound-pharmacy-302114381.html.

[86]    PR Newswire, *Empower Pharma to Purchase Eugia Manufacturing Facility in New Jersey for Large Scale Expansion of Personalized Compounded Medicine* (Feb. 5, 2024)*, https://www.prnewswire.com/news-releases/empower-pharma-to-purchase-eugia-manufacturing-facility-in-new-jersey-for-large-scale-expansion-of-personalized-compounded-medicine-302053371.html.

[87]    Empower Pharmacy, *Compounding Personalized Healthcare: Shaun Noorian Interviews with Mark Bishop*. https://www.empowerpharmacy.com/compound-medication/news/empower-pharmacy-compounding-personalized-healthcare/ (last visited July 21, 2025).

[88]    Empower Pharmacy, *Technology & Innovation,* https://www.empowerpharmacy.com/about/technology-innovation/ (last visited July. 21, 2025).

124.     In fact, over the course of a decade, FDA and multiple State Boards of Pharmacy have observed persistent safety and quality issues and documented significant violations.

125.     Empower has successfully deceived the marketplace.  For instance, one provider who advertises Empower's unapproved tirzepatide drugs falsely touts that Empower "was last inspected [by FDA] without concern on 8/28/2024."[89]  In fact, by the time the provider made this statement in November 2024, Empower had *already* failed another FDA inspection, in October 2024.

### 1.     Federal and State Regulators Have Observed Numerous Deficiencies in Empower's Safety Practices

126.     FDA first inspected Empower's compounding pharmacy in November 2015. Empower failed the inspection.   Among other things, FDA observed that (1) Empower had produced a purportedly sterile injection contaminated with bacteria, but failed to investigate the issue; (2) Empower did not have adequate procedures "to prevent microbiological contamination in drug products purporting to be sterile"; (3) Empower's aseptic processing areas were deficient; (4) Empower did not assess the stability of the drugs it produced; and (5) Empower had no scientific basis for the "Beyond Use Dates" it assigned to its drugs.[90]

127.     Because Empower failed to adequately remediate those observations, FDA issued a formal Warning Letter to Empower's compounding pharmacy in May 2017.  According to FDA, Empower's "practices for producing sterile drug products" were deficient and had "put patients at risk."   FDA reiterated that Empower lacked adequate procedures "to prevent microbiological

---

[89]     Lazar Medical Group, *Empower Pharmacy Tirzepatide* (Nov. 5, 2024),
         https://www.lazarmedicalgroup.com/post/empower-pharmacy-tirzepatide.

[90]     FDA Form 483 to Empower Clinic Services, LLC (Nov. 25, 2015), https://www.fda.gov/media/95350/
         download.

contamination of drug products purporting to be sterile" and that its aseptic processing areas and protocols for cleaning and disinfecting were deficient.[91]

128.    Around the same time, several state regulators inspected or investigated Empower. In June 2018, Empower entered into a consent decree with Oklahoma based on Empower's illegal sale of knockoffs of FDA-approved medicines.[92]   In July 2019, Empower entered into a similar consent decree with Idaho.[93]   In 2021, Empower received a letter of admonishment from Colorado.[94]   And in 2021, Iowa issued an order finding that Empower was illegally marketing knockoffs of FDA-approved medicines.[95]   Empower challenged that order in Iowa state court, but lost at both the trial and appellate levels.[96]

129.    In January 2023, Empower entered into a stipulated disciplinary order with California after a lengthy investigation.   In the stipulated order, Empower agreed that the California Board of Pharmacy could establish a factual basis at a hearing for the charges included in the Board's Third Amended Accusation, and gave up its right to contest those charges.   The charges included the unlawful compounding of a commercially available drug product, failure to maintain the quality of sterile compounded preparations, failure to obtain active ingredients from an FDA-registered supplier, compounding and dispensing prescriptions without the prescriber's

---

[91]    Letter from Monica Maxwell, Acting Program Division Director, FDA Office of Pharmaceutical Quality Operations Division II, to Arta Shaun Noorian, Owner, Empower Pharmacy, (May 25, 2017), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/empower-clinic-services-llc-516718-05252017.

[92]    Oklahoma Board of Pharmacy, *In re Complaint Against Empower Pharm.* (No. 1510) (June 13, 2018).

[93]    Idaho Board of Pharmacy, *In re License of Empower Pharm.* (No. BOP 18-053) (July 2, 2019), https://edopl.idaho.gov/OnlineServices/_/ (license no. 64890MS).

[94]    Letter from Colorado Dep't of Regulatory Agencies to Empower Pharmacy (Sept. 17, 2019), https://apps2.colorado.gov/dora/licensing/Lookup/PrintLicenseDetails.aspx?cred=931134&contact=992231.

[95]    Iowa Board of Pharmacy, *In re Nonresident Pharm. License of Empower Pharm.* (No. 2018-123) (May 12, 2021), https://documents.iowa.gov/#document=4142123.

[96]    *Empower Pharmacy v. Iowa Bd. Of Pharm.*, 991 N.W.3d 788 (Iowa Ct. App. 2023).

approval for use of a compounded drug, assigning unsupported Beyond Use Dates, and falsifying records of patient allergies.[97]

130.    The settlement with California led to further settlements on the same charges with Florida in November 2024,[98] with Colorado in August 2023,[99] and with Pennsylvania in January 2024.[100]

131.    In November 2023, Empower was inspected again by Iowa regulators, who identified "deficiencies related to sterile, nonsterile, and hazardous drug compounding."  The failed Iowa inspection caused Iowa to issue an emergency order in March 2024, which indefinitely suspended Empower's license based on charges that Empower had sold illegal knockoffs of approved medicines and failed to comply with basic pharmacy rules established by the United States Pharmacopeia ("USP").[101]  Empower settled with Iowa in January 2025, agreed to pay a fine, and agreed to stop distributing its compounded drugs into Iowa.[102]

---

[97]    Corrected Decision and Order, *In the Matter of the Accusation Against Empower Clinic Services, LLC, DBA Empower Pharmacy, Arta Shaun Noorian*, Board of Pharmacy Department of Consumer Affairs State of California (Jan. 18, 2023), at 15:11-12, 21:16-18, 25:6-7, and 13-57, https://www.pharmacy.ca.gov/enforcement/fy2021/ac207117.

[98]    Florida Board of Pharmacy, Settlement Agreement, *State of Florida Department of Health v. Empower Clinic Services, LLC* (Case No. 2023-03021) (Nov. 19, 2024), https://mqa-internet.doh.state.fl.us/MQASearchServices/healthcareproviders/LicenseVerification?LicInd=442&ProCde=2210&dba=Empower%20Pharmacy&org=EMPOWER%20CLINIC%20SERVICES%2C%20LLC.

[99]    Colorado Board of Pharmacy, Consent Agreement and Order, *In re Empower Pharmacy Non-Resident Prescription Drug Outlet Reg.* (No. 2023-1306) (Aug. 8, 2023), https://www.dora.state.co.us/pls/real/DDMS_documents_api.download?p_file=F732836008/2222781_Page1_197890_54694.pdf.

[100]    Pennsylvania Board of Pharmacy, *Bureau of Prof'l & Occupational Affairs v. Empower Pharmacy* (No. 20-54-000737 (Jan. 19, 2024), https://www.pals.pa.gov/#!/page/search (license no. NP000041).

[101]    Emergency Adjudicative Order, *In the Matter of Empower Pharmacy*, Pharmacy Board of the State of Iowa, Case No. 2018-0123 (Jan. 7, 2025), https://documents.iowa.gov/?utm_medium=email&utm_source=govdelivery#document=9592043.

[102]    Settlement Agreement and Final Order, *In the Matter of Empower Pharmacy*, Pharmacy Board of the State of Iowa, Case No. 2018-0123 (Jan. 7, 2025), https://documents.iowa.gov/?utm_medium=email&utm_source=govdelivery#document=9592043.

