**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| ELI LILLY AND COMPANY, | |
| Plaintiff, | |
| vs. | Civil Action No. 4:25-cv-03464 |
| EMPOWER CLINIC SERVICES, L.L.C. d/b/a EMPOWER PHARMACY, | Hon. Sim Lake |
| Defendant. | |

**DEFENDANT EMPOWER CLINIC SERVICES, L.L.C. D/B/A**
**EMPOWER PHARMACY'S MOTION TO DISMISS FOR**
**FAILURE TO STATE A CLAIM AND MEMORANDUM IN SUPPORT**

**TABLE OF CONTENTS**

Page

I.      PRELIMINARY STATEMENT ................................................................................ 1

II.     FACTUAL BACKGROUND ................................................................................. 3

        A.      Congress Codifies Compounding Into the FDCA. ............................... 3

        B.      Congress Revives Section 503A and Solidifies Personalized Care Parameters. .... 4

        C.      Compounders, Including Empower, Performed Their FDCA-Designated Roles
                During Lilly's Drug Shortage. .............................................................. 6

        D.      Empower Is Licensed and Authorized to Dispense Compounded Medications in
                Each State at Issue. ............................................................................ 7

III.    LILLY'S COMPLAINT: A THINLY-VEILED ATTEMPT TO ELIMINATE
        COMPOUNDING WITH TIRZEPATIDE ...................................................... 10

IV.     ARGUMENT ........................................................................................................ 11

        A.      Legal Standard. ................................................................................... 11

        B.      Lilly's False and Misleading Advertising Claims Fail ........................... 12

                1.      Lilly Does Not Plead Facts Demonstrating Empower's
                        Advertisements Caused Lilly Harm. ............................................ 12

                        a)      Lilly's Complaint Does Not Plead Facts Demonstrating
                                Reputational Harm Caused By Empower's Advertisements. ....... 13

                        b)      Lilly Cannot Plausibly Plead Facts Showing that Empower's
                                Advertising Led Lilly to Lose Sales. ............................ 15

                                i.      Lilly Fails to Acknowledge the Physician's Role. ............ 15

                                ii.     Compounded Tirzepatide and FDA-Approved
                                        Tirzepatide Serve Different Parts of the Market. .............. 18

                2.      Lilly's Personalization Theory Fails to State a Claim. ............................ 19

                        a)      Empower's Statements Are Literally True Under Section
                                503A and the Court Is Precluded from Holding Otherwise. ......... 20

                        b)      Alternatively, Lilly Fails to Allege that Empower's
                                Statements Actually or Tend to Deceive a Substantial Portion
                                of the Intended Audience. ................................................ 22

                        c)      Empower's Statements Are Non-Actionable Puffery. .................. 23

                3.      Lilly's Safety and Effectiveness Theory Fails to State a Claim. ............... 23

                        a)      Lilly's Claims Based on the Safety and Effectiveness
                                Statements Are Precluded by the Federal Regulatory Scheme ..... 24

|   |   | b) | If Not Precluded, Empower's Safety and Efficacy Statements Are Not Literally False. | 25 |

b) If Not Precluded, Empower's Safety and Efficacy Statements Are Not Literally False. ............................................................. 25

c) Because Empower's Study Citations and Oral Formulation Statements Are Not Literally False, Lilly Is Required to Identify Consumer Confusion, But Failed to Do So. ..................... 26

d) Empower's Oral Formulation Statements About Functionality and Ease of Use Are Non-Actionable Opinion and Puffery. ......... 27

4. Lilly's Compliance Theory Fails to State a Claim. .................................. 28

a) Lilly's Compliance Theory Is Precluded Because It Contravenes FDA's Regulatory Scheme. ...................................... 28

b) Lilly's Compliance Theory Statements Were Not False When Made. .................................................................................. 29

5. Lilly Cannot Plead Facts to Establish Empower's Statements Are Material Because Doctors Determine What to Prescribe. ........................ 30

C. Lilly Cannot State a Claim Based on Its "Unapproved Drug Theory." ............... 30

1. Lilly Cannot Establish Its State Law Claims Because Empower's Conduct Falls Within Each State's Exemptions. ........................................ 31

a) Connecticut, Colorado, Hawaii, South Carolina, Tennessee, and Washington Explicitly Permit Empower's Sale of Compounded Medications, Barring Lilly's Claims. ..................... 31

b) Alaska's UTPA Exemption Applies, Barring Lilly's Claim. ......... 33

c) North Carolina's Learned Professional Exemption Applies, Barring Lilly's Claim. ................................................................ 34

2. Lilly's Texas Common Law Count Fails. .................................................. 35

a) Empower's Sale of Compounded Medications in Texas Is Legal. ......................................................................................... 35

b) Lilly Cannot Use Common Law to Create a Private Cause of Action Under TFDCA. ............................................................. 37

3. Lilly's State Law Claims Are Preempted by Section 337(a). .................. 38

V. CONCLUSION ........................................................................................................ 40

## <u>TABLE OF AUTHORITIES</u>

*All legal authorities and briefs/filings not found in the United States Code, Supreme Court Reporter, Federal Reporter, Federal Rules Decisions, Federal Supplement, Southwestern Reporter, or Vernon's Revised Statutes and Codes Annotated are included in an Appendix of Authorities attached hereto.*

**Page(s)**

**Cases**

*Adkins v. Collens*,
    444 P.3d 187 (Alaska 2019)....................................................................................33, 34

*Alaska Interstate Const., LLC v. Pac. Diversified Inv., Inc.*,
    279 P.3d 1156 (Alaska 2012)........................................................................................33

*Alderman v. Iditarod Props., Inc.*,
    32 P.3d 373 (Alaska 2001)............................................................................................12

*Allergan U.S. v. Imprimis Pharms., Inc.*,
    No. 17-1551, 2017 WL 10526121 (C.D. Cal. Nov. 14, 2017) ...............................25

*Allergan, Inc. v. Athena Cosmetics, Inc.*,
    738 F.3d 1350 (Fed. Cir. 2013).....................................................................................40

*Aquilina v. Certain Underwriters at Lloyd's Syndicate*,
    407 F. Supp. 3d 1016 (D. Haw. 2019) .........................................................................31

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).......................................................................................................11

*Bailey v. Johnson*,
    48 F.3d 965 (6th Cir. 1995) ..........................................................................................40

*Bell Atl. v. Twombly*,
    550 U.S. 544 (2007).......................................................................................................17

*Best Glide Aviation Survival Equip., Inc. v. Tag-Z, LLC*,
    No. 23-1080, 2024 WL 3488129 (W.D. Tex. July 19, 2024)..................................30

*Blue Star Press, LLC v. Blasko*,
    No. 17-111, 2018 WL 1904835 (W.D. Tex. Mar. 6, 2018)........................13, 14, 19

*Boltex Mfg. Co., L.P. v. Galperti, Inc.*,
    827 F. App'x 401 (5th Cir. 2020) .................................................................................13

*Bridal Expo, Inc. v. van Florestein*,
    No. 08-03777, 2009 WL 255862 (S.D. Tex. Feb 3, 2009) .......................................27

*Charleston Lumber Co. v. Miller Hous. Corp.*,
    458 S.E.2d 431 (S.C. Ct. App. 1995) ....................................................12

*Church Ekklasia Sozo Inc. v. CVS Health Corp.*,
    No. 20-382, 2022 WL 1572732, \*14 (W.D.N.C. Feb 25, 2022) ...............35

*Coastal Abstract Servs., Inc. v. First Am. Title Ins. Co.*,
    173 F.3d 725 (9th 1999) .......................................................................29

*Davidson v. Sprout Foods, Inc.*,
    106 F.4th 842 (9th Cir. 2024), *cert. den.*, 145 S. Ct. 1922 (2025) .........39

*Davis v. Allstate Ins. Co.*,
    2009 WL 122761 (E.D. La. Jan 15, 2009) ...........................................27

*Dial A Car Inc. v. Transp., Inc.*,
    82 F.3d 484 (D.C. Cir. 1996) ...............................................................29

*Doctor's Assoc., Inc. v. QIP Holder LLC*,
    No. 06-1710, 2010 WL 669870 (D. Conn. Feb. 19, 2010) ....................12

*Dupart v. Roussell*,
    497 F. Supp. 3d 102 (E.D. La. 2020) ..................................................19

*Eli Lilly & Co. v. Alderwood Surgical Ctr. LLC*,
    No. 24-878, 2025 WL 745670 (W.D. Wash. Mar. 7, 2025) ..................39

*Eli Lilly & Co. v. Roussel Corp.*,
    23 F. Supp. 2d 460 (D.N.J. 1998) ........................................................27

*Eli Lilly & Co. v. RXCompoundStore.com, LLC*,
    No. 23-23586, 2024 WL 1554339 (S.D. Fla. Apr. 9, 2024) ....................2

*Eli Lilly & Co. v. Wells Pharmacy Network, LLC*,
    No. 23-576, 2024 WL 1641673 (M.D. Fla. Feb. 5, 2024) .......................2

*Eli Lilly & Co. v. Willow Health Servs., Inc.*,
    No. 25-03570, 2025 WL 2631620 (C.D. Cal. Aug. 29, 2025) ...............16

*Ellis v. Smith & Nephew, Inc.*,
    No. 15-545, 2016 WL 7319397 (D.S.C. Feb. 16, 2016) ........................39

*Funk v. Stryker Corp.*,
    631 F.3d 777 (5th Cir. 2011) ...........................................................5, 11

*Geomatrix, LLC v. NSF Int'l*,
    629 F. Supp. 3d 691 (E.D. Mich. 2022),
    *aff'd* 82 F.4th 466 (6th Cir. 2023) ..................................................15, 30

*Gomez v. Niemann & Heyer, LLP*,
No. 16-119, 2016 WL 3562148 (W.D. Tex. Jun. 24, 2016) ........................................11

*Greater Hous. Transp. Co. v. Uber Techs., Inc.*,
155 F. Supp. 3d 670 (S.D. Tex. 2015) .....................................................................26

*Greater Hous. Transp. Co. v. Uber Techs., Inc.*,
No. 14-0941, 2015 WL 1034254 (S.D. Tex. Mar. 10, 2015) ..................................11

*Hall v. Walgreens Boots All., Inc.*,
565 P.3d 564 (Wash. 2025) .......................................................................................31

*Hawkins v. Bayer Corp.*,
No. 21-646, 2022 WL 2761379 (W.D. Tex. Feb. 1, 2022) .......................................40

*State of Texas ex rel. Health Choice Alliance v. Eli Lilly & Co.*
(Harrison County Aug. 11, 2025) .................................................................................1

*Health v. Case Mgmt. Assocs., Inc.*,
128 F. Supp. 3d 1020 (E.D. Tenn. 2014) .................................................................12

*Healthpoint, Ltd. v. Ethex Corp.*,
273 F. Supp. 2d 817 (W.D. Tex. 2001),
*adopting relevant portion of R&R & rejecting other portions on other
grounds*, 2001 WL 34897840 (W.D. Tex. Aug. 3, 2001) .........................21, 22, 25

*Healthpoint, Ltd. v. Stratus Pharms., Inc.*,
273 F. Supp. 2d 769 (W.D. Tex. 2001) ...............................................................24, 25

*IQ Prods. Co. v. Penzoil Prods. Co.*,
305 F.3d 368 (5th Cir. 2002) ....................................................................................19

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) .............................................................................................12, 13

*Love v. Tyson Foods, Inc.*,
677 F.3d 258 (5th Cir. 2012) ...............................................................................18, 19

*McGuire v. Abbot Labs.*,
No. 22-197, 2022 WL 4295402 (E.D. Tex. Sept. 15, 2022) ......................................5

*Med. Ctr. Pharmacy v. Mukasey*,
536 F.3d 383 (5th Cir. 2008) ......................................................................................3

*In re Medtronic, Inc. Sprint Fidelis Leads Prods. Liab. Litig.*,
623 F.3d 1200 (8th Cir. 2010) ..................................................................................40

*Mighty Dreams LLC v. Shenzhen Beianen Auto. Supplies Co.*,
No. 24-00793, 2025 WL 1635240 (W.D. Wash. June 9, 2025) ...........................................12

*Mission Pharmacal Co. v. Virtus Pharms., LLC*,
23 F. Supp. 3d 748 (W.D. Tex. 2014)....................................................................................12

*Morris v. Pliva, Inc.*,
713 F.3d 774 (5th Cir. 2013) ........................................................................................39, 40

*Nexus Pharms., Inc. v. Cent. Admixture Pharm. Servs.*,
48 F.4th 1040 (9th Cir. 2022) ................................................................................................4

*In re Orthopedic Bone Screw Prods. Liab. Litig.*,
193 F.3d 781 (3d Cir. 1999)..................................................................................................40

*Outsourcing Facilities Ass'n v. FDA*,
No. 24-953, 2025 WL 1397537 (N.D. Tex. June 13, 2025) .................................................18

*Perez v. Nidek Co., Ltd.*,
711 F.3d 1109 (9th Cir. 2013) ..............................................................................................40

*Pizza Hut, Inc. v. Papa John's Int'l, Inc.*,
227 F.3d 489 (5th Cir. 2000) ...................................................................................... *passim*

*Pom Wonderful, LLC v. Coca-Cola Co.*,
573 U.S. 102 (2014)......................................................................................................21, 28

*Pros & Patients for Customized Care v. Shalala*,
847 F. Supp. 1359 (S.D. Tex. 1994) .....................................................................................29