132.    FDA inspected Empower's pharmacy compounding operations for a second time in December 2023.  Empower failed again.  FDA found that Empower failed to comply with rudimentary requirements, including failing to change or sanitize gloves properly, failing to properly clean or sterilize equipment, failing to use proper aseptic technique when making sterile drugs, and failing to properly control for endotoxin contamination.  FDA also found that Empower was using non-pharmaceutical grade ingredients to manufacture its purportedly sterile drugs.[103]

133.    FDA inspected Empower's pharmacy compounding operations for a third time in October 2024.  Empower failed this inspection too.  FDA stated that Empower was using "visibly dirty" equipment and that rust had been found inside Empower's supposedly state-of-the-art clean room.  FDA found, again, that Empower was using non-pharmaceutical grade ingredients to manufacture its purportedly sterile drugs.  Most concerningly, FDA detailed an incident in which samples taken from *inside* Empower's clean room were tested for microbial contamination and returned a "too numerous to count result" that was identified as the bacteria *paenibacillus lautus*.  Despite the confirmed presence of a bacterial pathogen in its clean room, Empower approved and distributed the entire batch of affected drugs.[104]

134.    When Empower failed to adequately remediate these issues, FDA issued a second formal Warning Letter on April 2, 2025.  FDA stated that there were "serious deficiencies in [Empower's] practices for producing drug products, which put patients at risk" and that Empower's drugs were adulterated for a host of reasons, including unsanitary conditions.[105]

---

[103]    FDA Form 483 to Empower Clinical Services, LLC (Dec. 1, 2023), https://www.fda.gov/media/176194/download.

[104]    FDA Form 483 to Empower Pharmacy (Oct. 4, 2024), https://www.fda.gov/media/185397/download.

[105]    Letter from F. Gail Bormel, Director, Office of Compounding Quality and Compliance, to Jules D'Souza, Director of Quality, Empower Clinic Services LLC (Apr. 2, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/empower-clinic-services-llc-dba-empower-pharmacy-700964-04022025.

135.    The many noted deficiencies at Empower's compounding pharmacy have led to risky injectable drugs being distributed around the country.  For instance, in August 2024, Empower's compounding pharmacy had to conduct a nationwide recall of its estradiol cypionate injections due to a lack of assurance of sterility.[106]  And in May 2025, Empower's compounding pharmacy had to conduct a nationwide recall of its testosterone cypionate injections for a lack of assurance of sterility.[107]

### 2.    Empower's Texas Outsourcing Facility Has an Unacceptable Safety Record Too

136.    Empower also operates a separate outsourcing facility in Texas.  Although Empower claims to no longer make tirzepatide at that facility, it has a similarly concerning safety record.

137.    FDA first inspected Empower's outsourcing facility in Texas in January 2018.  Empower failed the inspection.  FDA issued an observation that Empower failed to investigate when testing revealed quality problems with its drugs, including endotoxin contamination and a potency failure.[108]

138.    When Empower failed to remediate FDA's findings, the Agency issued an informal citation in July 2019.  FDA observed that Empower was using unlawful substances to make sterile injections, meaning that Empower was operating as an illegal manufacturer of unapproved and misbranded drugs.[109]

---

[106]  FDA Enforcement Report re Empower Pharmacy (Aug. 2, 2024), https://www.accessdata.fda.gov/scripts/ires/?Product=209417.

[107]  FDA Enforcement Report re Empower Pharmacy (May 2, 2025), https://www.accessdata.fda.gov/scripts/ires/?Product=213704.

[108]  FDA Form 483 to Empower Pharmacy (Jan. 24, 2018), https://www.fda.gov/media/111056/download.

[109]  Letter from Monica Maxwell, Program Division Director, FDA Office of Pharmaceutical Quality Operations Division II, to Arta Shaun Noorian, CEO, Empower Pharmacy (July 22, 2019), https://www.fda.gov/media/130590/download.

139.    FDA inspected Empower's outsourcing facility in Texas for a second time in March 2020.  Empower failed again.  FDA observed deficient aseptic processing, including failures to maintain "adequate environmental controls during sterile drug production," and determined that Empower was illegally manufacturing knockoffs of approved medicines and had failed to report serious adverse events caused by its drugs.[110]

140.    When Empower failed to adequately respond to FDA's observations, the Agency issued a formal Warning Letter in October 2021 telling Empower that it, among other things, failed to accurately and fully disclose its drugs to the Agency and failed to investigate serious adverse events.[111]

141.    FDA inspected Empower's outsourcing facility in Texas for a third time in August 2022.  Empower failed yet again.  FDA determined that Empower's aseptic procedures were deficient and did not include "procedures designed to prevent microbiological contamination of drug products purporting to be sterile."  FDA noted the build-up of "rust and/or discoloration" on carts and tables where aseptic drugs were made.  FDA also found that Empower was illegally using APIs from unregistered sources to make sterile drugs and had also used ingredients that were not suitable for pharmaceutical use.  And FDA found that Empower was still not properly reporting serious adverse events.[112]

142.    Following that inspection, the Virginia Board of Pharmacy moved to block Empower's license to do business as an outsourcing facility in that state in March 2024.  Empower

---

[110]  FDA Form 483 to Empower Clinic Services LLC, at 2 (Mar. 6, 2020), https://www.fda.gov/media/137544/download.

[111]  Letter from Tamala Bogan, Acting Program Division Director, FDA Office of Pharmaceutical Quality Operations Division II, to Arta Shaun Noorian, Owner, Empower Pharmacy, at 2 (Oct. 15, 2021), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/empower-clinic-services-llc-dba-empower-pharmacy-613792-10152021.

[112]  FDA Form 483 to Empower Clinic Services LLC, at 1–12 (Aug. 5, 2022), https://www.fda.gov/media/162155/download.

46

agreed to consent decree in September 2024. As part of that decree, Empower stipulated that it had violated Virginia regulations and statutes. Empower further conceded that it had used active ingredients with invalid certificates of analysis, as well as ingredients labeled "Not for Drug Use," "Food Grade," and "Food Additive" to manufacture sterile drugs. Empower conceded that it had used an active ingredient knowing that it had been confirmed to contain endotoxin. Empower conceded that it had not properly reported serious adverse events. And it conceded, in 2024, that it had not changed the air filters used in its aseptic operations *since 2019*.[113]

143.    FDA inspected Empower's outsourcing facility in Texas for a fourth time in August 2024. FDA again cited Empower for failing to maintain "[p]rocedures designed to prevent microbiological contamination of drug products purporting to be sterile." FDA observed concerning conduct by Empower employees, including an Empower technician "picking up a pair of scissors off the ISO-7 floor," wiping them, and "plac[ing] the scissors back into the ISO-5 hood." FDA determined that Empower had "released a batch of a sterile product even though positive microbial growth was detected" and failed to adequately investigate a report of "fungi" in a production batch. And FDA observed Empower's continued failure to properly report serious adverse events.[114]

144.    Empower's many failures at its Texas outsourcing facility led to yet another formal Warning Letter on April 2, 2025 (the same day that FDA sent its separate Warning Letter to Empower's compounding pharmacy). FDA determined that "serious deficiencies in [Empower's] practices for producing drug products intended or expected to be sterile" had "put patients at risk." FDA also determined that Empower's drugs were adulterated for a host of reasons, including

---

[113]    Consent Order, *In re Empower Pharmacy, Renewal Applicant*, Virginia Board of Pharmacy, Case No. 225928 (Sep. 4, 2024).

[114]    FDA Form 483 to Empower Pharmacy (Aug. 28, 2024), https://www.fda.gov/media/182593/download.

unsanitary conditions and numerous failures to comply with cGMP. FDA also observed that "[r]epeated failures demonstrate that executive management oversight and control over the manufacture of drugs is inadequate."[115]

145.    The many noted deficiencies at Empower's Texas outsourcing facility have led to substandard injectable drugs being distributed around the country. For instance, in May 2023, Empower's Texas outsourcing facility had to conduct a nationwide recall of its ascorbic acid injection because it was misbranded.[116] And in September 2024, Empower's Texas outsourcing facility had to conduct a nationwide recall of its pyridoxine (vitamin B-6) injections due to a lack of assurance of sterility.[117]

### 3.    Empower's New Jersey Outsourcing Facility Has a Similarly Concerning Safety Record

146.    In 2023, an unrelated generic drug manufacturer was developing a new 170,000 square foot manufacturing plant in East Windsor, New Jersey. The plant was intended to manufacture generic injections subject to approved ANDAs.

147.    FDA conducted a preapproval inspection of the facility in December 2023. The plant failed that inspection, drawing observations such as "[t]here is no quality control unit," as well as findings that the aseptic processing areas were deficient and the building and the equipment therein were not suitable for manufacturing, processing, packing, or holding drug products.[118]

---

[115]    Letter from F. Gail Bormel, Director, Office of Compounding Quality and Compliance, to Arta Shaun Noorian, CEO, Empower Pharmacy (Apr. 2, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/empower-clinic-services-llc-dba-empower-pharma-700962-04022025.

[116]    FDA Enforcement Report re Empower Pharmacy (May 12, 2023), https://www.accessdata.fda.gov/scripts/ires/?Product=200587.