*Reed v. City of Arlington*,
650 F.3d 571 (5th Cir. 2011) ...............................................................................................18

*Reliable Ambulance Serv. v. Mercy Hosp. of Laredo*,
No. 02-188, 2003 WL 21972724 (Tex. App.—San Antonio Aug. 20, 2023,
pet. denied).....................................................................................................35, 37, 38

*Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*,
62 P.3d 142 (Colo. 2003).....................................................................................................12

*Riviana Foods, Inc. v. Golden Star Trading, Inc.*,
No. 19-1994, 2020 WL 6153602 (S.D. Tex. Apr 6, 2020)..............................................27, 28

*S. Snow Mfg. Co. v. Snow Wizard Holdings, Inc.*,
829 F. Supp. 2d 437 (E.D. La. 2011)................................................................................22, 27

*Schoellkopf v. Pledger*,
778 S.W.2d 897 (5th Cir. 1989)..........................................................................................36, 38

*Schouest v. Medtronic, Inc.*,
    13 F. Supp. 3d 692 (S.D. Tex. 2014) ................................................................39

*Schwimmer v. Presidio Indus. LLC*,
    No. 10-2213, 2011 WL 13089398 (N.D. Tex. Feb. 11, 2011) .........................20, 23

*Showpiece Homes Corp. v. Assurance Co.*,
    38 P.3d 47 (Colo. 2001) ...................................................................................31

*Skinner v. Steele*,
    730 S.W.2d 335 (Tenn. App. 1987) ..................................................................31

*Spano v. Whole Foods, Inc.*,
    65 F.4th 260 (5th Cir. 2023) .........................................................................38, 40

*Sykes v. Health Network Sols., Inc.*,
    828 S.E.2d 467 (N.C. 2019).........................................................................34, 35

*Taylor Publ'g Co. v. Jostens, Inc.*,
    216 F.3d 465 (5th Cir. 2000) .......................................................................35, 36

*Thompson v. W. States Med. Ctr.*,
    535 U.S. 357 (2002)...............................................................................4, 5, 20

*Tremont Pub. Advisors, LLC v. Mats. Inn. & Recycling Auth.*,
    286 A.3d 485 (Conn. App. 2022) .................................................................31, 33

*U.S. ex rel. Univ. Loft Co. v. Avteq, Inc.*,
    No. 14-528, 2015 WL 13548950 (W.D. Tex. Dec. 22, 2015) .........................13, 17

*Walker v. Branch Banking & Tr. Co.*,
    515 S.E.2d 727 (N.C. Ct. App. 1999) ..............................................................12

*Ward v. Dick Dyer & Assoc.*,
    403 S.E.2d 310 (S.C. 1991) ............................................................................31

*Wellness Pharma., Inc. v. Becerra*,
    No. 20-3082, 2021 WL 4284567 (D.D.C. Sept. 21, 2021)...............................4-5

*Yoshikawa v. Exxon Mobil Corp.*,
    No. 21-194, 2022 WL 4677621 (N.D. Tex. Sept. 29, 2022) .............................23

*Zyla Life Scis., L.L.C. v. Wells Pharma of Hous., L.L.C.*,
    134 F.4th 326 (5th Cir. 2025) ......................................................................39, 40

**Briefs and Filings**

*Boehm v. Eli Lilly & Co.*,
    No. 10-159 (8th Cir. May 24, 2013) ................................................................17

*Dearinger v. Eli Lilly & Co.*,
  No. 99956-2 (Wash. Oct. 25, 2021) ............................................................17

*In re GLP-1 RAs Prods. Liab. Litig.*,
  24-3094 (E.D. Pa. Jan. 24, 2025) ..............................................................17

*Outsourcing Facility Ass'n v. FDA*,
  No. 24-953 (N.D. Tex. Apr. 17, 2025) .......................................................18

*Saavedra v. Eli Lilly & Co.*,
  No. 12-9366 (C.D. Cal. Mar. 27, 2013) .....................................................16

**Federal Statutes**

21 U.S.C. § 352(bb) ..........................................................................................5, 24

21 U.S.C. § 353a ........................................................................................3, 4, 32

21 U.S.C. § 353a(a) ........................................................................................15, 21

21 U.S.C. § 353a(a)(2)(A)–(B) .........................................................................5, 6

21 U.S.C. § 353a(a)(2)(A)–(B)(i)(ii)(I)-(II) ........................................................21

21 U.S.C. § 353a(A)(b)(1)(A)(i)(II) ....................................................................24

21 U.S.C. § 353a(b)(1)(A)(i)(II) ...........................................................................5

21 U.S.C. § 353a(b)(1)(D) ............................................................................6, 18

21 U.S.C. § 353a(b)(2) ...........................................................................................7

**State Statutes and Codes**

Alaska Admin. Code tit. 12, § 52.440 ..................................................................8

Alaska Stat. Ann. § 08.80.030(a) ........................................................................8

Alaska Stat. Ann. § 17.20.005 ...........................................................................34

Alaska Stat. Ann. §§ 17.20.110(a)(1)-(2) .........................................................34

Alaska Stat. Ann. § 45.50.481(a)(1) ..................................................................33

3 Colo. Code Regs. 719-1 ...................................................................................32

3 Colo. Code Regs. § 719-1 ..................................................................................8

Colo. Rev. Stat. § 6-1-106(1)(a) ........................................................................31

COLO. REV. STAT. § 12-280-120(4) ..........................................................................8

CONN. GEN. STAT. § 20-633b ...........................................................................8, 32

CONN. GEN. STAT. § 42-110c(1)(a) .........................................................................31

HAW. CODE R. TIT. 16, CH. 95 ..................................................................................9

HAW. REV. STAT. § 461-1 ........................................................................................9

HAW. REV. STAT. § 461-15(6) ...............................................................................32

HAW. REV. STAT. § 481A-5(a)(1) ...........................................................................31

N.C. GEN. STAT. ANN. § 75-1.1(a) .........................................................................34

N.C. GEN. STAT. ANN. § 75-1.1(b) ...................................................................34, 35

21 N.C. ADMIN. CODE 46.2801 ................................................................................9

S.C. CODE ANN. § 39-5-40(a) .................................................................................31

S.C. CODE ANN. § 40-43-86 ......................................................................................9

S.C. CODE ANN. § 40-43-86(CC) ...........................................................................32

S.C. CODE ANN. REGS. § 99-43(B)(2)(c) ..................................................................9

TENN. CODE ANN. § 47-18-111(a)(1) .....................................................................31

TENN. CODE. ANN. § 63-10-216 .........................................................................9, 32

TENN. COMP. R. & REGS. § 1140-07.01 ....................................................................9

22 TEX. ADMIN. CODE § 291.36(1) .........................................................................36

22 TEX. ADMIN. CODE § 291.131 ...........................................................................10

22 TEX. ADMIN. CODE § 291.133 .....................................................................10, 36

TEX. HEALTH & SAFETY CODE § 431.054 ..............................................................38

TEX. HEALTH & SAFETY CODE § 431.059 ..............................................................38

TEX. HEALTH & SAFETY CODE § 431.060 ..............................................................37

TEX. HEALTH & SAFETY CODE § 431.0585 ............................................................38

TEX. OCC. CODE ANN. § 151.001, *et seq* ...............................................................16

TEX. OCC. CODE § 554.002(5)..................................................................................37

TEX. OCC. CODE § 560.052(g) .............................................................................9, 10

WASH. ADMIN. CODE § 246-945-100...................................................................10, 32

WASH. REV. CODE ANN. § 19.86.170........................................................................31

**Other Authorities**

159 CONG. REC. S8071 (daily ed. Nov. 18, 2013) .......................................................5

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendant Empower Clinic Services, L.L.C. d/b/a Empower Pharmacy ("Empower"), through undersigned counsel, submits this Motion to Dismiss Plaintiff Eli Lilly and Company's Complaint ("Lilly" or "Plaintiff") for Failure to State a Claim and Memorandum in Support, respectfully requesting that this Court dismiss all claims in Lilly's Complaint. In support, Empower states as follows:

## I.    **PRELIMINARY STATEMENT**

This case is not about Empower—it is the latest and most aggressive chapter in Lilly's national anti-competitive campaign aimed at eliminating compounded drugs containing tirzepatide from the market. Littering courts across the nation with suits (34 and counting) against telehealth companies, pharmacies like Empower, and medical clinics, Lilly alleges "false advertising," "unfair competition," and "deceptive practices" to prevent all tirzepatide compounding. Lilly's motivation is clear—to make Lilly's own tirzepatide-based medications (Zepbound® and Mounjaro®) the *only* available tirzepatide-based GLP-1 treatment option a doctor can prescribe—which, of course, will bolster Lilly's profits.[1]

This Complaint is Lilly's second attempt to sue Empower. Lilly first sued Empower in New Jersey earlier this year, attacking Empower's advertising as false. Because Lilly failed to state a claim, Empower moved to dismiss that New Jersey complaint; instead of opposing Empower's motion, Lilly voluntarily dismissed its New Jersey complaint and filed this Complaint before this Court.

In this "take two," Lilly continues to put its own profits over patients. Here, Lilly is not just attacking what Empower is **saying** (advertising), but is also attacking what Empower is **doing** (compounding drugs with tirzepatide). According to Lilly, Empower is unfairly competing and deceiving consumers in violation of nine state laws because Empower's compounded drugs are somehow unlawful,

---

[1] The Texas Attorney General recently sued Lilly for creating a scheme to unlawfully induce doctors to prescribe Zepbound® and Mounjaro® along with a host of other drugs. Compl., *State of Texas ex rel. Health Choice Alliance v. Eli Lilly & Co.* (Harrison County Aug. 11, 2025*), available at* https://www.texasattorneygeneral.gov/sites/default/files/images/press/Lilly%20Marshall%20Petition%20Filed.pdf.

"unapproved drugs." Lilly claims that Empower's compounded medications fail to satisfy the federal law governing compounding, Section 503A of the Federal Food, Drug, and Cosmetic Act ("FDCA"). As Lilly well knows, compounded drugs that meet Section 503A requirements are legally exempt from the new drug approval process; thus, Lilly can only proceed on its state law claims that Empower's compounded drugs are "unapproved" if Lilly *first* establishes Empower's compounded medications fail Section 503A's requirements. Only then can Lilly allege that Empower's compounded mediations are "unapproved drugs" in violation of *state* law.

Recently, several federal district court judges reminded Lilly that Congress did not allow it to enforce Section 503A.[2] FDCA Section 337(a) authorizes FDA—and FDA alone—to enforce Section 503A. Lilly attempts to skate around these reminders by claiming violations of state law "unapproved drug" prohibitions as the supposed basis of Lilly's unfair competition and consumer deception claims. But Lilly cannot avoid Congress's unambiguous directive by layering state law drug approval statutes into its Complaint to mask Lilly's *real* basis of its unfair competition and consumer deception claims—Empower's supposed 503A violations.

Moreover, none of these nine state laws allow a profit-motivated drug manufacturer like Lilly to police patient access to compounded drugs by contorting Empower's legal conduct into unfair competition and deceptive practices. Compounding is expressly permitted under state law in *all* of the states upon which Lilly's Complaint relies. As such, Empower's shipments of compounded drugs, which are not required to go through new drug approval, are state-sanctioned activity, not an unlawful act which can form the basis for an unfair or deceptive practice—and without an unlawful act, these claims fail.

---

[2] *Eli Lilly & Co. v. Wells Pharmacy Network, LLC*, No. 23-576, 2024 WL 1641673, *3 (M.D. Fla. Feb. 5, 2024) ("Lilly does not allege any claim based on Florida tort law. Instead, Lilly's … claim is based on a violation of the [FDCA], and is therefore preempted."); *Eli Lilly & Co. v. RXCompoundStore.com, LLC*, No. 23-23586, 2024 WL 1554339, *4 (S.D. Fla. Apr. 9, 2024) (relying in part on *Wells Pharmacy Network* and holding that plaintiff's FDUTPA claim was a back-door attempt to privately enforce the FDCA and was therefore preempted).

Lilly's "false advertising" claims also fail because Lilly simply cannot plead statutory standing and the corresponding state law requirements. To bring "false advertising" claims, Lilly must plead a link between the supposedly false advertisements and some harm to Lilly. But Lilly is estopped from doing so because before another Texas federal district court, Lilly already conceded that compounded tirzepatide (like Empower's compounded medications) serve patients whose doctors have determined that the manufactured drugs are not the best therapeutic option for their patients' treatment. And, in other courts, when defending product liability claims, Lilly recognizes that no prescription drug can be purchased without a prescription, and relies on physicians' independent medical judgment as a break in the causal chain. Thus Lilly is estopped from pleading differently here, which is damning to Lilly's statutory standing and state law bases for its false advertising claims—Lilly has not linked any supposed harm to it caused by any "false advertising."

For all of these reasons, Lilly's complaint should be dismissed pursuant to Rule 12(b)(6).

## II.    FACTUAL BACKGROUND

Lilly manufactures two FDA-approved drug products containing tirzepatide as the main macromolecule and active pharmaceutical ingredient ("API"): Zepbound® and Mounjaro®. Complaint ¶ 69 ("Compl."). Empower operates a Texas-based pharmacy that lawfully engages in compounding under 21 U.S.C. § 353a ("Section 503A") and state law. At issue here is Empower's compounding of tirzepatide in oral form and as tirzepatide/niacinamide injections, pursuant to physicians' determinations that the compounded medications are necessary for patient treatment.