[117]    FDA Enforcement Report re Empower Pharmacy (Sep. 5, 2024), https://www.accessdata.fda.gov/scripts/ires/?Product=209942.

[118]    FDA Form 483 Report to Eugia US Manufacturing LLC (Dec. 22, 2023), https://www.fda.gov/media/175809/download.

148.    Because it failed the preapproval inspection, the generic drug maker could not use the site to make FDA-approved injections.  Further, remediating FDA's many serious observations would likely have taken significant time and the investment of significant capital.  Before bringing the site into compliance, the manufacturer sold the entire site, including equipment and workforce, to Empower, which was willing to immediately activate the site as an outsourcing facility and to immediately start manufacturing injections without FDA's approval.  Empower reportedly made an upfront payment of $52 million and agreed to pay an additional $58 million over 20 years for the facility.[119]  At the time, Empower boasted that the New Jersey facility would enable it to produce "50 million vials" of sterile injections every year.[120]  By contrast, manufacturing sites for FDA-approved medicines routinely cost *billions* of dollars to build and develop.[121]

149.    Empower utterly failed to remediate FDA's observations.  FDA reinspected the site under Empower's ownership in November 2024.  In a facility designed to manufacture 50 million sterile injections every year, FDA's inspectors determined that Empower lacked basic procedures and controls to "assure that the drugs products have the identity, strength, purity, and quality that they are purported or represented to possess."  FDA's inspectors further determined that when Empower attempted to qualify the systems it uses "for analytical and microbial drug product testing" and "to produce sterile injectable parenteral drug products," testing revealed seven

---

[119]    Capital Market, *Eugia US Manufacturing to dispose its assets to Empower Clinic Services New Jersey* (Feb. 5, 2024), https://www.capitalmarket.com/markets/news/corporate-news/eugia-us-manufacturing-to-dispose-its-assets-to-empower-clinic-services-new-jersey/1487672.

[120]    PR Newswire, *Empower Pharma to Purchase Eugia Manufacturing Facility in New Jersey for Large Scale Expansion of Personalized Compounded Medicine* (Feb. 5, 2024), https://www.prnewswire.com/news-releases/empower-pharma-to-purchase-eugia-manufacturing-facility-in-new-jersey-for-large-scale-expansion-of-personalized-compounded-medicine-302053371.html.

[121]    Eli Lilly and Company, *Lilly Announces $3 Billion Expansion of its Recently Acquired Manufacturing Facility in Wisconsin* (Dec. 5, 2024), https://investor.lilly.com/news-releases/news-release-details/lilly-announces-3-billion-expansion-its-recently-acquired; Eli Lilly and Company, *Lilly Announces New $4.5 Billion Site* (Oct. 2, 2024), https://investor.lilly.com/news-releases/news-release-details/lilly-announces-new-45-billion-site-lilly-medicine-foundry-drive.

different instances of contamination with gram-negative, pathogenic bacteria.  FDA's inspectors further found that *after* Empower had purported to qualify its systems for production, there remained "ongoing gram negative bacterial contamination" in Empower's systems involving 450 different "pathogenic bacteria colonies."  Egregiously, Empower had failed to investigate any of this contamination.[122]

### 4.    Whistleblowers Have Also Raised Red Flags About Empower's Safety Violations

150.    Whistleblowers have alleged that Empower's noncompliance is an intentional scheme directed by Empower's CEO.

151.    For example, Empower's former Director of Supply Chain, Samuel Pray, has alleged that when he began at Empower in May 2022, Empower was "failing to comply with a multitude of FDA regulations," including "us[e] of adulterated and contaminated products when compounding for consumer use (including injectable medications)"; "fail[ures] to properly sterilize equipment"; lack of "written policies and processes for storing ingredients, disposing of adulterated products, packaging products, and cleaning equipment"; "fail[ure] to conduct sample checks to ensure quality of products"; "fail[ure] to investigate complaints received regarding drugs that lacked quality"; and "fail[ure] to report adverse events."[123]

152.    According to Mr. Pray, Empower purchases "pharmaceutical ingredients from unregistered suppliers" and uses "food and cosmetic grade" ingredients when making "injectable and other drug products" "intentionally" in order "to cut costs."[124]  The directive to use "food or

---

[122]    FDA Form 483 Report to Empower Clinic Services New Jersey, LLC (Nov. 18, 2024).

[123]    Defendant Sam Pray's Original Answer, Verified Denials, Affirmative Defenses, and Counterclaims at ¶ 3 (Jan. 27, 2025), *Empower Clinic Services, L.L.C. d/b/a Empower Pharmacy v. Samuel Pray, Revive Rx, LLC, PSW Group LLC, and Striker Pharmacy LLC*, D. Ct. Harris County Tx., No. 2024-85045 ("Pray Answer").

[124]    *Id.* ¶¶ 3, 4(a), 5.

animal grade" ingredients came from "Empower's CEO," who asserted "that the best time to purchase and use these illegal products is right after the FDA inspects Empower because the FDA is not likely to inspect Empower's facility again any time soon."[125]

153.    Consistent with that directive, Empower reportedly purchases drug ingredients from "surreptitious Gmail and Yahoo accounts" that are not registered with FDA and are instead "middlemen" that sell ingredients "at half the cost compared to reputable providers," rather than "from verifiable or reputable entities."[126]  This includes bulk tirzepatide drug substance.  As one example, Empower purchased a *kilogram* of bulk tirzepatide of unknown origin (enough to make up to *400,000* finished tirzepatide drugs) from a front called Gabar Health Sciences ("Gabar").[127] Despite knowing that the Gabar tirzepatide was counterfeit, Empower reportedly used that API to make tirzepatide drugs that were distributed to consumers.[128]  Afterward, Empower reportedly falsified records to conceal its use of inappropriate ingredients.[129]

154.    According to Mr. Pray, these violations are intentional:  Mr. Pray has alleged Empower's leadership "[a]ctively creat[es] and enforc[es] a culture of disguise . . . including directives . . . to not keep records."[130]  Finally, Mr. Pray has alleged that Empower conceals its regulatory violations through intimidation tactics that prevent employees from speaking out.

---

[125]    *Id.* ¶ 6.

[126]    *Id.* ¶¶ 7-8, 79.

[127]    *Id.* ¶ 9.  Although Gabar claims to be an API manufacturer, it appears to have no real-world presence and to operate out of a "virtual" office at the Hartsfield Airport in Atlanta, Georgia.  *See* Gabar Health Sciences, https://gabarhealthsciences.com/.

[128]    Pray Answer ¶ 9 and Exhibit A.

[129]    *Id.* ¶ 10.

[130]    *Id.* ¶ 73(r).

155.    Mr. Pray is not the only former employee to raise concerns with Empower's practices.  Indeed, Empower's alleged "campaign of suing or threatening to sue employees"[131] is reflected in its ongoing litigation against former employee and fellow whistleblower, Matthew Ludowig.[132]    According to Mr. Ludowig, his memo "explaining that Empower was illegally producing impure GLP-1s and distributing them to thousands of consumers" led to his demotion within two weeks.[133]    He further alleges that his subsequent concerns regarding "other illegal activities related to fundraising efforts spearheaded by Empower's CEO" were no better received, and that he was fired shortly thereafter.[134]    Like Mr. Pray, Mr. Ludowig notes that Empower's selective litigation against former employees suggests "that Empower is targeting him because he possesses information directly related to Empower's illegal activity and that he objected to the same, making him a risk."[135]

*      *      *

156.    In summary, Empower falsely advertises to providers and consumers that it complies with state and federal regulatory standards.  Such claims are clearly false based on a ten-year history of regulatory violations, as evidenced by: nine failed FDA inspections (three in 2024); at least one failed state inspection; four formal FDA Warning Letters (two this year); one FDA Untitled Letter; at least four nationwide recalls of injectable drugs (three for lack of assurance of sterility); state disciplinary proceedings by at least Oklahoma, Idaho, Colorado, Iowa, California,

---

[131]    *Id*. ¶ 20.

[132]    *Empower Clinic Services, L.L.C. v. Bio Filling Solutions Inc. et al*, 4:23-cv-04123, Dkt. 133 (S.D. Tex. Oct. 30, 2023)

[133]    *Id*. at 7.

[134]    *Id*.

[135]    *Id*. at 8.

Florida, Pennsylvania, and Virginia; and whistleblowers who claim that the noncompliance is an intentional scheme.

## VI.    EMPOWER'S HARMS TO CONSUMERS AND LILLY

157.    Empower's unlawful, false, and deceptive promotion and sale of untested and unapproved Tirzepatide ODT and tirzepatide/niacinamide injections have harmed Lilly and consumers.  That harm will continue if left unchecked.