### A.    Congress Codifies Compounding Into the FDCA.

In 1938, Congress enacted the FDCA to regulate commercial drug manufacturing. *See Med. Ctr. Pharmacy v. Mukasey*, 536 F.3d 383, 388 (5th Cir. 2008). Under the FDCA, drugs manufactured, distributed, and marketed in the United States are subject to FDA's approval

process, providing that "no person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application filed [with FDA] … is effective with respect to such drug." *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 361 (2002) ("*Western States*") (quoting 21 U.S.C. § 355(a)).

When first enacted, the FDCA did not address drug compounding, which is a traditional component of the practice of pharmacy involving "a process by which a pharmacist or doctor combines, mixes, or alters ingredients to create a medication tailored to the needs of an individual patient." *Western States*, 535 U.S. at 360–61. Compounding occurs when a physician determines a manufactured drug is inappropriate or unavailable to treat a patient. *Id*. at 361. For many years, the historic practice of pharmacy compounding remained only regulated by the states. *Id*. at 362.

As compounding expanded, however, "FDA grew concerned that some pharmacies were turning into manufacturers of new drugs without going through the FDA-approval process for manufacturing." *Nexus Pharms., Inc. v. Cent. Admixture Pharm. Servs.*, 48 F.4th 1040, 1042 (9th Cir. 2022). In response, Congress promulgated the Food and Drug Administration Modernization Act of 1997 ("FDAMA"). *Id*. FDAMA amended the FDCA and added Section 503A—creating a federal overlay for the regulation of pharmacies engaged in compounding. 21 U.S.C. § 353a. Section 503A contained new parameters for compounding, including active pharmaceutical ingredients requirements and an advertising ban prohibiting compounders from advertising. In 2002, the Supreme Court struck down the advertising ban, invalidating the entire statute and returning the regulation of compounding pharmacies to the states. *Western States*, 535 U.S. at 377.

### B. <u>Congress Revives Section 503A and Solidifies Personalized Care Parameters.</u>

In 2013, Congress passed the Drug Quality and Security Act ("DQSA"), "which, among other things, severed the unconstitutional advertising provisions from Section 503A" and revived the remainder of the statute. *Wellness Pharma., Inc. v. Becerra*, No. 20-3082, 2021 WL 4284567,

*4 (D.D.C. Sept. 21, 2021). In its place, the DQSA included a prohibition against "the advertising or promotion of a compounded drug [if it] is false or misleading in any particular." 21 U.S.C. § 352(bb). From the DQSA's passage through to today, FDA has not promulgated any regulations or provided any guidance to create parameters for advertising compounded drugs.

In passing the DQSA, Congress's intent was to maintain patient access to quality compounded medications because drug compounding plays a critical role in patient care.[3] The DQSA's purpose was to provide uniformity in the regulation of compounders, avoid the prior piecemeal approach to regulation, and maintain continued access to compounded medications. To preserve access to compounded medications for personalized patient care, Section 503A purposely exempts compounded drugs from the new drug approval process, including clinical trials, because "[r]equiring FDA approval of all [compounded] drug products … would, as a practical matter, eliminate the practice of compounding." *Western States*, 535 U.S. at 369.

Congress created compounding parameters to accompany this exemption, including bulk drug substances requirements authorizing the use of bulk drug substances, like tirzepatide, that are components of drugs approved by FDA. 21 U.S.C. § 353a(b)(1)(A)(i)(II). Compounding is further tied to patient-specific prescriptions to ensure a doctor determines that the medications are necessary for patient treatment. 21 U.S.C. § 353a(a)(2)(A)–(B).[4] This does not require that a pharmacy compound only a single prescription's worth of a medication at a time. Rather, Section

---

[3] *See, e.g.*, 159 CONG. REC. S8071 (daily ed. Nov. 18, 2013) (Sen. Alexander) ("I want to make clear that all involved on this legislation have no intent of limiting patient or provider access to quality compounded drugs that fill a clinical need."); *id*. (Sen. Harkin) ("We have worked very hard to craft a proposal that preserves patient access to clinically necessary medications while helping to ensure that providers have access to safe sources of compounded drugs.").
[4] FDA, *Guidance for Industry: Prescription Requirement Under Section 503A of the Federal Food, Drug, and Cosmetic Act*, p. 6 (Dec. 2016) ("[Section 503A's prescription requirements] are meant to help ensure that compounding … is based on individual patient needs, and that entities purportedly operating under Section 503A are not actually operating as conventional manufacturers."), **Ex. A**. Courts may take judicial notice of FDA public records. *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (affirming district court's consideration of public FDA documents); *McGuire v. Abbot Labs.*, No. 22-197, 2022 WL 4295402, *3 (E.D. Tex. Sept. 15, 2022) (FDA public documents "are the type of documents which a court may take judicial notice" under the Fed. R. Evid.).

503A authorizes compounders to consider prescription history and create batches of compounded medications on this basis, dispensed after a physician determines patient need.[5]

Consistent with this federal overlay, FDA oversees and inspects compounding pharmacies. Just like with drug manufacturers (such as Lilly), FDA issues a Form 483 subsequent to compounder inspections, setting forth the FDA inspector's compliance observations.[6] These observations are not FDA's final determination regarding compliance, but an interim step in the regulatory process—a Form 483 certainly does not mean a regulated entity has "failed" an inspection, as Lilly claims. Like Form 483s, FDA Warning Letters are another advisory tool that do not represent FDA's final compliance determinations.

### C.    Compounders, Including Empower, Performed Their FDCA-Designated Roles During Lilly's Drug Shortage.

In 2022 and 2023, FDA approved Lilly's tirzepatide-based medications Mounjaro® and Zepbound®, respectively.[7] Immediately following approval, FDA placed Lilly's drugs on the shortage list. Because Lilly could not meet patient need,[8] both of Lilly's drugs remained on FDA's shortage list for nearly two years. Empower and other compounders dutifully stepped into their FDCA-designated roles, compounding these medications to fill the treatment gap created by Lilly's drug shortage. As drugs listed on FDA's drug shortage list are not considered "commercially available," compounders can make exact copies without violating the FDCA's prohibition against copying commercially available drug products. 21 U.S.C. § 353a(b)(1)(D).[9]

---

[5] *See* 21 U.S.C. § 353a(a)(2)(A)–(B).
[6] *See* FDA, *FDA Form 483 FAQ* (Jan. 09, 2020), **Ex. B**; *supra* note 4 (judicial notice of FDA public records).
[7] *See* Application No. 215866 (Mounjaro®), Orange Book: Approved Drug Products with Therapeutic Equivalence Evaluations, available at https://www.accessdata.fda.gov/scripts/cder/ob/search_product.cfm; Application No. 217806 (Zepbound®), Orange Book: Approved Drug Products with Therapeutic Equivalence Evaluations, available at https://www.accessdata.fda.gov/scripts/cder/ob/search_ product.cfm.
[8] FDA, *FDA clarifies policies for compounders as national GLP-1 supply begins to stabilize* (Apr. 28, 2025), **Ex. C**; *supra* note 4 (judicial notice of FDA public records).
[9] FDA, *Guidance for Industry: Compounded Drugs that Are Essentially Copies of a Commercially Available Drug Product Under Section 503A of the Federal Food, Drug, and Cosmetic Act*, at 5 (Jan. 2018) ("We do not consider a

Once FDA removes a drug from its shortage list, compounders could no longer make exact copies. But—and contrary to Lilly's position—compounding pharmacies **may still compound variations** to meet patients' needs.[10] FDA acknowledges that "[c]ompounded drug products serve an important role for patents whose clinical needs cannot be met by an FDA-approved drug product."[11] FDA gives extensive guidance regarding the variations that compounding pharmacies are permitted to make; indeed, FDA recognizes that compounders may make the very modifications that Lilly is complaining about—altering the route of administration (*i.e.*, injectable to oral), altering dosage strength within FDA's parameters, or adding active ingredients.[12] As with all compounded medications made by pharmacies, a physician must determine that the medication is necessary for the patient by issuing a prescription.

### D.    Empower Is Licensed and Authorized to Dispense Compounded Medications in Each State at Issue.

Compounding is a lawful and regulated practice in each of the nine states (indeed all fifty states) pled in Lilly's Complaint. Each state has a comprehensive regulatory scheme and enforcement mechanisms to oversee compounding and ensure compliance. None of these states' statutes or regulations require compounded medications to undergo new drug approval prior to

---

drug product to be commercially available if … the drug product appears on the FDA drug shortage list ….."), **Ex. D**; *supra* note 4 (judicial notice of FDA public records).

[10] 21 U.S.C. § 353a(b)(2) (explaining that "the term 'essentially a copy of a commercially available drug product' does not include a drug product in which there is a change, made for an identified individual patient, which produces for that patient a significant difference, as determined by the prescribing practitioner, between the compounded drug and the comparable commercially available product").

[11] FDA's Essential Copies Guidance, *supra* note 9, at 2.

[12] *Id.* at 6 ("When a compounded drug product offers the same API as a commercially available drug product, the same, similar, or easily substitutable dosage strength and for use through the same route of administration, we generally intend to consider such a drug product *essentially a copy*, unless a prescriber determines that there is a change, made for an identified individual patient, that will produce a significant difference for that patient.") (emph. in original); *id.* at 7 ("FDA generally intends to consider two drugs to have a similar dosage strength if the dosage strength of the compounded drug is within 10% of the dosage strength of the commercially available drug product."); *id.* ("FDA does not intend to consider a compounded drug product with the same API and similar or easily substitutable strength to be essentially a copy of a commercially available drug product if the compounded drug product and the commercially available drug product have different routes of administration," (e.g., oral versus topical)).

sale into their state. State regulatory requirements can vary significantly among states; state standards evolve over time. Empower is licensed and authorized to dispense compounded medications into each of the nine states.

*Alaska*. The Alaska Board of Pharmacy has the authority to "control and regulat[e] the practice of pharmacy," ALASKA STAT. ANN. § 08.80.030(a), which includes developing standards for pharmacies engaged in compounding, *id.* § 08.80.030(b)(7). Prior to dispensing compounded medications into the state, Alaska requires pharmacies to obtain a license; Empower's pharmacy holds Alaska license no. 181037, **Ex. E**.[13] Alaska did not incorporate Section 503A into its statutes or regulations; Alaska regulates compounding under its own regulatory scheme. ALASKA ADMIN. CODE tit. 12, § 52.440.

*Colorado*. Colorado authorizes "registered prescription drug outlet or other outlet registered pursuant to section 12-280-119 (1)(d) to [] *compound* or dispense a prescription" (COLO. REV. STAT. § 12-280-120(4)) into Colorado; Empower's pharmacy holds Colorado license no. OSP.0006131, **Ex. F**. Colorado did not incorporate Section 503A into its statutes or regulations; Colorado regulates compounding under its own regulatory scheme. 3 COLO. CODE REGS. § 719-1.

*Connecticut*. Connecticut authorizes "nonresident pharmacy intend[ing] to compound sterile pharmaceuticals," pursuant to the pharmacy's license—authorizing the pharmacy to dispense compounded medications into the state. CONN. GEN. STAT. § 20-633b. Empower's pharmacy holds Connecticut license no. PCN.0002564. **Ex. G**. Connecticut did not incorporate Section 503A into its statutes or regulations; Connecticut regulates compounding under its own regulatory scheme. CONN. AGENCIES REGS. § 20-576-66.

*Hawaii*. Hawaii authorizes licensed pharmacies to dispense compounded medications into

---

[13] Empower's relevant state licenses are attached as **Exs. E-M**. This court can take judicial notice of them, *infra* at 11.

the state (HAW. REV. STAT. § 461-1 (defining "pharmacy" to include where compounding occurs); Empower's pharmacy holds Hawaii license no. PMP-1076, **Ex. H**. Hawaii did not incorporate Section 503A into its statutes or regulations; Hawaii regulates compounding under its own regulatory scheme. HAW. CODE. R. TIT. 16, CH. 95.

*North Carolina*. North Carolina authorizes licensed pharmacies to dispense compounded medications into the state (21 N.C. ADMIN. CODE 46.2801); Empower's pharmacy holds North Carolina license no. 11581, **Ex. I**. North Carolina did not incorporate Section 503A into its statutes or regulations; North Carolina regulates compounding under its own regulatory scheme. *Id.*

*South Carolina*. South Carolina authorizes licensed pharmacies to dispense compounded medications into the state (S.C. CODE ANN. § 40-43-86); Empower's pharmacy holds South Carolina license no. 15188, **Ex. J**. South Carolina did not incorporate Section 503A into its statutes or regulations; South Carolina regulates compounding under its own regulatory scheme. *Id.*; *see also* S.C. CODE ANN. REGS. § 99-43(B)(2)(c).

*Tennessee*. Tennessee authorizes licensed pharmacies to dispense compounded medications into the state (TENN. CODE. ANN. § 63-10-216); Empower's pharmacy holds Tennessee license no. 00005312, **Ex. K**. Tennessee did not incorporate Section 503A into its statutes or regulations; Tennessee regulates compounding under its own regulatory scheme. TENN. COMP. R. & REGS. § 1140-07.01.