158.    *First*, Empower engages in unfair competition by unlawfully selling its unapproved compounded tirzepatide products to customers throughout Alaska, Colorado, Connecticut, Hawaii, North Carolina, South Carolina, Tennessee, Texas, and Washington.  Some sales made by Empower of its compounded tirzepatide products would have been made by Lilly but for Empower's unlawful and unfair competition, and Lilly has suffered financial harm as a direct result.

159.    *Second*, Empower's unlawful, false and deceptive sales and practices lure consumers away from obtaining safe and effective treatment with MOUNJARO® and ZEPBOUND® on the false promises that (i) untested and unapproved Empower oral disintegrating tablets and tirzepatide/niacinamide injections are safe and effective in treating diabetes and addressing chronic weight management, (ii) Empower's untested and unapproved compounded tirzepatide/niacinamide injections and tirzepatide oral disintegrating tablets fit patients' unique needs, when, in truth, Empower is marketing and selling the same tirzepatide/niacinamide injections and tirzepatide oral disintegrating tablets to every consumer, and/or (iii) Empower is in compliance with regulatory requirements.

160.    *Third*, Empower's false and deceptive practices cause irreparable harm to Lilly's brand and customer goodwill by promising results that consumers will not obtain from Empower's products.  Empower promotes its Tirzepatide ODT and tirzepatide/niacinamide injections by

trading on the credibility of Lilly and its FDA-approved MOUNJARO® and ZEPBOUND®—earned through decades of safe and effective pharmaceutical manufacturing and years of clinical research and testing on tirzepatide specifically—including by specifically citing studies of Lilly's medicines as support for its untested and unapproved knockoffs.  When consumers fail to achieve desired results from Empower's Tirzepatide ODT and combination injection, consumers are likely to conclude that tirzepatide is ineffective in general—an outcome made more likely given Empower's reliance on Lilly's clinical studies.  Worse still, consumers are likely to be harmed using compounded tirzepatide products from a pharmacy like Empower that has a long record of safety lapses, and when they are, consumers are likely to draw unwarranted conclusions about the safety and effectiveness of Lilly's FDA-approved tirzepatide medicines.

**FIRST CAUSE OF ACTION**
**Unfair Competition and Deceptive Trade Practices**
**in Violation of the Alaska Unfair Trade Practices and Consumer Protection Act**
**Alaska Stat. Ann. §§ 45.50.471 *et seq*. and Alaska Common Law**

161.    Lilly repeats and realleges each and every allegation above as if fully set forth herein.

162.    Empower's tirzepatide tablets and injections are prescription drugs.

163.    Empower has not conducted any preclinical studies or clinical trials of its tirzepatide tablets or injections.

164.    Empower has not filed any application seeking approval for its tirzepatide tablets or injections with any regulator.

165.    No regulator has ever determined that Empower's tirzepatide tablets or injections are safe and effective.  No regulator has ever approved them for sale.

166.    The Alaska Unfair Trade Practices and Consumer Protection Act (UTPA) declares "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce . . . to be unlawful."  Alaska Stat. Ann. § 45.50.471(a).

167.    Under the UTPA, an act is unfair if it "offends public policy as it has been established by statutes, the common law, or otherwise," if it "is immoral, unethical, oppressive, or unscrupulous," and if "it causes substantial injury to consumers (or competitors or other businessmen)."  *Kenai Chrysler Center, Inc. v. Denison*, 167 P.3d 1240, 1255 (Alaska 2007).

168.    In the course of trade and commerce in Alaska, Empower engages in unfair methods of competition and unfair practices in violation of Alaska Stat. Ann. § 45.50.471(a). Empower does so by unlawfully selling unapproved drugs in Alaska, including its Tirzepatide ODT and tirzepatide/niacinamide injections, in violation of Alaska Stat. Ann. §§ 17.20.110(a)(1)-(2), which proscribes the sale of unapproved new drugs.

169.    Empower's tirzepatide tablets and injections are new drugs within the meaning of Alaska Stat. Ann. § 17.20.370 because they are not generally recognized among experts as safe for use under the conditions prescribed, recommended, or suggested in their labeling.

170.    Empower also engages in deceptive trade practices in violation of Alaska Stat. Ann. § 45.50.471(a).  Empower deceives consumers by marketing and selling its Tirzepatide ODT and tirzepatide/niacinamide injections to treat weight issues while misciting inapplicable clinical trials and materially omitting that no data exists to support its use for any purpose.  In doing so, Empower purports that its disintegrating tirzepatide tablets and tirzepatide/niacinamide injections are safe and effective prescription medications.

171.    Empower further engages in deceptive trade practices by marketing and selling its Tirzepatide ODT and tirzepatide/niacinamide injections as unique, personalized, compounded

55

medicine, when, in fact, Empower does not tailor its unapproved and untested drugs to patients'
needs at all.  Empower falsely states that its tirzepatide/niacinamide injections are "personalized
formulations," "custom combination[s]," and "tailored to fit individual patients."

172.    Empower's sales practices are deceptive in a material way by, among other things,
steering patients with serious diseases like diabetes and obesity away from obtaining safe,
effective, and FDA-approved treatments.  Empower's unlawful conduct is putting health, safety,
and lives at risk.

173.    Empower's consumer-oriented conduct actually or has likely deceived consumers
and is likely to continue to deceive them.

174.    Empower's conduct has caused substantial injury to Lilly in the form of lost sales,
lost revenues, lost market share, and loss of customers that is not outweighed by countervailing
benefits to any consumers or competition.

175.    As a direct and proximate result of Empower's unlawful, unfair, and deceptive
business practices, Lilly has suffered and will continue to suffer monetary damages and discernible
competitive injury by the loss of goodwill associated with Lilly's MOUNJARO® and
ZEPBOUND® tirzepatide medicines.

176.    Lilly, as a "person who was the victim of [an] unlawful act" under Alaska Stat.
Ann. § 45.50.471, has standing to bring its claims against Empower under Alaska Stat. Ann.
§§ 45.50.531 and 45.50.535.

177.    Empower is liable to Lilly for damages in amounts to be proven at trial, including
attorneys' fees and costs, injunctive relief enjoining Empower from further violating the law, and
any other remedies the Court may deem appropriate under Alaska law.

## SECOND CAUSE OF ACTION
### Unfair and Deceptive Trade Practices
### in Violation of the Colorado Consumer Protection Act
### Colo. Rev. Stat. § 6-1-105(z)

178.    Lilly repeats and realleges each and every allegation above as if fully set forth herein.

179.    Under the Colorado Consumer Protection Act (CCPA), "A person engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation, the person: … Refuses or fails to obtain all governmental licenses or permits required to perform the services or to sell the goods, food, services, or property as agreed to or contracted for with a consumer."  Colo. Rev. Stat. § 6-1-105(z).

180.    Colorado law prohibits the sale of "any new drug not authorized to move in interstate commerce under appropriate federal law."  Colo. Rev. Stat. § 12-280-131(1).

181.    Empower's tirzepatide tablets and injections are unapproved new drugs within the meaning of 21 U.S.C. § 321 and are not authorized to move in interstate commerce under appropriate federal law.

182.    Empower has engaged in an unlawful, unfair, and deceptive trade practice by selling unapproved drugs in Colorado, including its Tirzepatide ODT and tirzepatide/niacinamide, in violation of Colorado law governing the sales of new drugs, Colo. Rev. Stat. § 12-280-131. Empower has failed to obtain all governmental licenses or permits required to sell its drugs, and therefore violates the CCPA, Colo. Rev. Stat. § 6-1-105(z).

183.    Empower has also engaged in a deceptive trade practice in violation of Colo. Rev. Stat. § 6-1-105(e) and (rrr).  Empower knowingly deceives consumers by marketing and selling its Tirzepatide ODT and tirzepatide/niacinamide injections to treat weight issues while misciting inapplicable clinical trials and materially omitting that no data exists to support its use for any

purpose.    In doing so, Empower purports that its disintegrating tirzepatide tablets and tirzepatide/niacinamide injections are safe and effective prescription medications.

184.    Empower further engages in deceptive trade practices by marketing and selling its Tirzepatide ODT and tirzepatide/niacinamide injections as unique, personalized, compounded medicine, when, in fact, Empower does not tailor its unapproved and untested drugs to patients' needs at all.  Empower falsely states that its tirzepatide/niacinamide injections are "personalized formulations," "custom combination[s]," and "tailored to fit individual patients."