*Texas*. Texas statute instructs that a "license may not be issued to a pharmacy that compounds sterile preparations unless the pharmacy has been inspected by the board to ensure the pharmacy meets the safety standards and other requirements of this subtitle and board rules." TEX. OCC. CODE § 560.052(g). Empower's pharmacy holds a Class A-S license no. 26444, authorizing Empower to compound sterile preparations in Texas. *Id.*; **Ex. L**. Texas did not incorporate Section

503A into its statutes or regulations; Texas regulates compounding under its own regulatory scheme. 22 TEX. ADMIN. CODE § 291.133; *see also* 22 TEX. ADMIN. CODE § 291.131.

*Washington*. Washington authorizes licensed pharmacies to dispense compounded medications into the state (WASH. ADMIN. CODE § 246-945-100); Empower's pharmacy holds Washington license no. PHNR.FO.60669290, **Ex. M**. Washington did not incorporate Section 503A into its statutes or regulations; Washington regulates compounding under its own regulatory scheme. WASH. ADMIN. CODE § 246-945-100.

## III. LILLY'S COMPLAINT: A THINLY-VEILED ATTEMPT TO ELIMINATE COMPOUNDING WITH TIRZEPATIDE

Under the umbrella of false advertising, deceptive practices, and unfair competition, Lilly's Complaint sets forth the following four core theories:

- **Safety and Effectiveness Theory**: Empower's use of articles describing the clinical data regarding tirzepatide (the active pharmaceutical ingredient) falsely implies that Empower's compounded medications are safe and effective, when Empower's compounded tirzepatide ODT and tirzepatide/niacinamide medications have not undergone clinical trials. Compl. ¶¶ 10-13.

- **Personalization Theory**: According to Lilly, "Empower's practice of selling its Tirzepatide ODT and combination tirzepatide injectable as "personalized" products is deceptive, because in fact, Empower is mass manufacturing one-size-fits-all drugs." Compl. ¶ 14.

- **Compliance Theory**: Based on FDA's non-final determinations and state matters resolving conduct that far pre-date Empower's advertisements at issue, Lilly asserts that Empower's current statements that it "adheres to state and federal regulations' are false. Compl. ¶ 15.[14]

- **"Unapproved Drugs" Theory**: Empower's compounded tirzepatide ODT and tirzepatide/niacinamide medications are "unapproved drugs," which allegedly violate state preapproval requirements in Alaska, Colorado, Connecticut, Hawaii, North Carolina, South Carolina, Tennessee, Texas, and Washington. Compl. ¶ 9.

---

[14] In support of its assertion, Lilly cites the following: a 2015 FDA Form 483, a 2017 FDA Warning Letter, a 2023 FDA Form 483, and a 2025 Warning Letter, Compl. ¶¶ 126-127, ¶¶ 132-135, and prior settlements with the California, Colorado, Florida, Oklahoma, and Pennsylvania Boards of Pharmacy. Compl. ¶¶ 128-130.

## IV.    ARGUMENT

### A.    Legal Standard.

"To survive a motion to dismiss, a complaint must contain sufficient ***factual matter***, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007)).[15] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. While courts accept "all well-pleaded facts contained in the complaint are true," courts need not "accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Greater Hous. Transp. Co. v. Uber Techs., Inc.*, No. 14-0941, 2015 WL 1034254, *5 (S.D. Tex. Mar. 10, 2015). Further, the Court need not "strain to find inferences favorable to plaintiff," nor are "legal conclusions masquerading as factual conclusions treated as true." *Id*.

In deciding a motion to dismiss, "the Court may consider the complaint, its proper attachments, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Id*. The Court can appropriately consider matters of public record, such as FDA documents, state regulations, and Empower's publicly available state licenses. *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (holding that FDA documents and transcripts are properly subject to judicial notice and can be considered on a motion to dismiss); *Greater Hous. Transp. Co.*, 2015 WL 1034254, *6 (taking judicial notice of city ordinances and regulations); *Gomez v. Niemann & Heyer, LLP*, No. 16-119, 2016 WL 3562148, *15 (W.D. Tex. Jun. 24, 2016) (publicly available state documents properly subject to judicial notice). Here, the court can consider Empower's statements, both referenced in and appended to the Complaint, FDA

---

[15] Throughout, emphasis is added, citations and internal quotation marks are generally omitted, and quotations are generally cleaned up for readability, unless otherwise indicated.

documents, and state regulations and licenses in evaluating the Complaint.

**B.    Lilly's False and Misleading Advertising Claims Fail**

A plaintiff who asserts a claim under the Lanham Act[16] must establish that: (1) the

defendant made a false or misleading description of fact or representation of fact in a commercial

advertisement about his own or another's product; (2) the misrepresentation actually deceives or

has the tendency to deceive a substantial segment of its audience; (3) the misrepresentation is

material, in that it is likely to influence the purchasing decision; (4) the defendant placed the false

or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be

injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of

goodwill associated with its products. *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 495

(5th Cir. 2000). Lilly has failed to establish standing or properly plead the first, second, third, and

fifth elements. Empower begins with statutory standing and the fifth element, which both fail here

because Lilly has not plausibly alleged that Empower proximately caused Lilly harm.

**1.    Lilly Does Not Plead Facts Demonstrating Empower's Advertisements Caused Lilly Harm.**

To establish it has standing to bring a Lanham Act claim, Lilly must identify a specific

assertion in its Complaint of a non-speculative commercial injury to its reputation or sales.

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132-33 (2014). The Lanham

Act's purpose is to protect parties only against "injuries to business reputation and present and

---

[16] False advertising claims under Alaska, Connecticut, Texas, and Washington state law parallel the Lanham Act. *Alderman v. Iditarod Props., Inc.*, 32 P.3d 373, 380 (Alaska 2001); *Doctor's Assoc., Inc. v. QIP Holder LLC*, No. 06-1710, 2010 WL 669870, *25 (D. Conn. Feb. 19, 2010); *Mission Pharmacal Co. v. Virtus Pharms., LLC*, 23 F. Supp. 3d 748, 759 (W.D. Tex. 2014); *Mighty Dreams LLC v. Shenzhen Beianen Auto. Supplies Co.*, No. 24-00793, 2025 WL 1635240, *3 (W.D. Wash. June 9, 2025). Similarly, to state an actionable false advertising claim under the unfair competition laws of Colorado, North Carolina, South Carolina, and Tennessee, a plaintiff must allege—at a minimum—conduct that misleads or deceives consumers, and that the plaintiff was actually injured by the challenged conduct. *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 146-47 (Colo. 2003); *Walker v. Branch Banking & Tr. Co.*, 515 S.E.2d 727, 729 (N.C. Ct. App. 1999); *Charleston Lumber Co. v. Miller Hous. Corp.*, 458 S.E.2d 431, 438 (S.C. Ct. App. 1995); *Health v. Case Mgmt. Assocs., Inc.*, 128 F. Supp. 3d 1020, 1036 (E.D. Tenn. 2014). As such, the reasoning in this section applies to the Lanham Act and state law claims alike.

future sales." *Id.* at 131. Recovery under the Lanham Act is limited to plaintiffs who prove "an injury to a commercial interest in sales or business reputation ***proximately*** caused by the defendant's misrepresentations." *Blue Star Press, LLC v. Blasko*, No. 17-111, 2018 WL 1904835, *5 (W.D. Tex. Mar. 6, 2018) (quoting *Lexmark*, 572 U.S. at 132).

Unless facts demonstrate the plaintiff suffered "economic or reputational injury flowing ***directly*** from the deception wrought by the defendant's advertising," which occurs "when deception of consumers causes them to withhold trade from the plaintiff," standing is lacking. *Lexmark*, 572 U.S. at 133. To sue under the Lanham Act then, a plaintiff must plead "a link or proximate cause between defendants' alleged false advertising and a resulting injury to plaintiff." *U.S. ex rel. Univ. Loft Co. v. Avteq, Inc.*, No. 14-528, 2015 WL 13548950, *9 (W.D. Tex. Dec. 22, 2015), *R&R adopted*, 2016 WL 9461763 (W.D. Tex. Jan. 8, 2016). So too, the fifth element of the Lanham Act requires evidence that "consumers would have bought plaintiff's product instead of the defendant's products in absence of the defendant's allegedly false statement." *Boltex Mfg. Co., L.P. v. Galperti, Inc.*, 827 F. App'x 401, 406 (5th Cir. 2020). Thus, Lilly's failure to adequately plead Empower's statements proximately caused it harm is dispositive at the motion to dismiss stage because Lilly lacks standing and cannot establish an injury to satisfy the fifth element.

### a) Lilly's Complaint Does Not Plead Facts Demonstrating Reputational Harm Caused By Empower's Advertisements.

Lilly cannot establish a plausible connection between Empower's statements and Lilly's purported reputational harm. *Lexmark*, 572 U.S. at 132. Lilly alleges that Empower's statements promise "results that consumers will not obtain from Empower's products" and are likely to harm consumers because "a pharmacy like Empower has a long record of safety lapses." Compl. ¶ 160. According to Lilly, when "consumers fail to achieve desired results" from Empower's products or are harmed by Empower's products, "consumers are likely to draw unwarranted conclusions about

the safety and effectiveness of Lilly's FDA-approved tirzepatide medicines." *Id.*

These allegations are insufficient because they do not allege direct harm to Lilly from Empower's alleged consumer deceptions. Under Lilly's multi-step causation theory, a patient would need to (1) see an advertisement from Empower that references Lilly's clinical studies, (2) have a doctor determine that compounded tirzepatide is appropriate for treatment and prescribe it, (3) submit the physician's prescription to Empower to dispense compounded tirzepatide, (4) have a negative experience with Empower's compounded tirzepatide by either not achieving the desired result or being harmed by it, (5) believe that it was deceived by Empower as to the safety or efficacy of compounded tirzepatide generally; and then (6) take this negative reaction out ***on Lilly*** because Lilly sells Mounjaro® and Zepbound®. Lilly pleaded absolutely none of these facts; the Complaint contains no facts to support any inference that this speculative harm to Lilly's reputation could occur. *Blue Star Press, LLC*, 2018 WL 1904835, *5 (dismissing false advertising claim that alleged only conclusory statements of harm).

Lilly's Complaint does not explain how patients would leap from a negative experience with Empower's compounded tirzepatide to holding Lilly responsible for this negative experience—Lilly's name is not on the compounded tirzepatide, nor is Lilly or its medications mentioned anywhere in Empower's advertisements. Even more, Lilly does not plead any facts to plausibly support that patients are likely to be harmed by Empower's compounded tirzepatide or that if such speculative harm occurred, the patients would somehow blame Lilly as a result. Lilly has failed to set forth any facts establishing a plausible basis for reputational harm linked directly to any alleged deceptive practices by Empower. Because Empower's advertisements are completely unrelated to Lilly and its medications, Lilly cannot establish a proximate connection between the advertisements at issue and Lilly's purported reputational harm to establish standing

or the fifth element. Lilly's claims should be dismissed for failure to plead Lanham Act standing and failure to plead the proximate cause element of the claim.

> ### b) Lilly Cannot Plausibly Plead Facts Showing that Empower's Advertising Led Lilly to Lose Sales.

Lilly cannot link Empower's purported unlawful activity under the Lanham Act to any purported patient diversion harming Lilly. Lilly conclusorily alleges "[s]ome sales made by Empower of its compounded tirzepatide products would have been made to Lilly but for Empower's unlawful and unfair competition," and Empower's statements "lure customers away from" being treated with Mounjaro® and Zepbound® with false promises about the safety and efficacy of Empower's compounded tirzepatide. Compl. ¶¶ 158-59. This is insufficient.

> #### i.    Lilly Fails to Acknowledge the Physician's Role.

Independent, third-party doctors—not Empower—determine whether a patient receives compounded tirzepatide. 21 U.S.C. § 353a(a) (requiring that a compounded medication be tied to a "prescription order that a compounded product is necessary for the identified patient"). Prescribing determinations are based on the doctor's independent clinical judgment—not Empower's advertisements. Therefore, it is impossible to connect any compounded tirzepatide prescribing to Empower's statements.

Lilly's proximate cause theory fails because Lilly cannot show any alleged Lanham Act violations caused Lilly harm. Consumers do not decide if they will be prescribed compounded tirzepatide or FDA-approved tirzepatide—doctors make these decisions. *Geomatrix, LLC v. NSF Int'l*, 629 F. Supp. 3d 691, 709 (E.D. Mich. 2022), *aff'd* 82 F.4th 466, 484 (6th Cir. 2023) (finding no proximate cause where independent state regulators' decisions not to approve the plaintiff's products were the "intervening cause and the proximate one" of plaintiff's harm—not alleged false statements about the effectiveness and environmental impact of plaintiff's products). In fact,

Lilly's theory was recently criticized and rejected in the Central and Northern Districts of California, where Lilly brought similar Lanham Act claims against two technology platforms that connect patients with physicians and pharmacies for marketing compounded tirzepatide on their websites. *Eli Lilly & Co. v. Willow Health Servs., Inc.*, No. 25-03570, 2025 WL 2631620 (C.D. Cal. Aug. 29, 2025); Tr. of Mot to Dismiss Hr'g at 3:21-9:14, 63:25-65:23, *Eli Lilly & Co. v. Mochi Health Corp.*, No. 25-3534 (N.D. Cal. Aug. 28, 2025), **Ex. N** ("*Mochi* Tr."). In dismissing for lack of statutory standing, the *Willow* court stated:

> Plaintiff pleads no direct link or even any facts suggesting some chain of inferences between a consumer (a patient) seeing Defendant's advertisement and then buying compounded medication instead of Plaintiff's medication. Even further, Plaintiff ignores the simple fact that regardless of what an advertisement says or what a consumer wants to buy, obtaining a prescription medication requires a physician to prescribe it. A physician prescribing a compounded medication is the proximate cause of a consumer/patient using compounded medication instead of Plaintiff's medication.