185.    Empower's unlawful, unfair, and deceptive trade practices significantly impact the public as actual or potential consumers of Empower's Tirzepatide ODT and tirzepatide/niacinamide injections.

186.    As a direct and proximate result of Empower's unlawful, unfair and deceptive trade practices, Lilly has suffered and will continue to suffer monetary damages and discernible competitive injury by the loss of goodwill associated with Lilly's MOUNJARO® and ZEPBOUND® tirzepatide medicines.

187.    The CCPA creates a private cause of action "against any person who has engaged in or caused another to engage in any deceptive trade practice listed in this article. An action under this section shall be available to any person who… [i]n the course of the person's business or occupation, is injured as a result of such deceptive trade practice." Colo. Rev. Stat. § 6-1-113(1)(c).

188.    Lilly qualifies as a person under the CCPA who can bring an action as the CCPA defines "person" as an "individual, corporation, business trust, estate, trust, partnership, unincorporated association, or two or more thereof having a joint or common interest, or any other legal or commercial entity." Colo. Rev. Stat. § 6-1-102(6).

189.    Empower's unlawful, unfair, and deceptive trade practices occur in the course of its business of selling drugs.

190.    Colo. Rev. Stat. § 6-1-113(1)(c) creates a cause of action for Lilly to bring these claims.

191.    Empower is liable to Lilly for damages in amounts to be proven at trial, including attorneys' fees and costs, injunctive relief enjoining Empower from further violating the law, and any other remedies the Court may deem appropriate under Colorado law.

### THIRD CAUSE OF ACTION
**Unfair and Deceptive Trade Practices**
**in Violation of the Connecticut Unfair Trade Practices Act**
**Conn. Gen. Stat. Ann. § 42-110b(a)**

192.    Lilly repeats and realleges each and every allegation above as if fully set forth herein.

193.    Under the Connecticut Unfair Trade Practices Act (CUTPA), "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Conn. Gen. Stat. Ann. § 42-110b(a).

194.    Empower has engaged in an unfair trade practice by selling unapproved drugs in Connecticut, including its Tirzepatide ODT and tirzepatide/niacinamide, in violation of Connecticut law governing the sales of new drugs. Conn. Gen. Stat. Ann. §§ 21a-110(a)-(b).

195.    Empower's tirzepatide tablets and injections are new drugs within the meaning of Conn. Gen. Stat. Ann. § 21a-92 because they are not generally recognized among experts as safe and effective for use under the conditions prescribed, recommended, or suggested in their labeling.

196.    Empower's failure to seek required drug approval causes confusion or misunderstanding as to the source, sponsorship, approval, or certification of its drugs.

197. Empower also engages in deceptive trade practices in violation of the CUTPA. Empower deceives consumers by marketing and selling its Tirzepatide ODT and tirzepatide/niacinamide injections to treat weight issues while misciting inapplicable clinical trials and materially omitting that no data exists to support its use for any purpose. In doing so, Empower purports that its disintegrating tirzepatide tablets and tirzepatide/niacinamide injections are safe and effective prescription medications.

198. Empower further engages in deceptive trade practices by marketing and selling its Tirzepatide ODT and tirzepatide/niacinamide injections as unique, personalized, compounded medicine, when, in fact, Empower does not tailor its unapproved and untested drugs to patients' needs at all. Empower falsely states that its tirzepatide/niacinamide injections are "personalized formulations," "custom combination[s]," and "tailored to fit individual patients."

199. The practices described herein also offend established public policy regarding the protection of consumers against companies, like Empower, that engage in unfair methods of competition and sell untested, unapproved drugs.

200. Empower's conduct has caused injury to Lilly in the form of lost sales, lost revenues, lost market share, and loss of customers, that is not outweighed by countervailing benefits to any consumers or competition.

201. As a direct and proximate result of Empower's unlawful, unfair, and deceptive trade practices, Lilly has suffered and will continue to suffer monetary damages and discernible competitive injury by the loss of goodwill associated with Lilly's MOUNJARO® and ZEPBOUND® tirzepatide medicines.

202.    Conn. Gen. Stat. Ann. § 42-110g creates a cause of action for "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act, or practice prohibited by section 42-110b."

203.    Lilly is a "person" that has suffered loss of money as a result of Empower's unfair acts under Conn. Gen. Stat. Ann. § 42-110g.

204.    Empower is liable to Lilly for damages in amounts to be proven at trial, including attorneys' fees and costs, injunctive relief enjoining Empower from further violating the law, and any other remedies the Court may deem appropriate under Connecticut law.

**FOURTH CAUSE OF ACTION**
**Unfair Competition and Deceptive Trade Practices**
**in Violation of Haw. Rev. Stat. §§ 480-1 *et seq***

205.    Lilly repeats and realleges each and every allegation above as if fully set forth herein.

206.    Under Hawaii law, "[u]nfair methods of competition . . . in the conduct of any trade or commerce are unlawful."  Haw. Rev. Stat. § 480-2(a).

207.    Empower is engaged in unfair competition by selling its unapproved Tirzepatide ODT and tirzepatide/niacinamide injection in Hawaii without obtaining the requisite approvals to sell new drug products, in violation of Hawaii law.  *See* Haw. Rev. Stat. §§ 328-17(a)(1)-(2).

208.    Empower's tirzepatide tablets and injections are new drugs within the meaning of Haw. Rev. Stat. Ann. § 328-4 because they are not generally recognized among experts as safe and effective for use under the conditions prescribed, recommended, or suggested in their labeling.

209.    In doing so, Empower lures consumers away from obtaining safe and effective treatment, such as Lilly's FDA-approved tirzepatide medicines, causing harm and injury-in-fact to Lilly for which Empower has no justification other than to increase, beyond what Empower would have otherwise realized, its market share and revenue from the sale of unapproved drugs.

210.    Empower's unlawful and unfair conduct puts health, safety, and lives at risk, leading customers to draw unwarranted conclusions about the safety and effectiveness of Lilly's FDA-approved tirzepatide medicines and causing harm to Lilly's brand and customer goodwill.

211.    As a direct and proximate result of its unlawful, unfair, and deceptive business practices, Empower has obtained an unfair and illegal business advantage, thereby benefitting and profiting from sales it made as a result of goodwill associated with Lilly's MOUNJARO® and ZEPBOUND® tirzepatide medicines.  Lilly has suffered and will continue to suffer monetary damages that can be measured and quantified as well as discernible competitive injury by the loss of goodwill.

212.    The practices described herein also offend established public policy regarding the protection of consumers against companies, like Empower, that engage in unfair methods of competition and sell untested, unapproved drugs.

213.    Under Hawaii law, "[a]ny person may bring an action based on unfair methods of competition declared unlawful by this section."  Haw. Rev. Stat. § 480-2(e).

214.    Lilly is a "person" under Haw. Rev. Stat. § 480-1.

215.    Lilly has standing to bring this unfair competition claim under Haw. Rev. Stat. § 480-13(a) as a person injured in business or property by Empower's unlawful and unfair actions.

216.    Empower is liable to Lilly for damages in amounts to be proven at trial, including attorneys' fees and costs, injunctive relief enjoining Empower from further violating the law, and any other remedies the Court may deem appropriate under Hawaii law.

## FIFTH CAUSE OF ACTION
### Unfair Competition and Deceptive Trade Practices
### in Violation of North Carolina Unfair and Deceptive Trade Practices Act
### N.C. Gen. Stat. Ann. § 75-1.1, *et seq.*

217.    Lilly repeats and realleges each and every allegation above as if fully set forth herein.

218.    Under the North Carolina Unfair and Deceptive Trade Practices Act (NCUDTPA) "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive act or practices in or affecting commerce" are unlawful.  N.C. Gen. Stat. Ann. § 75-1.1(a).

219.    Empower engages in unfair methods of competition in or affecting commerce, and unfair practices in or affecting commerce, when it unlawfully sells unapproved and potentially dangerous drugs in North Carolina, including Tirzepatide ODT and tirzepatide/niacinamide injections, in violation of the North Carolina Food, Drug and Cosmetic Act.  *See* N.C. Gen. Stat. Ann. § 106-135.

220.    Empower's tirzepatide tablets and injections are unapproved new drugs within the meaning of N.C. Gen. Stat. Ann. § 106-121 because they are not generally recognized among experts as safe and effective for use under the conditions prescribed, recommended, or suggested in their labeling.