*Willow*, 2025 WL 26312620, *6. The physician's prescription is an intervening factor that breaks any purported connection between Empower's advertisements and alleged Lilly lost sales.

Accepting Lilly's theory that consumers were "lured" away requires this Court to erase the doctor's role in independent clinical determinations doctors make when evaluating whether to prescribe a medication at all, and, if so, in selecting the appropriate medication. *See generally* TEX. OCC. CODE ANN. § 151.001, *et seq*. Doctors rely upon myriad factors when selecting which medication, if any, is appropriate to treat their patients, such as medical history, comorbidities, and treatment goals, as well as the approved uses for commercially available medications. Lilly cannot dispute that a physician's independent medical judgment in prescribing a medication is an intervening factor in the causal chain between a drug advertisement and the patient being prescribed the drug—especially when Lilly regularly relies on that very intervening factor to disclaim liability in cases challenging the warnings or safety representations on the warning labels of its drugs. *See e.g.*, Mot. for Summ. J. at 20, *Saavedra v. Eli Lilly & Co.*, No. 12-9366 (C.D. Cal.

Mar. 27, 2013) (ECF No. 54) (arguing Lilly was not liable for injuries caused by Cymbalta because "in the prescription medicine context, the independent decision of a physician to prescribe a medicine breaks the causal chain between the alleged misrepresentation and the alleged injury").[17]

Recognizing that the undisputable facts prevent it from pleading direct causation, Lilly attempts to bridge the gap with a single allegation that one healthcare provider "repeated Empower's false and deceptive claims." Compl. ¶ 98. But this solitary allegation cannot support the weight Lilly imposes on it—the general inference that doctors' independent judgments have been co-opted by Empower's advertisements. Regardless of what any one healthcare facility's website states, a patient cannot receive compounded tirzepatide unless a physician exercises independent clinical judgment and prescribes it. This Court should not accept Lilly's entirely implausible implied factual assertions that completely ignore the doctor's role. *Univ. Loft Co.*, 2015 WL 13548950, *9 (dismissing Lanham Act claims for lack of statutory standing because allegations that certain statements might impact customer's decision "insufficient to support an inference" that the customer "was lured away" without a "particularized statement of facts" showing causal connection between statement and harm); *Twombly*, 550 U.S. at 570 (courts may reject as implausible allegations that are too speculative to warrant further factual development).

---

[17] *See also* Lilly's Mem. of Law in Support of Mot. to Dismiss at 13, *In re GLP-1 RAs Prods. Liab. Litig.*, 24-3094, (E.D. Pa. Jan. 24, 2025) (ECF No. 329-1) (arguing claims against Lilly for failing to warn of side effects from GLP-1s, including Mounjaro® and Zepbound®, should be dismissed because "the role of the prescribing physician destroys privity or results in the claim being barred under the learned intermediary doctrine"); Br. of Resp. Eli Lilly & Co. on Certified Question at 22-23, *Dearinger v. Eli Lilly & Co.*, No. 99956-2 (Wash. Oct. 25, 2021) (arguing Lilly was not liable for injuries caused by Cialis because direct-to-consumer "advertising is primarily intended to encourage patients who may be appropriate candidates for a medication to speak with their prescribers about that mediation. It is not intended to replace, and does not replace the medical judgment that prescribers provide. Instead, the physician remains solely responsible for any ultimate prescription decision."); Br. of Appellee Eli Lilly & Co. at 19, *Boehm v. Eli Lilly & Co.*, No. 10-159 (8th Cir. May 24, 2013) (Entry ID 4039220) ("Lilly is not liable for the alleged injury if Plaintiff's physicians made an 'individualized medical judgment' that Zyprexa was a necessary and desirable treatment.").

  ii. Compounded Tirzepatide and FDA-Approved Tirzepatide Serve Different Parts of the Market.

Lilly knows full well that compounded tirzepatide is often ***not*** prescribed for the same patients as Lilly's drugs, which highlights the implausible connection between Empower's statements and Lilly's purported lost sales. As discussed above, in 2022, FDA declared that Lilly's tirzepatide-based drugs were "in shortage." In December 2024, FDA determined Lilly could meet patient need, declaring the shortage resolved.[18] FDA's shortage resolution was challenged in federal court, and Lilly intervened to support FDA. In its briefs, Lilly argued it could adequately meet patient need for tirzepatide-based medications. As Lilly explained:

> [T]here was good reason to think that ***much of the market for compounded tirzepatide would not translate to future demand for Lilly's FDA-approved products.*** Compounded products are often promoted for uses different from the indications FDA has approved, including by affiliated telehealth providers, so patients may be less likely to get a prescription from a physician for FDA-approved medicine. There also might not be insurance coverage for those off-label uses, and some compounded products use a different formulation than Lilly's products.[19]

Relying on Lilly's representations, the court affirmed the shortage's resolution. *Outsourcing Facilities Ass'n v. FDA*, No. 24-953, 2025 WL 1397537, *9 (N.D. Tex. June 13, 2025).

Thus, before a different Texas federal district court, Lilly admitted that ***its*** drugs and compounded tirzepatide serve patients with different therapeutic needs. Lilly's admission is ***fatal*** to its claims here—that Empower's advertisements "lure[d]" customers away from Lilly.[20] Lilly cannot claim patient diversion before this Texas federal district court, when Lilly has conceded, in a different Texas federal district court, that doctors may prescribe compounded tirzepatide

---

[18] Following the shortage, compounders may continue to compound with tirzepatide API in accordance with Section 503A and FDA guidance. 21 U.S.C. § 353a(b)(1)(D); FDA's Essential Copies Guidance, *supra* note 9, at 5-6.

[19] Intervenor-Def.'s Br. in Opp. to Pl.'s Mot. for Summ. J. at 25-26, *Outsourcing Facility Ass'n v. FDA*, No. 24-953 (N.D. Tex. Apr. 17, 2025) (ECF No. 138).

[20] *Love v. Tyson Foods, Inc.*, 677 F.3d 258, 261 (5th Cir. 2012) ("The doctrine of judicial estoppel … can be invoked by a court to prevent a party from asserting a position in a legal proceeding that is inconsistent with a position taken in a previous proceeding."); *Reed v. City of Arlington*, 650 F.3d 571, 573–74 (5th Cir. 2011) (same).

medications for patients whom Lilly's drugs are not the best therapeutic option. Lilly is bound by its prior admission; the doctrine of judicial estoppel bars Lilly from now changing its tune for the purpose of this litigation. *Love*, 677 F.3d at 261.

As the *Mochi* court in the Northern District of California warned, if Lilly is alleging that it lost sales, then Lilly "better allege facts that plausibly support that inference" to establish standing. *Mochi* Tr. 64:19-23, **Ex. N**. Because Lilly cannot plausibly allege Empower's advertisements were a proximate cause of any purported patient diversion, Lilly lacks standing under the Lanham Act and has failed to sufficiently plead the fifth element; its claims should be dismissed. *Blasko*, 2018 WL 1904835, *5 (no standing because no allegation on how "conduct took away from plaintiff's market share"); *IQ Prods. Co. v. Pennzoil Prods. Co.*, 305 F.3d 368, 375 (5th Cir. 2002) (insufficient harm to support Lanham Act claim where no evidence consumers would have bought plaintiff's products absent alleged false statements).

### 2.    Lilly's Personalization Theory Fails to State a Claim.

The Lanham Act distinguishes literally false ads from those which, while true, are misleading in context. *IQ Prods. Co.*, 305 F.3d at 375. "A statement is literally false when it is an explicit representation of fact that on its face conflicts with reality." *Dupart v. Roussell*, 497 F. Supp. 3d 102, 119 (E.D. La. 2020). But if the statement is misleading or ambiguous in context, "the plaintiff must demonstrate actual deception through direct evidence of consumer reaction to the advertising or evidence of consumer surveys or consumer reaction tests." *IQ Prods.*, 305 F.3d at 375. The Lanham Act also only provides relief for false or misleading representations of ***fact***. Statements of opinion, including "puffery," are not actionable. *Pizza Hut, Inc.*, 227 F.3d at 495–96 ("Essential to any claim under the Lanham Act is a determination of whether the challenged statement is one of fact—actionable under the Lanham Act—or one of general opinion—not actionable under the Lanham Act."). When a statement constitutes non-actionable puffery, the

Court may dismiss the claim at the 12(b)(6) stage. *Schwimmer v. Presidio Indus. LLC*, No. 10-2213, 2011 WL 13089398, *3 (N.D. Tex. Feb. 11, 2011) (granting motion to dismiss false advertising claim based on "mere puffery").

Plaintiff's Personalization Theory fails to allege facts to support the first and second elements of the Lanham Act Claim because under the governing federal regulations, Empower's advertisements are literally true; the Court is precluded from holding otherwise as it contradicts and undermines the federal regulatory scheme. But even if preclusion did not apply and Empower's statements were not true on their face, Lilly's claims still independently fail because Lilly has failed to plead facts showing reasonable consumers were misled or could be misled by Empower's statement, and the statements at issue are non-actionable puffery.

a) *Empower's Statements Are Literally True Under Section 503A and the Court Is Precluded from Holding Otherwise.*

According to Lilly's unilateral definition, "personalization" means making compounded medications one-by-one after the receipt of a prescription for a specific patient, and does not include "predetermined dosages." Compl. ¶ 116. In Lilly's world, Empower can comply with claims that its compounded medications are "personalized" only if the patient has the "opportunity to select additives or adjust dosages to meet a patient's specific needs." Compl. ¶ 117.

But the FDCA and FDA—not Lilly—determine what constitutes "personalized medication." Compounded medications are by nature "personalized" medications. Doctors prescribe compounded medications when they determine that mass-manufactured medications, like Lilly's, are unsuitable for a patient's treatment. *Western States*, 535 U.S. at 360-61 (defining compounding as the "process by which a pharmacist or doctor combines, mixes, or alters ingredients to create a medication tailored to the needs of an individual patient"). Section 503A sets forth the parameters for how compounded medications are "personalized" or "tailored to the

needs of an individual patient." *See* 21 U.S.C. § 353a(a) (requiring issuance of a prescription showing that "a compounded product is necessary for the identified patient"). Therefore, drugs compounded pursuant Section 503A are *per se* "personalized" under the regulatory scheme. *FedEx*, 97 F.4th at 453.

Section 503A does not require that a compounder make medications one-by-one. Rather, Lilly's self-created one-by-one compounding limitation contradicts both the FDCA and FDA's guidance interpreting Section 503A, which *explicitly* authorizes compounders to create batches of compounded medications for subsequent dispensing. *See* 21 U.S.C. § 353a(a)(2)(A)–(B)(i)(ii)(I)–(II). Empower's listing "fixed dosages" on its website is nothing more than publication of Empower's compliance with batch allowances under Section 503A. In short, Empower's statements regarding "personalization" are literally true as determined by Section 503A and FDA.

Still, Lilly asks this Court to "directly conflict with FDA's policy choice" and otherwise "undermine FDA's judgment." *Pom Wonderful, LLC v. Coca-Cola Co.*, 573 U.S. 102, 120 (2014). The FDCA precludes all Lanham Act claims where plaintiff's factual allegations require FDA's "peculiar expertise" to resolve. *Healthpoint, Ltd. v. Ethex Corp.*, 273 F. Supp. 2d 817, 843-44 (W.D. Tex. 2001) (R&R) (allegedly false marketing regarding "equivalence" among drugs is "inextricably linked to the determination of whether [defendant's drug] is being marketed lawfully, a matter within the exclusive enforcement domain and peculiar expertise of the FDA"), *adopting relevant portion of R&R & rejecting other portions on other grounds*, 2001 WL 34897840, *4-5 (W.D. Tex. Aug. 3, 2001). Lilly's claims, therefore, amount to a bold attempt to rewrite a federal regulatory framework that Lilly does not like, via litigation. This is exactly why the FDCA precludes such Lanham Act claims—because "new definitions of FDA terms would undercut national uniformity regarding federal laws regulating the drug market or would confuse

the public and undermine confidence in the drug supply in general." *Id.* at 844. According to

Section 503A and FDA, Empower's claims are literally true. By holding otherwise, this Court

would be contradicting and undermining the federal regulatory scheme and is precluded from

doing so. In the absence of a false statement of fact, Lilly's personalization Lanham Act allegations

must fail.

> **b) Alternatively, Lilly Fails to Allege that Empower's Statements Actually or Tend to Deceive a Substantial Portion of the Intended Audience.**

Even if Empower's claims were not literally true and preclusion did not apply, Lilly's

Personalization Theory still fails. Without literal falsity, Lilly must sufficiently allege that

Empower's advertisements are nonetheless misleading and deceived consumers. *Pizza Hut*, 227

F.3d at 497. Lilly has not done so. Lilly claims Empower's classification of its compounded

medications as "personalized" is misleading because Empower's website features specified

formulations and doses without the option for patient-by-patient modification allegedly resulting

in mass-manufacturing. Compl. ¶¶ 112-121. But Lilly pleads no facts that any customer was

confused or deceived by Empower's website. *Id.* At most, Lilly claims that consumers had an

online discussion about the need to change pharmacies because Empower did not offer tirzepatide

without niacinamide. *Id.* ¶ 119. This sole allegation does not allege consumer confusion regarding

"personalization" and is therefore insufficient because "plaintiff may not rely on the judge or the

jury to determine based solely upon his or her own intuitive reaction, whether the advertisement

is deceptive." *Pizza Hut*, 227 F.3d at 497. "Instead, proof of actual deception requires proof that

consumers were actually deceived." *Id.*; *S. Snow Mfg. Co. v. Snow Wizard Holdings, Inc.*, 829 F.