221.    Empower also engages in deceptive trade practices in violation of the NCUDTPA. Empower deceives consumers by marketing and selling its Tirzepatide ODT and tirzepatide/niacinamide injections to treat weight issues while misciting inapplicable clinical trials and materially omitting that no data exists to support its use for any purpose.  In doing so, Empower purports that its disintegrating tirzepatide tablets and tirzepatide/niacinamide injections are safe and effective prescription medications.

222.    Empower further engages in deceptive trade practices by marketing and selling its Tirzepatide ODT and tirzepatide/niacinamide injections as unique, personalized, compounded medicine, when, in fact, Empower does not tailor its unapproved and untested drugs to patients' needs at all.  Empower falsely states that its tirzepatide/niacinamide injections are "personalized formulations," "custom combination[s]," and "tailored to fit individual patients."

223.    Empower's unlawful, unfair, and deceptive conduct has caused injury to Lilly in the form of lost sales, lost revenues, lost market share, and loss of customers that is not outweighed by countervailing benefits to any consumers or competition.

224.    As a direct and proximate result of its unlawful, unfair, and deceptive business practices, Empower has obtained an unfair and illegal business advantage, thereby benefitting and profiting from sales it made as a result of goodwill associated with Lilly's MOUNJARO® and ZEPBOUND® tirzepatide medicines.  Lilly has suffered and will continue to suffer monetary damages that can be measured and quantified as well as discernible competitive injury by the loss of goodwill.

225.    The practices described herein also offend established public policy regarding the protection of consumers against companies, like Empower, that engage in unfair methods of competition and sell untested, unapproved drugs.

226.    N.C. Gen. Stat. Ann. § 75-16 creates a cause of action for "any person" injured by unfair methods of competition or unfair or deceptive acts or practices.

227.    Lilly is a person under N.C. Gen. Stat. Ann. § 75-16.

228.    Empower is liable to Lilly for damages in amounts to be proven at trial, including attorneys' fees and costs, injunctive relief enjoining Empower from further violating the law, and any other remedies the Court may deem appropriate under North Carolina law.

**SIXTH CAUSE OF ACTION**
**Unfair Competition and Deceptive Trade Practices**
**in Violation of the South Carolina Unfair Trade Practices Act**
**S.C. Code Ann. §§ 39-5-20 *et seq***

229.    Lilly repeats and realleges each allegation above as if fully set forth herein.

230.    The South Carolina Unfair Trade Practices Act (SCUTPA) prohibits "[u]nfair methods of competition . . . in the conduct of any trade or commerce."  S.C. Code Ann. § 39-5-20(a).  "Unfair" methods of competition are those that are offensive to public policy or those that are immoral, unethical, or oppressive.

231.    Empower has engaged in unfair competition by selling its unapproved Tirzepatide ODT and tirzepatide/niacinamide injection in South Carolina without obtaining the requisite approvals to sell new drug products, in violation of South Carolina law.  *See* S.C. Code Ann. § 39-23-70.

232.    Empower's tirzepatide tablets and injections are unapproved new drugs within the meaning of S.C. Code Ann. § 39-23-20 because they are not generally recognized among experts as safe and effective for use under the conditions prescribed, recommended, or suggested in their labeling.

233.    Empower also engages in deceptive trade practices in violation of the SCUTPA. Empower deceives consumers by marketing and selling its Tirzepatide ODT and tirzepatide/niacinamide injections to treat weight issues while misciting inapplicable clinical trials and materially omitting that no data exists to support its use for any purpose.  In doing so, Empower purports that its disintegrating tirzepatide tablets and tirzepatide/niacinamide injections are safe and effective prescription medications.

234.    Empower further engages in deceptive trade practices by marketing and selling its Tirzepatide ODT and tirzepatide/niacinamide injections as unique, personalized, compounded

65

medicine, when, in fact, Empower does not tailor its unapproved and untested drugs to patients' needs at all. Empower falsely states that its tirzepatide/niacinamide injections are "personalized formulations," "custom combination[s]," and "tailored to fit individual patients."

235.    In doing so, Empower lures consumers away from obtaining safe and effective treatment, such as Lilly's FDA-approved tirzepatide medicines, causing harm and injury-in-fact to Lilly for which Empower has no justification other than to increase, beyond what Empower would have otherwise realized, its market share and revenue from the sale of unapproved drugs.

236.    Empower's unlawful, unfair, and deceptive conduct puts health, safety, and lives at risk, leading customers to draw unwarranted conclusions about the safety and effectiveness of Lilly's FDA-approved tirzepatide medicines and causing harm to Lilly's brand and customer goodwill.

237.    As a direct and proximate result of its unlawful, unfair, and deceptive business practices, Empower has obtained an unfair and illegal business advantage, thereby benefitting and profiting from sales it made as a result of goodwill associated with Lilly's MOUNJARO® and ZEPBOUND® tirzepatide medicines. Lilly has suffered and will continue to suffer monetary damages that can be measured and quantified as well as discernible competitive injury by the loss of goodwill.

238.    Empower's unfair practices have an adverse impact on the public interest by undermining public policy of protecting consumers by prohibiting the marketing and sale of unapproved new drugs.

239.    S.C. Code Ann. § 39-5-140(a) creates a cause of action for "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or

employment by another person of an unfair or deceptive method, act or practice declared unlawful by Section 39-5-20."

240.    Lilly is a "person" under S.C. Code Ann. § 39-5-10(a).

241.    Empower is liable to Lilly for damages in amounts to be proven at trial, including attorneys' fees and costs, injunctive relief enjoining Empower from further violating the law, and any other remedies the Court may deem appropriate under South Carolina law.

**SEVENTH CAUSE OF ACTION**
**Unfair Competition and Deceptive Trade Practices**
**in Violation of the Tennessee Consumer Protection Act**
**Tenn. Code Ann. §§ 47-18-104 *et seq***

242.    Lilly repeats and realleges each allegation above as if fully set forth herein.

243.    The Tennessee Consumer Protection Act ("TCPA") prohibits "unfair or deceptive acts or practices affecting the conduct of any trade or commerce." Tenn. Code Ann. § 47-18-104(a). Under the TCPA, this includes "[a]dvertising, promoting, selling, or offering for sale any good or service that is illegal or unlawful to sell in the state." Tenn. Code Ann. § 47-18-104(b)(43)(C).

244.    Empower has engaged in unfair competition by selling its unapproved Tirzepatide ODT and tirzepatide/niacinamide injection in Tennessee without obtaining the requisite approvals to sell new drug products, in violation of Tennessee law. *See* Tenn. Code Ann. § 53-1-110.

245.    Empower's tirzepatide tablets and injections are unapproved new drugs within the meaning of Tenn. Code Ann. § 106-121 because they are not generally recognized among experts as safe for use under the conditions prescribed, recommended, or suggested in their labeling.

246.    Empower also engages in deceptive trade practices in violation of the TCPA. Empower deceives consumers by marketing and selling its Tirzepatide ODT and tirzepatide/niacinamide injections to treat weight issues while misciting inapplicable clinical trials

67

and materially omitting that no data exists to support its use for any purpose.  In doing so, Empower purports that its disintegrating tirzepatide tablets and tirzepatide/niacinamide injections are safe and effective prescription medications.

247.    Empower further engages in deceptive trade practices by marketing and selling its Tirzepatide ODT and tirzepatide/niacinamide injections as unique, personalized, compounded medicine, when, in fact, Empower does not tailor its unapproved and untested drugs to patients' needs at all.  Empower falsely states that its tirzepatide/niacinamide injections are "personalized formulations," "custom combination[s]," and "tailored to fit individual patients."

248.    In doing so, Empower lures consumers away from obtaining safe and effective treatment, such as Lilly's FDA-approved tirzepatide medicines, causing harm and injury-in-fact to Lilly for which Empower has no justification other than to increase, beyond what Empower would have otherwise realized, its market share and revenue from the sale of unapproved drugs.

249.    Empower's unlawful, unfair, and deceptive conduct puts health, safety, and lives at risk, leading customers to draw unwarranted conclusions about the safety and effectiveness of Lilly's FDA-approved tirzepatide medicines and causing harm to Lilly's brand and customer goodwill.

250.    Empower's unlawful practices further constitute unfair business practices in violation of the TCPA since they are substantially injurious to consumers and any utility of these business practices is outweighed by the harm to consumers.  Further, Empower's practices violate Tennessee public policy of protecting consumers by prohibiting the marketing and sale of unapproved new drugs.

251.    As a direct and proximate result of its unlawful, unfair, and deceptive business practices, Empower has obtained an unfair and illegal business advantage, thereby benefitting and

profiting from sales it made as a result of goodwill associated with Lilly's MOUNJARO® and ZEPBOUND® tirzepatide medicines.  Lilly has suffered and will continue to suffer monetary damages that can be measured and quantified as well as discernible competitive injury by the loss of goodwill.