Supp. 2d 437, 455 (E.D. La. 2011) ("Plaintiffs have made a strategic business decision to proceed

without customer input via surveys …. Thus, Plaintiffs have no evidence of … actual deception,

which is necessary for monetary relief."). Without any allegations that consumers were misled by

Empower's statements, Lilly's Personalization Theory claims fail.

### c) *Empower's Statements Are Non-Actionable Puffery.*

Section 503A's parameters are the metric for determining personalization for compounded medication. If for some reason these parameters do not apply, *no* empirical metric exists and Empower's personalization statements are non-actionable puffery. *Schwimmer*, 2011 WL 13089398, *3 (statement touting "revolutionary" and "unique" medical practice "merely puffery" because required "subjective interpretation of the consumer based on qualitative factors"—not empirical verification); *Yoshikawa v. Exxon Mobil Corp.*, No. 21-194, 2022 WL 4677621, *15 (N.D. Tex. Sept. 29, 2022) (statements such as "on track," "decent," and "optimized" non-actionable puffery because "[a]ttempting to 'objectively verify' these statements would prove difficult, as there would be no clear standard or verification would yield few or no additional details."). As such, Lilly's Personalization Theory fails for this independent reason.

### 3. Lilly's Safety and Effectiveness Theory Fails to State a Claim.

Lilly claims that by referencing Lilly's clinical trials involving tirzepatide (the active pharmaceutical ingredient in Lilly's drugs and Empower's compounded medications), Empower implies its compounded drugs are safe and effective treatments for diabetes and weight management. Compl. ¶¶ 100-108. Lilly also claims that Empower represents its compounded tirzepatide medications are better than Lilly's FDA-approved medicines. *Id.* ¶ 107. These are not actionable statements under the Lanham Act because the federal regulatory scheme precludes the Court from determining the truth or falsity of Empower's statements. Even without preclusion, Empower's statements are non-actionable puffery. And, even if the statements were actionable, Lilly's claims still fail because it has not pled any facts supporting customer confusion.

*a)  Lilly's Claims Based on the Safety and Effectiveness Statements Are Precluded by the Federal Regulatory Scheme*

Lilly claims that Empower's references to tirzepatide data are inappropriate when applied to Empower's compounded medications because there are differences in the bioavailability between oral and injectable medications, and there are no studies regarding Empower's specific compounded medication—an oral form of tirzepatide and tirzepatide/niacinamide as an injectable. Compl. ¶¶ 109-111.  But, these claims "require direct application or interpretation of the FDCA or its implementing regulations or FDA policies." *Healthpoint, Ltd. v. Stratus Pharms., Inc.*, 273 F. Supp. 2d 769, 793 (W.D. Tex. 2001). As such, these claims are precluded.

The FDCA sets forth the active pharmaceutical ingredient requirements for compounders and specifically authorizes compounders to utilize active pharmaceutical ingredients that are "a component of a drug approved by" FDA. 21 U.S.C. § 353a(A)(b)(1)(A)(i)(II). Accordingly, Empower uses tirzepatide, the active pharmaceutical ingredient in Lilly's manufactured drug, to compound medications following a physician's determination that the medication is necessary for treatment. Plaintiff does not allege that Empower's medications do not contain tirzepatide; nor does Plaintiff allege that Empower's tirzepatide is different than the active pharmaceutical ingredient at issue in the cited articles. Compl. ¶¶ 1–290.

Rather, Lilly asks this Court to rule on the open-ended question of whether it is appropriate for Empower to reference data about tirzepatide when discussing certain types of tirzepatide-containing compounded medications in its advertising. But FDA has oversight of compounded drug advertisements. *See* 21 U.S.C. § 352(bb) (prohibiting "the advertising or promotion of a compounded drug [if it] is false or misleading in any particular."). FDA has not promulgated regulations or issued guidance interpreting Section 352(bb); there is certainly no FDA guidance as to what types of studies compounders can cite in advertisements regarding the active ingredients

used in their compounded medications.

Thus "arguments concerning what federal law does or does not require for [drugs] to be marketed legally require the direct application and interpretation of FDA regulations." *Ethex Corp.*, 273 F.Supp.2d at 840. Such open-ended determination within the peculiar expertise of FDA should not be addressed by this (or any) Court. And, as for Lilly's complaints about Empower's marketing of compounded tirzepatide ODT, FDA must weigh in—and has not—on whether there are differences in bioavailability between oral and injectable medications such that Empower's references to the tirzepatide studies are inappropriate.

All these issues are open-ended questions that are squarely in the province of FDA. *Allergan U.S. v. Imprimis Pharms., Inc.*, No. 17-1551, 2017 WL 10526121, *7 (C.D. Cal. Nov. 14, 2017) (reasoning that claims that are not binary factual determinations but rather involve open-ended determinations are precluded); *Stratus Pharma., Inc.*, 273 F. Supp. 2d at 793 n.147 (refusing to address statements about drug safety and mislabeling because required the court to directly apply or interpret the FDCA). Because Lilly's Lanham Act claim requires nuanced, open-ended determinations within FDA's jurisdiction, Lilly's claims are precluded and therefore must fail.

> b) *If Not Precluded, Empower's Safety and Efficacy Statements Are Not Literally False.*

Lilly's claims that Empower's reference to tirzepatide clinical studies on its Product Overview page for compounded tirzepatide/niacinamide and compounded tirzepatide ODT is false advertising because the clinical trials do not involve these specific compounded medications. Compl. ¶ 108. But Lilly conveniently omits necessary context for Empower's Product Overview statements that demonstrate that the statements are not literally false on their face. Product Page

Tirzepatide/Niacinamide Injection, **Ex. O**; Product Page Tirzepatide ODT, **Ex. P**.[21]

Specifically, the studies Empower cites are indisputably and explicitly discussing tirzepatide and niacinamide alone—not Empower's combined tirzepatide/niacinamide, and not Empower's oral formulation. **Ex. O**, **Ex. P**. Empower's citations explicitly reference clinical studies in various medical journals of tirzepatide, alone, and niacinamide, alone. Empower never states nor implies that it hosted, conducted, funded, or developed the cited data—in fact, Empower includes citations *showing* the source of this data, demonstrating it is not Empower's own data.

Further, Plaintiff alleges Empower's generalized convenience statements are false: "No needles, no refrigeration, no preparation," and "Skip the needle and get customized weight management support with the new tirzepatide ODT." Compl. ¶¶ 109-110. Yet again, Empower's statements are literally true—Empower's oral formulation does not require needles, refrigeration, or preparation, and patients can skip the needles and receive customized weight management support with the compounded medication. Therefore, Lilly fails to allege how Empower's citations to studies about tirzepatide and statements about the oral formulation's convenience are false.

> *c)* Because Empower's Study Citations and Oral Formulation Statements Are Not Literally False, Lilly Is Required to Identify Consumer Confusion, But Failed to Do So.

To survive without literal falsity, Lilly must claim that Empower's statements, while true, are misleading. Compl. ¶¶ 108, 111. Stated differently, Lilly asserts that Empower's summary of the tirzepatide data is true, but allegedly misleading when applied to Empower's compounded medications. *Id.* ¶¶ 106-111. Here again, Lilly failed. To support actual deception in the

---

[21] Lilly cited these pages in its Compl. (¶¶ 117 n.82 & ¶ 118 n.83), but did not attach them. The full versions are included here as **Exs. N & P.** The court may consider them at this stage as a document referenced in Lilly's Complaint. *Pizza Hut, Inc.*, 227 F.3d at 495 n.5 ("When construing the allegedly false or misleading statement to determine if it is actionable, the statement must be viewed in the light of the overall context in which it appears."); *Greater Hous. Transp. Co. v. Uber Techs., Inc.*, 155 F. Supp. 3d 670, 700 (S.D. Tex. 2015) ("The court must view the face of the statement in its entirety, rather than examining the eyes, nose, and mouth separately and in isolation from each other.").

marketplace, Lilly claims only that a single healthcare provider has advertised Empower's tirzepatide ODT as a "powerful tool for patients" that "offers the same powerful benefits" as Lilly's FDA-approved medicines. *Id.* ¶ 98. Yet, Lilly fails to allege how or why this demonstrates deception. The provider's website does not cite to Empower's website, the clinical studies that Empower cites, or otherwise mention Empower at all. This is plainly insufficient. *S. Snow. Mfg. Co.*, 829 F. Supp. 2d at 455; *Eli Lilly & Co. v. Roussel Corp.*, 23 F. Supp. 2d 460, 475 (D.N.J. 1998) ("A plaintiff can maintain an action under the Lanham Act even 'where the advertisements are not literally false' so long as there is evidence of actual consumer confusion or deception.")

         *d)  Empower's Oral Formulation Statements About Functionality and
             Ease of Use Are Non-Actionable Opinion and Puffery.*

Plaintiff alleges that the following generalized convenience statements are superiority claims: "No needles, no refrigeration, no preparation," "Just an easy, consistent routine," and "Skip the needle and get customized weight management support with the new tirzepatide ODT." Compl. ¶¶ 109-110. According to Plaintiff, the statements communicate that "Tirzepatide ODT is better (i.e., more convenient and less painful) yet just as safe and effective as Lilly's FDA-approved and clinically tested medicines." *Id.* ¶ 111. Empower's oral formulation statements are nothing more than puffery and are, at most, akin to the "general claims of superiority over comparable products that is so vague that it can be understood as nothing more than a mere expression of opinion" that courts have found to be non-actionable. *Pizza Hut*, 227 F.3d at 496-98 ("Better Ingredients, Better Pizza" alone is non-actionable puffery).[22]

Empower has not included any measurable indicator of "convenience" or ease that would

---

[22] *See also Riviana Foods, Inc. v. Golden Star Trading, Inc.*, No. 19-1994, 2020 WL 6153602, *10 (S.D. Tex. Apr. 6, 2020) ("prime grade" non-actionable puffery); *Davis v. Allstate Ins. Co.*, 2009 WL 122761, *6 (E.D. La. Jan 15, 2009) ("'You're in good hands with Allstate' is a general, subjective statement that cannot be proved true or false" and is thus "mere puffery"); *Bridal Expo, Inc. v. van Florestein*, No. 08-03777, 2009 WL 255862, *7 (S.D. Tex. Feb 3, 2009) ("Houston's # 1 Bridal Show" puffery that is not empirically verifiable).

mislead consumers as to the characteristics and quality of its ODT tirzepatide. Rather, Empower has stated its opinion that oral medications are more convenient and easier to take than injectable medications. Whether a routine is "easy" or more convenient is precisely the non-quantifiable type of statement that courts regularly find to constitute puffery. *Riviana Foods, Inc.*, 2020 WL 6153602, at *10 (citing *Presidio Enters., Inc. v. Warner Bros Distrib. Corp.*, 784 F.2d 674, 686 (5th Cir. 1986)) ("Such words as easy, primes, amazing, perfect, wonderful, excellent, are regarded in law as mere puffing or dealer's talk upon which no charge of misrepresentation can be based."). This opinion is not an actionable false statement of fact under the Lanham Act and Lilly's Safety and Effectiveness theory fails for another independent reason. As such, each of Empower's challenges warrants dismissal at the 12(b)(6) stage.

### 4.    Lilly's Compliance Theory Fails to State a Claim.

Lilly claims that Empower's statements that it currently adheres to state and federal regulations are false because Empower previously received Form 483s and warning letters from FDA and settled state administrative actions. Compl. ¶ 123. These statements are not actionable.

#### a)  *Lilly's Compliance Theory Is Precluded Because It Contravenes FDA's Regulatory Scheme.*

To establish falsity under Lilly's Compliance Theory, Lilly seeks to convert FDA's interim, non-final observations into determinations of non-compliance. Compl. ¶¶ 126-149. This directly contravenes FDA's policy choice and therefore, these allegations are precluded. *See Pom Wonderful*, 573 U.S. at 120. FDA chooses to use Form 483s and Warning Letters as advisory actions to obtain voluntary compliance. According to FDA, neither a Form 483 nor a Warning Letter is a final determination that a violation of the FDCA has occurred.[23] Courts in this circuit

---

[23] *See FDA Form 483 FAQ*, *supra* note 6 (indicating that "[t]he FDA Form 483 does not constitute a final Agency determination of whether any condition is in violation of the FD&C Act or any of its relevant regulations"), Ex. B.

follow FDA's lead. *See Pros & Patients for Customized Care v. Shalala*, 847 F. Supp. 1359, 1365 (S.D. Tex. 1994) ("Warning letters issued by the FDA are deemed to be informal communications that do not constitute final agency action."). As such, these claims are precluded.