252.    Tenn. Code. Ann. § 47-18-109 states "[a]ny person who suffers an ascertainable loss . . . as a result of the use or employment by another person of an unfair or deceptive act or practice described in § 47-18-104(b) and declared to be unlawful . . . may bring an action individually recover actual damages."

253.    Lilly is a "person" under Tenn. Code. Ann. § 47-18-109.

254.    Empower is "another" who used or employed "an unfair or deceptive act or practice described in § 47-18-104(b)" under Tenn. Code. Ann. § 47-18-109.

255.    Empower is liable to Lilly for damages in amounts to be proven at trial, including attorneys' fees and costs, injunctive relief enjoining Empower from further violating the law, and any other remedies the Court may deem appropriate under Tennessee law.

<u>EIGHTH CAUSE OF ACTION</u>
**Unfair Competition**
**in Violation of Texas Common Law**

256.    Lilly repeats and realleges each and every allegation above as if fully set forth herein.

257.    Unfair competition under Texas law is the umbrella for all statutory and non-statutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters.  *Taylor Pub. Co. v. Jostens, Inc*., 216 F.3d 465, 486 (5th Cir. 2000).

258.    The tort of unfair competition requires a plaintiff to prove only: (1) an illegal act by the defendant that (2) interfered with the plaintiff's ability to conduct its business.  *W. Rsrv.*

*Medtec Servs., LLC v. Stryker Corp.*, 2019 WL 13191641, at \*8 (S.D. Tex. May 13, 2019) (citing *Taylor Pub. Co.*, 216 F.3d at 486).

259.    Empower has engaged in an illegal act by selling unapproved new drugs in Texas in violation of violation of the Texas Food, Drug, & Cosmetic Act, Tex. Health & Safety Code Ann. § 431.114(a).

260.    Empower's tirzepatide tablets and injections are unapproved new drugs within the meaning of Tex. Health & Safety Code Ann. § 431.002 because they are not generally recognized among experts as safe and effective for use under the conditions prescribed, recommended, or suggested in their labeling.

261.    Empower's illegal conduct has interfered with Lilly's ability to conduct its business through sales of tirzepatide that otherwise would have been made by Lilly and through harm to Lilly's brand and customer goodwill.

262.    Because Empower's illegal conduct has interfered with Lilly's ability to conduct its business, Lilly has a cause of action under the Texas common law of unfair competition to bring this claim.

263.    Empower has engaged in unfair competitive acts or practices by advertising, promoting, selling and offering for sale in Texas its unapproved new drugs in violation of the Texas Food, Drug, & Cosmetic Act, Tex. Health & Safety Code Ann. § 431.114(a).

264.    In doing so, Empower lures consumers away from obtaining safe and effective treatment, such as Lilly's FDA-approved tirzepatide medicines, thereby interfering with Lilly's ability to conduct its business.

265.     Empower's unlawful and unfair conduct puts health, safety, and lives at risk, harming Lilly by creating a risk that customers will draw unwarranted conclusions about the safety and effectiveness of Lilly's FDA-approved tirzepatide medicines.

266.     As a direct and proximate result of its unlawful and unfair business practices, Empower has obtained an unfair and illegal business advantage, benefitting and profiting from sales made as a result of goodwill associated with Lilly's MOUNJARO® and ZEPBOUND® tirzepatide medicines.  Lilly has suffered and will continue to suffer monetary damages that can be measured and quantified as well as discernible competitive injury by the loss of goodwill.

267.     Empower's unfair conduct is interfering with Lilly's ability to conduct its business. As a direct and proximate result of Empower's unfair business practices, Lilly is suffering immediate and continuing, competitive, irreparable injury for which no adequate remedy at law exists.

268.     The practices described herein also offend established public policy regarding the protection of consumers against companies, like Empower, that engage in unfair methods of competition.

269.     Lilly is entitled to reasonable attorney's fees and costs pursuant to Tex. Civ. Prac. & Rem. Code Ann. § 37.009.

**NINTH CAUSE OF ACTION**
**Unfair Competition**
**in Violation of the Washington Consumer Protection Act**
**R.C.W. §§ 19.86.010 *et seq***

270.     Lilly repeats and realleges each allegation above as if fully set forth herein.

271.     Under the Washington Consumer Protection Act (WCPA), "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" are unlawful.  R.C.W. § 19.86.020.

71

272.    Empower has engaged in unfair competition by selling its unapproved Tirzepatide ODT and tirzepatide/niacinamide injection in Washington without obtaining the requisite approvals to sell new drug products, in violation of Washington law.  *See* R.C.W. § 69.04.570.

273.    Empower's tirzepatide tablets and injections are unapproved new drugs within the meaning of Wash. Rev. Code Ann. § 69.04.018 because they are not generally recognized among experts as safe for use under the conditions prescribed, recommended, or suggested in their labeling.

274.    Empower also engages in deceptive trade practices in violation of the WCPA. Empower deceives consumers by marketing and selling its oral disintegrating tirzepatide tablets and tirzepatide/niacinamide injections to treat weight issues while misciting inapplicable clinical trials and materially omitting that no data exists to support its use for any purpose.  In doing so, Empower purports that its disintegrating tirzepatide tablets and tirzepatide/niacinamide injections are safe and effective prescription medications.

275.    Empower further engages in deceptive trade practices by marketing and selling its Tirzepatide ODT and tirzepatide/niacinamide injections as unique, personalized, compounded medicine, when, in fact, Empower does not tailor its unapproved and untested drugs to patients' needs at all.  Empower falsely states that its tirzepatide/niacinamide injections are "personalized formulations," "custom combination[s]," and "tailored to fit individual patients."

276.    Empower's unlawful practices affect the public interest.  They are substantially injurious to consumers and any utility of these business practices is outweighed by the harm to consumers.  Further, Empower's practices violate Washington public policy of protecting consumers by prohibiting the marketing and sale of unapproved new drugs.

277.    As a direct and proximate result of Empower's unlawful, unfair, and deceptive practices, Lilly has suffered and will continue to suffer monetary damages and discernible competitive injury by the loss of goodwill associated with Lilly's MOUNJARO® and ZEPBOUND® tirzepatide medicines.

278.    Under the WCPA, "[a]ny person who is injured in his or her business or property by a violation of RCW 19.86.020 . . . may bring a civil action in superior court to enjoin further violations [and] to recover the actual damages sustained."  R.C.W. § 19.86.090.

279.    Lilly is a "person" as defined by R.C.W. § 19.86.010.

280.    Lilly has standing to bring this claim as a "person who is injured in his or her business or property by a violation of RCW 19.86.020."

281.    Empower is liable to Lilly for damages in amounts to be proven at trial, including attorneys' fees and costs, injunctive relief enjoining Empower from further violating the law, and any other remedies the Court may deem appropriate under Washington law.

## TENTH CAUSE OF ACTION
### False or Misleading Advertising and Promotion
### in Violation of 15 U.S.C. § 1125(a)(1)(B)

282.    Lilly repeats and realleges each allegation above as if fully set forth herein.

283.    Empower's commercial advertising claims described herein are false and misleading in violation of Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B). Empower deceptively promotes its tirzepatide products as "safe" and "effective" based on Lilly studies, deceptively promotes its tirzepatide products as "personalized" when they are mass-manufactured, and falsely advertises that it complies with regulations, despite the fact that regulatory authorities have concluded otherwise on multiple occasions.

284.    Empower has made materially false statements to sell its Tirzepatide ODT and its tirzepatide/niacinamide injection.  These statements have influenced and are likely to continue to influence consumers' purchasing decisions—specifically, decisions to purchase Empower's Tirzepatide ODT and tirzepatide/niacinamide products instead of Lilly's FDA-approved medicines.  Empower is steering patients with serious diseases like diabetes and obesity away from obtaining safe, effective, available, and FDA-approved treatments.  Empower's unlawful conduct is putting health, safety, and lives at risk.

285.    Empower's advertisements and business practices actually deceive or have the tendency to deceive consumers.

286.    Empower has caused its false statements to enter interstate trade or commerce.

287.    As a direct and proximate result of Empower's false and deceptive campaign, Lilly is suffering immediate and continuing irreparable injury for which there is no adequate remedy at law.

288.    As a direct and proximate result of Empower's false and deceptive campaign, Lilly has suffered and will continue to suffer significant monetary damages and discernible competitive injury by the loss of goodwill.