    *b) Lilly's Compliance Theory Statements Were Not False When Made.*

    Lilly relies on Empower's state settlement agreements involving *old* conduct, asserting that Empower's present-day statement must, therefore, be false based on its *history* of past violations. Compl. ¶ 156. But none of the cited state matters establish "a clear and unambiguous ruling from a court or agency of competent jurisdiction" about the status of Empower's current regulatory compliance. *See e.g., Dial A Car Inc. v. Transp., Inc.*, 82 F.3d 484, 489 (D.C. Cir. 1996) (requiring an unambiguous clear interpretation from the appropriate regulatory authority at the time the statements were made to establish falsity). Absent such a ruling, Empower's purported compliance statements are non-actionable "opinion statements." *Id*. The "proper inquiry" here is whether, at the time that Empower made its statements, was there an unambiguous clear interpretation from the regulators that those statements were false. *Id.*

    Lilly has not pled a single, verifiably false statement of fact regarding Empower's compliance with regulatory requirements at the time the alleged compliance statements were made. Rather, Lilly claims only that, at certain times in the past, **before** the compliance statements, Empower entered into settlements with various state boards of pharmacy. Lilly's position—that these older matters demonstrate "non-compliance" in perpetuity, barring Empower from ever holding the opinion that it is regulatorily compliant—is implausible. *See Coastal Abstract Servs., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th 1999) (discussing that regulatory compliance statements are nothing more than opinion statements). Because Empower's statements are non-actionable opinions, Lilly's Compliance Theory based on state settlements fails.

5.    Lilly Cannot Plead Facts to Establish Empower's Statements Are Material
      Because Doctors Determine What to Prescribe.

Lilly has also failed to plausibly plead facts to support the required element of materiality,
*i.e.*, that the purportedly false advertisements were material and influenced consumers' purchasing
decisions. *Best Glide Aviation Survival Equip., Inc. v. Tag-Z, LLC*, No. 23-1080, 2024 WL
3488129, *6 (W.D. Tex. July 19, 2024) (dismissing claim for failure to allege materiality of the
advertisements at issue). Once again, Lilly merely makes conclusory statements unsupported with
facts. Compl. ¶¶ 98, 172. These statements do not adequately plead materiality.

Moreover, Lilly could never adequately plead materiality because doctors, not patients,
determine whether and what medications are prescribed. *Geomatrix*, 82 F.4th at 484 ("any
deceptions on defendants' part was not the cause of consumers' decisions, for consumers were not
the ones that decided to do anything"). Doctors determine whether to prescribe FDA-approved
medications or compounded medications. *Supra*, §IV.B.1.b.i. Thus, Empower's advertisements
could not materially influence consumers' purchasing decisions when consumers can purchase
only what doctors prescribe. Because Lilly cannot establish that Empower's advertisements are
material to consumer purchasing determinations, Lilly's claims must be dismissed.

**C.    Lilly Cannot State a Claim Based on Its "Unapproved Drug Theory."**

Lilly's Unapproved Drug Theory is based on the claim that Empower's compounded
medications are unlawful "unapproved drugs," which allegedly violates state laws requiring
federal drug approval. Compl. ¶¶ 168, 182, 194, 207, 219, 231, 244, 259, and 272. But under both
state and federal law, compounded medications are not required to undergo federal drug approval.
Therefore, Empower's conduct falls under state exemptions permitting state-sanctioned activity,
excluding Empower's conduct from liability under deceptive practices and unfair competition acts
in these states. For the same reason, Lilly's Texas common law cause of action fails to establish an

"illegal act" necessary to sustain its "unfair competition" claim. What Lilly really seeks to do with each of these state law claims is enforce Section 503A of the FDCA, but pursuant to Section 337(a), FDA and FDA alone is authorized to interpret and enforce the FDCA. Thus, Lilly's Unapproved Drug Theory fails.

        1.    <u>Lilly Cannot Establish Its State Law Claims Because Empower's Conduct Falls Within Each State's Exemptions.</u>

           a)  *Connecticut, Colorado, Hawaii, South Carolina, Tennessee, and Washington Explicitly Permit Empower's Sale of Compounded Medications, Barring Lilly's Claims.*

Under the laws of Connecticut, Colorado, Hawaii, South Carolina, Tennessee, and Washington, conduct that is permitted by regulatory agencies cannot form the basis of an unfair competition or deceptive practice claim.[24] Each of these states has interpreted the so-called "regulatory exemption" using a conduct-specific test.[25] These exemptions are designed to avoid precisely the situation we have here: subjecting a business, such as Empower, to liability under these various state acts, when the business engages in conduct that the state permits under other statutes or regulations. *See, e.g., Skinner*, 730 S.W. 2d at 337-38.

Each of Lilly's state law claims rely on the same alleged unlawful conduct: Empower's

---

[24] *See, e.g.*, COLO. REV. STAT. § 6-1-106(1)(a) (excluding from CCPA liability all "[c]onduct in compliance with the orders or rules of, or a statute administered by, a federal, state, or local governmental agency"); CONN. GEN. STAT. § 42-110c(1)(a) (excluding from CUPTA liability "transaction or actions otherwise permitted under law as administered by any regulatory board …."); HAW. REV. STAT. § 481A-5(a)(1) (excluding from UDTPA liability "conduct in compliance with the orders or rules of, or a statute administered by, a federal, State, or local governmental agency"); S.C. CODE ANN. § 39-5-40(a) (excluding from SCUPTA liability "actions or transactions permitted under laws administered by any regulatory body"); TENN. CODE ANN. § 47-18-111(a)(1) (excluding from TCPA "acts or transactions … specifically authorized under laws administered by, or rules and regulations promulgated by, any regulatory bodies"); WASH. REV. CODE ANN. § 19.86.170 (excluding from Washington's CPA "actions or transactions permitted by any other regulatory body or officer acting under statutory authority of this state or the United States").

[25] *Skinner v. Steele*, 730 S.W.2d 335, 338 (Tenn. App. 1987) (analyzing the purpose of regulatory exemptions and finding that the exemption requires the specific conduct at issue to be authorized or permitted by the regulatory agency); *Hall v. Walgreens Boots All., Inc.*, 565 P.3d 564, 567-68 (Wash. 2025) (same); *Tremont Pub. Advisors, LLC v. Mats. Inn. & Recycling Auth.*, 286 A.3d 485, 487 (Conn. App. 2022) (same); *Showpiece Homes Corp. v. Assurance Co.*, 38 P.3d 47, 56 (Colo. 2001) (same); *Aquilina v. Certain Underwriters at Lloyd's Syndicate*, 407 F. Supp. 3d 1016, 1042 (D. Haw. 2019) (same); *Ward v. Dick Dyer & Assoc.*, 403 S.E.2d 310, 311-12 (S.C. 1991) (same).

sale of "unapproved drugs" in violation of certain state laws. Compl. ¶¶ 168, 182, 194, 207, 219, 231, 244, 259, and 272. Lilly alleges that Empower was required to seek and obtain FDA-approval prior to dispensing its compounded tirzepatide ODT product and its compounded tirzepatide/niacinamide injections into each of these states. But Lilly purposely misconstrues the regulatory scheme in each of these states (and federally) in an effort to cobble together causes of action. Not one of these states requires compounded medications to undergo new drug approval prior to sale, as Lilly claims. Nor does federal law.

Rather, both federal and state law ***permit*** licensed pharmacies (like Empower) to sell and dispense compounded medications without undergoing federal drug approval. *See, e.g.*, 21 U.S.C. § 353a (exempting compounded medications from drug approval requirements); 3 COLO. CODE REGS. 719-1 (authorizing nonresident prescription drug outlets registered in Colorado to dispense compounded medications); CONN. GEN. STAT. § 20-633b (setting forth the licensing requirements for pharmacies dispensing sterile compounded medications); HAW. REV. STAT. § 461-15(6) (requiring any entity engaged in the sale of compounded medications to first obtain a permit from the board to do so); S.C. CODE ANN. § 40-43-86(CC) (setting forth requirements for compounding of medication by pharmacies permitted in the State of South Carolina); TENN. CODE ANN. § 63-10-216 (setting forth Tennessee's licensing requirements for pharmacies engaged in compounding); WASH. ADMIN. CODE § 246-945-100 (setting forth Washington's standards for pharmacies engaged in compounding).

As demonstrated by these state and federal regulatory schemes, Empower's compounded medication are not required to undergo new drug approval prior to sale. In fact, the specific conduct upon which Lilly predicates Empower's violations of the Acts—shipment of compounded drugs without new drug approval—is expressly ***permitted*** by these statutes and regulations. As a result

of its state licenses, Empower is authorized to sell compounded medications and is not required to obtain new drug approval prior to doing so, exempting Empower from liability under the state statues under which Lilly sues, **Exs. F-H**, **J-K**, **M**. *Tremont Pub. Advisors, LLC*, 286 A.3d at 488 (holding the exemption applied because the complained-of conduct was expressly authorized and regulated by statute). As such, Lilly's state law Unapproved Drug Theory claims fail in Colorado, Connecticut, Hawaii, South Carolina, Tennessee, and Washington.

*b)  Alaska's UTPA Exemption Applies, Barring Lilly's Claim.*

Empower's supposed "unlawful sale of unapproved drugs" falls squarely within one of Alaska's UTPA's statutory exemptions, barring UTPA liability. The relevant statute provides that UTPA does not apply to "an act or transaction regulated by a statute or regulation administered by the state, including a state regulatory board or commission, unless the statute or regulation does not prohibit the practices declared unlawful in AS 45.50.471." ALASKA STAT. ANN. § 45.50.481(a)(1). "Put another way, if acts declared unlawful under the UTPA are prohibited by some other state law or regulation, then they are exempt from the UTPA." *Adkins v. Collens*, 444 P.3d 187, 195 (Alaska 2019). To demonstrate the exemption applies, the conduct at issue must be "subject to ongoing, careful regulation and that such regulation prohibits the conduct … identified as violating the UTPA." *Id.* If both prongs are met, the statutory exemption applies, and the conduct is excluded from UTPA liability. *Alaska Interstate Const., LLC v. Pac. Diversified Inv., Inc.*, 279 P.3d 1156, 1163 (Alaska 2012) ("[T]he UTPA exemption only applies where a separate and distinct statutory scheme regulates acts and practices, and the acts or practices are therein prohibited.").

Here, Lilly's UTPA claim is based solely on the allegation that Empower engaged in the sale of "unapproved drugs" in Alaska. Compl. ¶ 168. Lilly alleges that "Empower failed to file[] any application seeking approval for its tirzepatide tablets or injections with any regulator," Compl. ¶ 164, and "no regulator has ever approved [Empower's drugs] for sale." Compl. ¶ 165. According

to Lilly, this conduct violates ALASKA STAT. ANN. §§ 17.20.110(a)(1)-(2) (Compl. ¶ 168), a part of Alaska's comprehensive Food, Drug, and Cosmetic Act. ALASKA STAT. ANN. § 17.20.005. Lilly's Complaint, therefore, *concedes* that the sale of "new drugs" is subject to a "separate and distinct statutory scheme." *Adkins*, 444 P.3d at 195 (the first prong of the statutory exemption requires the conduct to be subject to a "separate and distinct statutory scheme"). As Lilly *admits*, this separate and distinct statutory scheme prohibits the exact conduct relied upon for the UTPA claim: the sale of "unapproved drugs." *Adkins*, 444 P.3d at 195 (the second prong of the statutory exemption assesses whether the conduct is *prohibited* by the separate and distinct regulatory scheme). Thus, Lilly's UTPA claim fails because Empower's conduct falls within the relevant statute's exemption.

### c) *North Carolina's Learned Professional Exemption Applies, Barring Lilly's Claim.*

Lilly fails to state a claim under North Carolina's Unfair and Deceptive Trade Practices Act ("UDTP") because "professional services rendered by a member of a learned profession," such as pharmacy services, are exempt from UDTP liability. Specifically, UDTP provides that "unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C. GEN. STAT. ANN. § 75-1.1(a). However, UDTP defines "commerce" to *exclude* "professional services rendered by a member of a learned profession." N.C. GEN. STAT. ANN. § 75-1.1(b). This is known as the "learned profession" exemption. *Sykes v. Health Network Sols., Inc.*, 828 S.E.2d 467, 472-73 (N.C. 2019).

The "learned profession" exemption involves a two-prong test. *Id*. "[F]irst, the person or entity performing the alleged act must be a member of a learned profession. Second, the conduct in question must be a rendering of professional services." *Id*. North Carolina courts consider conduct "affecting the professional services rendered by members of a learned profession … [to fall] within the exception in N.C.G.S. § 75-1.1(b)." North Carolina courts broadly apply the

"learned profession" to medical professionals, *id.*, including pharmacists. *Church Ekklasia Sozo Inc. v. CVS Health Corp.*, No. 20-382, 2022 WL 1572732, *14 (W.D.N.C. Feb 25, 2022).

As a pharmacy, Empower is a member of a "learned profession." *Sykes*, 828 S.E.2d at 472-74 (finding members of a medical business included in the "learned profession" umbrella). Thus, the first prong of the "learned profession" exemption is satisfied. Further, the crux of Lilly's allegation focuses on whether Empower's compounded medications comply with state regulatory requirements, such that Empower's medications are exempt from new drug approval. Compl. ¶ 219. These allegations are inextricably related to Empower's rendering of patient care. *Sykes*, 828 S.E.2d at 472-74 (holding that plaintiffs' UDTP claim that chiropractors are reducing the level of services patients receive to be sufficiently related to patient care to fall within the rendering of professional services). As such, the second prong of the "learned profession" exemption is established. Thus, Lilly's UDTP should be dismissed.