289.    Given Empower's conduct, this is an exceptional case under 15 U.S.C. § 1117.

290.    Lilly is entitled to injunctive relief as well as monetary damages, and other remedies provided by Sections 1116, 1117, and 1118, including Empower's profits, treble damages, reasonable attorneys' fees, costs, and prejudgment interest.

## **JURY DEMAND**

Lilly hereby demands a jury trial for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Lilly prays that this Court enter judgment in Lilly's favor on

Lilly's claims and award Lilly relief including:

1.      An Order declaring that Empower:

    i.     Engaged in false and deceptive acts, in violation of 15 U.S.C. § 1125(a)(1)(B);

    ii.    Engaged in unfair competition and deceptive trade practices in violation of the Alaska Unfair Trade Practices Act by its deceptive marketing and its unlawful manufacture, distribution, and sale of unapproved new drugs in violation of the Alaska Food, Drug, and Cosmetic Act;

    iii.   Engaged in unfair and deceptive trade practices in violation of the Colorado Consumer Protection Act by its deceptive marketing and unlawful manufacture, distribution, and sale of unapproved new drugs in violation of Colo. Rev. Stat. § 12-280-131(1);

    iv.   Engaged in unfair and deceptive trade practices in violation of the Connecticut Unfair Trade Practices Act by its deceptive marketing and unlawful manufacture, distribution, and sale of unapproved new drugs in violation of Conn. Gen. Stat Ann. §§21a-110(a)-(b);

    v.    Engaged in unfair competition in violation of Haw. Rev. Stat. §§ 480-1 *et seq* by its unlawful manufacture, distribution, and sale of unapproved new drugs in violation of Haw. Rev. Stat. §§ 328-17(a)(1)-(2);

    vi.   Engaged in unfair and deceptive trade practices in violation of the North Carolina Unfair and Deceptive Trade Practices Act by its deceptive marketing and its unlawful manufacture, distribution, and sale of unapproved new drugs in violation of the North Carolina Food, Drug, and Cosmetic Act, N.C.G.S.A. § 106-135;

    vii.   Engaged in unfair and deceptive trade practices in violation of the South Carolina Unfair Trade Practices Act by its deceptive marketing and its unlawful manufacture, distribution, and sale of unapproved new drugs in violation of S.C. Code. Ann. § 39-23-70;

    viii.  Engaged in unfair and deceptive trade practices in violation of the Tennessee Consumer Protection Act by its deceptive marketing and its unlawful manufacture, distribution, and sale of unapproved new drugs in violation of Tenn. Code. Ann. § 53-1-110 and Tenn. Admin. Code § 1140-01-.08;

    ix.   Engaged in unfair and deceptive trade practices in violation of the Washington Consumer Protection Act by its deceptive marketing and unlawful manufacture,

distribution, and sale of unapproved new drugs in violation of R.C.W. § 69.04.570; and

x.    Violated Tex. Health & Safety Code § 431.114(a)(1), which constitutes unfair competition under Texas common law by unlawful manufacture, distribution, and sale of unapproved new drugs.

2.    An injunction preliminarily and then permanently enjoining and restraining Empower and its officers, agents, employees, and attorneys and all persons acting in concert or participation with any of them from:

i.    Marketing, distributing, dispensing, selling, or otherwise making available to consumers Empower's Tirzepatide ODT for weight management;

ii.    Marketing, distributing, dispensing, selling, or otherwise making available to consumers Empower's tirzepatide/niacinamide injections;

iii.    Claiming or representing that Empower's tirzepatide products are custom-made for a patient's specific needs;

iv.    Citing Lilly's clinical testing to support the safety and effectiveness of Empower's unapproved Tirzepatide ODT or tirzepatide/niacinamide injections;

v.    Claiming or representing that Empower adheres to or exceeds regulatory standards; and/or

vi.    Engaging in any deceptive acts.

3.    An Order requiring Empower and its officers, agents, employees, and attorneys and all persons acting in concert or participation with any of them, to engage in corrective advertising by informing consumers that:

i.    Empower's Tirzepatide ODT and tirzepatide/niacinamide products have never been demonstrated to be safe or effective;

ii.    Empower's Tirzepatide ODT and tirzepatide/niacinamide products have never been studied in clinical trials;

iii.    Empower's Tirzepatide ODT and tirzepatide/niacinamide products do not have any proven therapeutic effect;

iv.    Empower's Tirzepatide ODT product is not comparable or equivalent to any injectable tirzepatide drug product;

76

     v.    Empower's Tirzepatide ODT is not superior to any injectable tirzepatide drug product;

    vi.    Lilly's clinical testing regarding Lilly's FDA-approved injectable tirzepatide medicines provide no support for the safety, effectiveness, or quality of Empower's Tirzepatide ODT or tirzepatide/niacinamide injections;

    vii.    Empower's products were not custom-made, tailor-made, or personalized for an individual patient's specific needs as determined by a prescriber;

   viii.    Empower does not provide individualized tirzepatide products; and

    ix.    Empower's drugs do not adhere to or exceed regulatory standards.

4.    An Order directing Empower to file with this Court and serve on Lilly's attorneys, thirty (30) days after the date of entry of any injunction, a report in writing and under oath setting forth in detail the manner and form in which it has complied with the Court's injunction.

5.    An Order requiring Empower to account for and pay to Lilly any and all profits arising from the foregoing acts of deceptive trade practices and false advertising pursuant to 15 U.S.C. § 1117.

6.    An Order requiring Empower to pay Lilly compensatory damages in an amount as yet undetermined caused by the deceptive business practices and false advertising and trebling such compensatory damages for payment to Lilly in accordance with 15 U.S.C. § 1117, Texas common law, the Alaska Unfair Trade Practices Act, the Colorado Consumer Protection Act, the Connecticut Unfair Trade Practices Act, Haw. Rev. Stat. §§ 480-1 *et seq*, the North Carolina Unfair and Deceptive Trade Practices Act, the South Carolina Unfair Trade Practices Act, the Tennessee Consumer Protection Act, the Washington Consumer Protection Act and any other applicable laws.

7.    An Order for pre-judgment and post-judgment interest on all damages.

8.    A finding that Empower's actions are exceptional under 15 U.S.C. § 1117.

9.     An Order requiring Empower to pay Lilly's costs and attorneys' fees in this action pursuant to 15 U.S.C. § 1117, the Alaska Unfair Trade Practices Act, the Colorado Consumer Protection Act, the Connecticut Unfair Trade Practices Act, Haw. Rev. Stat. §§ 480-1 *et seq*, the North Carolina Unfair and Deceptive Trade Practices Act, the South Carolina Unfair Trade Practices Act, the Tennessee Consumer Protection Act, Tex. Civ. Prac. & Rem. Code Ann. § 37.009, the Washington Consumer Protection Act, and any other applicable provision of law.

10.     Other relief as the Court may deem appropriate.

Dated: July 25, 2025

/s/ *James John Lomeo*

James John Lomeo (*attorney-in-charge*)
Texas Bar No. 24118993
Southern District No. 3511238
KIRKLAND & ELLIS LLP
401 Congress Avenue
Austin, Texas 78701
Telephone: (512) 678-9101
Facsimile: (512) 678-9101
james.lomeo@kirkland.com

James F. Hurst (*pro hac vice forthcoming*)
Diana M. Watral (*pro hac vice forthcoming*)
Robin A. McCue (*pro hac vice forthcoming*)
Ryan J. Moorman (*pro hac vice forthcoming*)
James R.P. Hileman (*pro hac vice forthcoming*)
Nicholas M. Ruge (*pro hac vice forthcoming*)
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
james.hurst@kirkland.com
diana.watral@kirkland.com
robin.mccue@kirkland.com
ryan.moorman@kirkland.com
jhileman@kirkland.com
nicholas.ruge@kirkland.com

Joshua L. Simmons (*pro hac vice forthcoming*)
Jeanna M. Wacker (*pro hac vice forthcoming*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.simmons@kirkland.com
jeanna.wacker@kirkland.com

David I. Horowitz (*pro hac vice forthcoming*)
KIRKLAND & ELLIS LLP
2049 Century Park East, 38th Floor
Los Angeles, CA 90067
Telephone: (310) 552-4200
dhorowitz@kirkland.com

Eugene Temchenko
Texas Bar No. 24118928
Southern District No. 3929004
KIRKLAND & ELLIS LLP
4550 Travis Street
Dallas, Texas 75205
Telephone: (214) 432-5072
Facsimile: (214) 972-1771
eugene.temchenko@kirkland.com

*Counsel for Plaintiff Eli Lilly and Company*