### 2. Lilly's Texas Common Law Count Fails.

Lilly's Texas "unfair competition" claims rests on two unsupported positions: (1) that dispensing compounded medications into Texas is an "unlawful act" and (2) that Lilly can enforce the Texas Food, Drug, and Cosmetic Act ("TFDCA") to prove the "illegal act" needed to support its "unfair competition" claim. Neither is true and therefore, Lilly's claim cannot survive.

#### a) *Empower's Sale of Compounded Medications in Texas Is Legal.*

In Texas, "'unfair competition' is not, in and of itself, a separate tort." *Reliable Ambulance Serv. v. Mercy Hosp. of Laredo*, No. 02-188, 2003 WL 21972724, *2 (Tex. App.—San Antonio Aug. 20, 2023, pet. denied). Rather, "[t]he tort requires that the plaintiff show an illegal act by the defendant which interfered with the plaintiff's ability to conduct its business." *Taylor Publ'g Co. v. Jostens, Inc.*, 216 F.3d 465, 486 (5th Cir. 2000). "Although the illegal act need not necessarily violate criminal law, it must at least be an independent tort." *Id.* "Without some finding of an

independent substantive tort or other illegal conduct," the tort of "unfair competition" cannot be established. *Schoellkopf v. Pledger*, 778 S.W.2d 897, 904-905 (5th Cir. 1989). Lilly's "unfair competition" claim "founders on this requirement." *Taylor*, 216 F.3d at 486. Lilly has not and cannot plead facts to establish Empower's dispensing of compounded medications in Texas is illegal or otherwise tortious as Empower's compounding of medications is explicitly permitted by the Texas State Board of Pharmacy.

As Lilly is well aware, Empower is located in Texas. Compl. ¶ 19. Empower holds Texas pharmacy license number 26444, which is a Class A-S license, Ex. L. Texas regulation instructs that community pharmacies (in-state pharmacies) engaged in sterile compounding must hold a Class A-S license prior to sterile compounding, as Empower appropriately does. *See* 22 TEX. ADMIN. CODE § 291.36(1). And, Texas regulation prohibits a Class A-S license from being issued "***unless the pharmacy*** has been inspected by the board to ensure the pharmacy ***meets*** the requirements as specified in § 291.133," which relates to Texas sterile compounding requirements. 22 TEX. ADMIN. CODE § 291.36(1). Consistent with this requirement, Empower undergoes annual or biannual inspections for Texas sterile compounding standards prior to its license renewals resulting in reauthorization of Empower's right to sell compounded medications in Texas. Ex. L.

Lilly has not pleaded a single fact alleging that Empower fails to comply with Texas sterile compounding requirements—the requirements applicable to Empower's Texas conduct. Instead, Lilly's conclusory allegations claim that Empower's conduct does not comply with Section 503A (which Lilly cannot enforce). But, an alleged violation of Section 503A is not sufficient to establish that Empower's compounded medications are *illegal* in Texas. Compl. ¶ 80. Texas regulates sterile compounding under its *own* set of standards. The Texas State Board of Pharmacy—the regulatory body authorized to enforce the Texas Pharmacy Practice Act and all corresponding regulations (*see*

TEX. OCC. CODE § 554.002(5))—has affirmed that Empower's conduct complies with these requirements via the repeated issuance of a license to sterile compound in the state. Lilly's unfair competition claim fails because it has not pled (nor could it) any facts establishing an "illegal act."

> b) *Lilly Cannot Use Common Law to Create a Private Cause of Action Under TFDCA.*

While Empower is clearly licensed and authorized to offer compounded medications in Texas, Lilly nevertheless tries to end-run Texas' clear regulatory scheme—claiming that Empower's compounded medications are really "unapproved drugs." Compl. ¶ 259. In doing so, Lilly seeks to deputize itself as the enforcer of Texas pharmacy statutes and TFDCA. This directly contravenes Texas' determinations that only the Texas State Board of Pharmacy and elected officials such as the Texas attorney general—not self-interested profit-motivated drug manufacturers—have authority to enforce these provisions. *See, e.g.*, TEX. OCC. CODE § 554.002(5) (imbuing the Board of Pharmacy with authority to regulate the practice of pharmacy through enforcement of the Pharmacy Practice Act); TEX. HEALTH & SAFETY CODE § 431.060 (setting out the enforcement structure for the attorney general, or a district, county or municipal attorney). Lilly cannot use a common law "unfair competition" claim to create an implied private right of action under the TFDCA where none was provided by the Texas Legislature.

*Reliable Ambulance* controls. Reliance Ambulance brought "unfair competition" claims against Mercy Hospital, alleging violations of the federal criminal statute that prohibited kickbacks but contained no private right of action. 2003 WL 21972724 *2. In considering whether a private right of action could be implied, the Texas appellate court assessed whether doing so would undermine legislative intent. *Id*. Assessing the regulatory scheme, the court found that "recognizing a common law cause of action by a competitor for damages and injective relief" would be "inconsistent with the intent of Congress." *Id*. *6. The clear purpose of the statutory

scheme was not to protect competitors, but to protect the health and safety of the public. *Id*. Thus, the court held that allowing a private citizen to create a private right of action where none was provided in the statutory scheme would contradict "Congress' decision not to create a private right of action for a violation for the statute." *Id*.

Here, allowing Lilly to create a private cause of action to enforce the Texas FDCA would be "inconsistent with the intent" of the legislature. The TFDCA contains comprehensive mechanisms for administrative (TEX. HEALTH & SAFETY CODE § 431.054), civil (Tex. Health & Safety Code § 431.0585), and criminal penalties (TEX. HEALTH & SAFETY CODE § 431.059). And, the legislature has specifically imbued Texas state attorney generals with authority to prosecute any violations of the Act to protect the health and safety of the public. The Act's purpose is not to protect competitors alleging business harm. Because there is no private right of action under TFDCA, and one should not be implied, Lilly cannot establish the alleged "illegal act" necessary to support its "unfair competition" claim and its claim fails. *See Schoellkopf*, 778 S.W. 2d at 904-05 (absent an "illegal act," an "unfair competition" claim fails).

### 3.   Lilly's State Law Claims Are Preempted by Section 337(a).

The FDCA contains an unambiguous prohibition against non-federal enforcement of the drug-related provisions of the FDCA. Section 337(a) states, in relevant part: "[e]xcept as provided in subsection (b), all such proceedings for the enforcement … of this chapter [i.e., the FDCA] shall be by and in the name of the United States." 21 U.S.C. § 337(a). And as the Supreme Court of the United States has confirmed, in enacting Section 337(a), Congress made clear its intent that, unless an exception was provided by federal statute, the FDCA would be "enforced exclusively by the Federal Government." *Buckman Co. v. Pls.' Legal Comm.*, 531 U.S. 341, 352 (2001); *Spano v. Whole Foods, Inc.*, 65 F.4th 260, 262 (5th Cir. 2023) ("Title 21 U.S.C. § 337(a) provides in relevant part that there is no private right of action under the FDCA"). Lilly's state law claims each

improperly seek to enforce Section 503A of FDCA.

*Buckman's* preemption analysis focuses on whether the state law claim is "impliedly preempted because it amount[s] to an attempt to privately enforce the FDCA, which is barred by the enforcement limitation" in Section 337(a). *Davidson v. Sprout Foods, Inc.*, 106 F.4th 842, 849 (9th Cir. 2024), *cert. den.*, 145 S. Ct. 1922 (2025). "But if the claim relies on an independent state law duty, even if parallel to an FDCA duty, then it is not preempted under *Buckman*." *Eli Lilly & Co. v. Alderwood Surgical Ctr. LLC*, No. 24-878, 2025 WL 745670, *4 (W.D. Wash. Mar. 7, 2025); *see also Zyla Life Scis., L.L.C. v. Wells Pharma of Hous., L.L.C.*, 134 F.4th 326, 332 (5th Cir. 2025) (noting that there is no conflict in terms and no preemption in states making federal law their own).

To avoid federal preemption there is "a narrow gap through which a plaintiff's state-law claim must fit." *Ellis v. Smith & Nephew, Inc.*, No. 15-545, 2016 WL 7319397, *3 (D.S.C. Feb. 16, 2016). To survive, Plaintiff's state law claim must parallel federal requirements—but not **depend** on the federal requirements for resolution. *Morris v. Pliva, Inc.*, 713 F.3d 774, 777 (5th Cir. 2013) (state law claims that "sounded exclusively in federal (not state) law" preempted). There must, therefore, **be** a state law corollary allowing for plaintiff's claim to be resolved on state law alone, (*Amiodarone Cases*, 300 Cal. Rptr. 881, 893 (Cal. App.  2022)), such that the state law claim exists "even if the FDCA had never been enacted." *Schouest v. Medtronic, Inc.*, 13 F. Supp. 3d 692, 700 (S.D. Tex. 2014).

Lilly attempts to circumvent FDCA's private enforcement prohibition by cloaking its federal claims under state laws that require "new drugs" to undergo federal approval prior to sale. *See, e.g.*, Compl. ¶¶ 168, 180, 194, 207, 219, 231, 244, 259, and 272. Lilly alleges that Empower violates these state laws by selling compounded medications into these states. *Id*. Lilly, therefore, seeks to avoid implied preemption by relying on parallel state laws that mirror and incorporate federal new

drug approval requirements. But, by Lilly's own admission, the above state laws are **only** relevant if Empower's compounded medications do **not** comply with Section 503A, which would thereby make Empower's compounded medications "unapproved drugs." *See* Compl. ¶ 80 (asserting that Empower cannot invoke Section 503A as a defense because Empower allegedly violates Section 503A's requirements). What Lilly is **actually** seeking to do is to enforce Section 503A of the FDCA. *Spano*, 65 F.4th at 262 (private litigants cannot enforce the FDCA).

Thus, Lilly's state law claims are entirely dependent upon proving noncompliance with Section 503A; Lilly's state law claims cannot be proven in Section 503A's absence. This is precisely what Section 337(a) forbids.[26] Further, Lilly has not cited (nor could it) any parallel state law basis for its true claims (violation of Section 503A) because **none** of these states have incorporated parallel versions of Section 503A into their state law. Thus, the issue is *not* that Lilly is enforcing state laws that have made federal laws their own (*Zyla*, 134 F.4th at 332), but that these states have not made the federal law that Lilly is **actually enforcing** their own. The Fifth Circuit's recent *Zyla* opinion is therefore inapposite. No matter how Lilly packages its claim, it "is effectively suing for a violation of the FDCA … and the claim is thus impliedly preempted under *Buckman*." *Hawkins v. Bayer Corp.*, No. 21-646, 2022 WL 2761379, \*3 (W.D. Tex. Feb. 1, 2022). Therefore, Lilly's state law claims fail.

## V.    **CONCLUSION**

For the foregoing reasons, this Court should grant this Motion to Dismiss, and dismiss Lilly's Complaint with prejudice.

---

[26] *See, e.g., Allergan, Inc. v. Athena Cosmetics, Inc.*, 738 F.3d 1350, 1359 (Fed. Cir. 2013) ("The FDA—and the FDA alone—has the power and the discretion to enforce the FDCA."); *Perez v. Nidek Co., Ltd.*, 711 F.3d 1109, 1119 (9th Cir. 2013) ("Private enforcement of the [FDCA] is barred."); *Morris*, 713 F.3d at 778 ("The FDCA provides no private right of action for these violations."); *In re Medtronic, Inc. Sprint Fidelis Leads Prods. Liab. Litig.*, 623 F.3d 1200, 1204 (8th Cir. 2010) (FDCA "provides that all actions to enforce FDA requirements shall be by and in the name of the United States."); *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 193 F.3d 781, 791 (3d Cir. 1999) (FDCA "expressly restricts its enforcement to the federal government"); *Bailey v. Johnson*, 48 F.3d 965, 968 (6th Cir. 1995) (same).

Dated: September 29, 2025           Respectfully submitted,

BECK REDDEN LLP


By: */s/ Geoff A. Gannaway*
Geoff A. Gannaway (*attorney-in-charge*)
Texas State Bar No. 24036617
Federal I.D. No. 37039
David J. Beck
Texas Bar No. 00000070
Federal I.D. No. 16605
1221 McKinney Street, Suite 4500
Houston, Texas 77010
Telephone 713.951.3700
Fax 713.951.3720
ggannaway@beckredden.com
dbeck@beckredden.com

**BLANK ROME LLP**
*A Pennsylvania LLP*
SHANNON E. MCCLURE (*pro hac vice pending*)
One Logan Square
130 N. 18th Street
Philadelphia, PA 19103
Phone: (215) 569-5586
Shannon.McClure@BlankRome.com

**BLANK ROME LLP**
*A Pennsylvania LLP*
RACHAEL PONTIKES (*pro hac vice pending*)
444 West Lake Street, Suite 1650
Chicago, IL 60606
Phone: (312) 776-2587
Rachael.Pontikes@BlankRome.com

**HYMAN, PHELPS & MCNAMARA, P.C.**
Karla L. Palmer (*pro hac vice forthcoming*)
1101 K Street N.W.
Suite 700
Washington, DC 20005
Phone: (202) 737-7542
kpalmer@hpm.com

**Attorneys for Defendant**

- 41 -

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of the foregoing document was served on all counsel of record on this 29th day of September, 2025, via the Courts Electronic Filing System.

*/s/ Geoff A. Gannaway*