# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| ELI LILLY AND COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO. 4:25-cv-03464 |
| | ) | |
| vs. | ) | |
| | ) | Complaint Filed: July 25, 2025 |
| EMPOWER CLINIC SERVICES, LLC D/B/A | ) | |
| EMPOWER PHARMACY, | ) | |
| | ) | Judge: Honorable Sim Lake |
| Defendant. | ) | Courtroom: [ ] |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

## PLAINTIFF ELI LILLY AND COMPANY'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

# TABLE OF CONTENTS

Page

INTRODUCTION AND SUMMARY OF ARGUMENT .............................................................. 1

NATURE OF THE PROCEEDING ................................................................................................ 3

I.     Lilly and Its Medicines ..................................................................................................... 3

II.    Empower ............................................................................................................................... 4

III.   Stage of the Proceedings ................................................................................................. 7

STATEMENT OF THE ISSUES AND STANDARD OF REVIEW ............................................ 7

ARGUMENTS AND AUTHORITIES .......................................................................................... 8

I.     Empower Violates State Unfair Competition Laws by Selling Unapproved
Compounded Tirzepatide ............................................................................................... 8

      A.    The Fifth Circuit Has Rejected Empower's Preemption Argument ....................... 8

      B.    Empower's Conduct Is Not Protected by State-Law Safe Harbors ..................... 10

            1.    Empower's Conduct Is Actionable Under Colorado, Connecticut,
South Carolina, Tennessee, and Washington Law ................................... 10

            2.    Empower's Conduct Is Actionable Under Hawaii Law ........................... 13

            3.    Empower's Conduct Is Actionable Under Alaska Law ............................ 14

            4.    Empower's Conduct Is Actionable Under North Carolina Law .............. 15

            5.    Empower's Conduct Is Actionable Under Texas Law .............................. 17

II.    Empower's False Advertising Violates the Lanham Act ................................................. 19

      A.    Lilly Has Standing to Redress Injuries Caused by Empower's False
Advertising ............................................................................................................. 20

      B.    Lilly Adequately Pleads That Empower's Advertising Is False ......................... 27

            1.    Lilly's Complaint Properly Challenged Empower's Personalization
Claims ....................................................................................................... 27

            2.    Lilly Has Properly Challenged Empower's Regulatory Compliance
Claims ....................................................................................................... 29

3. Lilly Has Properly Challenged Empower's Safety and Effectiveness Claims .................................................................. 32

C. Lilly Has Adequately Pled Deception And Materiality ....................................... 35

D. Empower's False Advertising Is Not Puffery ........................................................ 38

CONCLUSION ............................................................................................................................... 40

# **TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*AHBP LLC v. Lynd Co.*,
   649 F. Supp. 3d 371 (W.D. Tex. 2023)............................................................30, 32

*Alaska v. Express Scripts, Inc.*,
   No. 3:23-CV-00233-JMK, 2024 WL 2321210 (D. Alaska May 22, 2024)............................15

*Allergan USA Inc. v. Imprimis Pharms., Inc.*,
   No. SACV171551DOCJDEX, 2017 WL 10526121 (C.D. Cal. Nov. 14, 2017).........22, 32, 33

*Aquilina v. Certain Underwriters at Lloyd's Syndicate #2003*,
   407 F. Supp. 3d 1016 (D. Haw. 2019)..................................................................13

*Ashcroft v. Iqbal*,
   556 U.S. 662, 129 S. Ct. 1937 (2009)............................................................26, 30

*Austin's Nat. Frozen Pops, Inc. v. Jonny Pops, LLC*,
   No. 1:24-CV-716-RP, 2025 WL 888560 (W.D. Tex. Mar. 13, 2025).......................23, 24, 26

*Blue Star Press, LLC v. Blasko*,
   No. SA17CA111OLGHJB, 2018 WL 1904835 (W.D. Tex. Mar. 6, 2018) .....................24, 26

*Blue Buffalo Co. v. Nestle Purina Petcare Co.*,
   No. 4:15 CV 384 RWS, 2015 WL 364526 (E.D. Mo. June 10, 2015) ...................................39

*Boehm v. Eli Lilly and Co.*,
   747 F.3d 501 (8th Cir. 2014) .........................................................................22, 23

*Boltex Mfg. Co., v. Galperti, Inc.*,
   No. CV H-17-1439, 2018 WL 1535199 (S.D. Tex. Mar. 29, 2018)................................36, 37

*Bridal Expo., Inc. v. Van Florestein*,
   No. CIV.A. 4:08-CV-03777, 2009 WL 255862 (S.D. Tex. Feb. 3, 2009) ............................40

*Bristol-Myers Squibb Co. v. Connors*,
   444 F. Supp. 3d 1231 (D. Haw.), *aff'd*, 979 F.3d 732 (9th Cir. 2020) ...................................13

*Buckman Co. v. Pls.' Legal Comm.*,
   531 U.S. 341, 121 S. Ct. 1012 (2001)....................................................................9

*Clark v. Carter*,
   768 F. Supp. 3d 927 (S.D. Ind. 2025) ..................................................................38

*Coastal Abstract Servs., Inc. v. First Am. Title Ins. Co.*,
    173 F.3d 725 (9th Cir. 1999) ........................................................... *passim*

*Colorado Biolabs, Inc. v. Three Arrows Nutra, LLC*,
    No. 3:25-CV-0601-D, 2025 WL 2524313 (N.D. Tex. Sept. 2, 2025) ..............................20, 21

*Crystaphase Prods., Inc. v. Criterion Catalysts & Techs., LP*,
    No. 3:17-CV-00265, 2018 WL 4266237 (S.D. Tex. Aug. 20, 2018) ........................25, 26, 27

*Daly v. Harris*,
    215 F. Supp. 2d 1098 (D. Haw. 2002), *aff'd*, 117 F. App'x 498 (9th Cir. 2004) ...................13

*Davis v. Allstate Ins. Co.*,
    No. CIV.A. 07-4572, 2009 WL 122761 (E.D. La. Jan. 15, 2009).........................................40

*Decorative Ctr. of Houston, L.P. v. Direct Response Publications, Inc.*,
    208 F. Supp. 2d 719 (S.D. Tex. 2002) ................................................18, 21, 36, 37

*Dial A Car v. Transp. Inc.*,
    82 F.3d 484 (D.C. Cir. 1996) ...........................................................................32

*In re Dollar Gen. Corp. Motor Oil Mktg. & Sales Pracs. Litig.*,
    No. 16-02709-MD-W-GAF, 2017 WL 3863866 (W.D. Mo. Aug. 3, 2017) ..........................12

*Don Stevenson Design, Inc. v. TBP Enters. I, Ltd.*,
    No. SA-16-CV-01128-RCL, 2018 WL 1902688 (W.D. Tex. Apr. 19, 2018) ..........................8

*Dyson, Inc. v. Oreck Corp.*,
    No. CIV.A.07-9633, 2009 WL 537074 (E.D. La. Mar. 4, 2009) ...........................................40

*El Paso Disposal, LP v. Ecube Labs Co.*,
    No. EP-24-CV-97-KC, 2025 WL 1766310 (W.D. Tex. June 26, 2025) ...............................36

*Eli Lilly & Co. v. Adonis Health, Inc.*,
    No. 25-CV-03536-JST, 2025 WL 2721684 (N.D. Cal. Sept. 24, 2025)........................ *passim*

*Eli Lilly & Co. v. Willow Health Servs., Inc.*,
    No. 2:25-CV-03570-AB-MAR, 2025 WL 2631620 (C.D. Cal. Aug. 29, 2025) ..............21, 22

*Eli Lilly and Co. v. Mochi Health Corp.*,
    No. 25-CV-03534-JSC, 2025 WL 2998166 (N.D. Cal. Oct. 24, 2025)...........................26, 27

*Emps.' Ret. Sys. v. Whole Foods Mkt., Inc.*,
    905 F.3d 892 (5th Cir. 2018) ................................................................8, 11, 13, 29

*FedEx Ground Package Sys., Inc. v. Route Consultant, Inc.*,
    97 F.4th 444 (6th Cir. 2024) ...........................................................................29

*Ford v. NYLCare Health Plans of the Gulf Coast, Inc.*,
    1997 U.S. Dist. LEXIS 24377 (S.D. Tex. Jan. 3, 1997) ........................................................38

*Genus Lifesciences Inc. v. Lannett Co., Inc.*,
    No. 18-CV-07603-WHO, 2019 WL 4168958 (N.D. Cal. Sept. 3, 2019) ................................22

*Greater Houston Transp. Co. v. Uber Techs., Inc.*,
    No. CIV.A. 4:14-0941, 2015 WL 1034254 (S.D. Tex. Mar. 10, 2015)......................21, 38, 39

*Healthpoint Ltd. v. Allen Pharm., LLC*,
    No. SA-07-CA-0526-XR, 2008 WL 728333 (W.D. Tex. Mar. 18, 2008)..............................22

*Healthpoint, Ltd. v. Ethex Corp.*,
    273 F. Supp. 2d 817 (W.D. Tex. 2001).................................................................................29

*Healthpoint, Ltd. v. Stratus Pharmaceuticals, Inc.*,
    273 F. Supp. 2d 769 (W.D. Tex. 2001).................................................................................34

*IQ Prods. Co. v. Pennzoil Prods. Co.*,
    305 F.3d 368 (5th Cir. 2002) ...............................................................................................25

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118, 134 S. Ct. 1377 (2014)..................................................................3, 20, 25, 26

*McCracken v. KSF Acquisition Corp.*,
    No. 5:22-CV-01666-SB-SHK, 2023 WL 5667869 (C.D. Cal. Apr. 4, 2023).........................35

*Miller v. Stroman*,
    No. 1-19-CV-00475-ADA, 2020 WL 2494576 (W.D. Tex. May 14, 2020) ...........................8

*Obesity Rsch. Inst., LLC v. Fiber Rsch. Int'l, LLC*,
    165 F. Supp. 3d 937 (S.D. Cal. 2016)...................................................................................26

*Pacira Biosciences, Pacira Biosciences, Inc. v. QuVa Pharma, Inc.*,
    No. 4:23-CV-4147, 2024 WL 4329142 (S.D. Tex. Aug. 26, 2024) .................................34, 37

*Perkins v. Johnson*,
    551 F. Supp. 2d 1246 (D. Colo. 2008).................................................................................12

*Philippi-Hagenbuch, Inc. v. W. Tech. Servs. Int'l, Inc.*,
    No. 12-1099, 2015 WL 13590400 (C.D. Ill. Feb. 2, 2015) ....................................................39

*Pizza Hut, Inc. v. Papa John's Int'l, Inc.*,
    227 F.3d 489 (5th Cir. 2000) ........................................................................................ *passim*

*POM Wonderful, LLC v. Coca-Cola Co.*,
    573 U.S. 102, 134 S. Ct. 2228 (2014)........................................................................28, 29, 34

*Presidio Enters., Inc. v. Warner Bros Distrib. Corp.*,
  784 F.2d 674 (5th Cir. 1986) .......................................................................40

*Pros & Patients for Customized Care v. Shalala*,
  847 F. Supp. 1359 (S.D. Tex. 1994) ............................................................30

*Riviana Foods, Inc. v. Golden Star Trading, Inc.*,
  No. 4:19-CV-01994, 2020 WL 6153602 (S.D. Tex. Apr. 6, 2020).....................40

*S. Snow Mfg. Co. v. Snow Wizard Holdings, Inc.*,
  829 F. Supp. 2d 437 (E.D. La. 2011) ...........................................................36

*Saavedra v. Eli Lilly & Co.*,
  No. 2:12-CV-9366-SVW-MAN, 2013 WL 3148923 (C.D. Cal. June 13, 2013) ..................23

*Safoco, Inc. v. KLX Energy Servs., LLC*,
  No. 2:22-CV-0437-JRG-RSP, 2023 WL 4281243 (E.D. Tex. June 10, 2023).......................38

*Schwinner v. Presidio Industries LLC*,
  No. 3:10-CV-2213-P, 2011 WL 13089398 (N.D. Tex. 2011) .................................39

*Sewell v. Monroe City Sch. Bd.*,
  974 F.3d 577 (5th Cir. 2020) ........................................................................8

*Sheet Metal Workers Loc. 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*,
  737 F. Supp. 2d 380 (E.D. Pa. 2010) ...........................................................16

*Southland Sod Farms v. Stover Seed Co.*,
  108 F.3d 1134 (9th Cir. 1997) .....................................................................35

*Taylor Publ'g Co. v. Jostens, Inc.*,
  216 F.3d 465 (5th Cir. 2000) .............................................................17, 18, 19

*Tempur-Pedic Int'l Inc. v. Angel Beds LLC*,
  902 F. Supp. 2d 958 (S.D. Tex. 2012) ....................................................36, 37

*Transportes Ferreos de Venez. II CA v. NKK Corp.*,
  239 F.3d 555 (3d Cir. 2001)........................................................................17

*United States v. Medoc Health Servs. LLC*,
  470 F. Supp. 3d 638 (N.D. Tex. 2020) ........................................................12

*Univ. Loft Company v. Blue Furniture Sols., LLC*,
  No. A-15-CV-826 LY, 2017 WL 876312 (W.D. Tex. Mar. 3, 2017) ....................40

*W. Rsrv. Medtec Servs., LLC v. Stryker Corp.*,
  No. 4:18-CV-2604, 2019 WL 13191641 (S.D. Tex. May 13, 2019).......................19

*White v. NYLIFE Sec., LLC*,
    551 F. Supp. 3d 974 (D. Alaska 2021) ...............................................................15

*Wyeth v. Levine*,
    555 U.S. 555, 129 S. Ct. 1187 (2009)....................................................................9

*Yoshikawa v. Exxon Mobil Corp.*,
    No. 3:21-CV-00194-N, 2022 WL 4677621 (N.D. Tex. Sept. 29, 2022) ...............39

*Zyla Life Scis., LLC v. Wells Pharma of Houston, LLC*,
    134 F.4th 326 (5th Cir. 2025) ....................................................................... *passim*

**State Cases**

*Alaska Interstate Constr., LLC v. Pac. Diversified Invs., Inc.*,
    279 P.3d 1156 (Alaska 2012)...............................................................................15

*Dearinger v. Eli Lilly & Co.*,
    199 510 P.3d 326 (Wash. 2022)...........................................................................23

*Featherstone v. Indep. Serv. Station Ass'n of Tex.*,
    10 S.W.2d 124 (Tex. App.—Dallas 1928)...........................................................18

*Feldman v. Lederle Lab'ys*,
    479 A.2d 374 (N.J. 1984).....................................................................................17

*Goran Pleho, LLC v. Lacy*,
    439 P.3d 176 (Haw. 2019)...................................................................................13

*Hall v. Walgreens Boots All., Inc.*,
    565 P.3d 564 (Wash. 2025)..................................................................................11

*Hamlet H.M.A., LLC v. Hernandez*,
    821 S.E.2d 600 (N.C. App. 2018), *aff'd, ordered not precedential*,
    835 S.E.2d 436 (N.C. 2019)................................................................................16

*Matanuska Maid, Inc. v. State*,
    620 P.2d 182 (Alaska 1980)................................................................................15

*Reid v. Ayers*,
    531 S.E.2d 231 (N.C. App. 2000)..................................................................16, 17

*Reliable Ambulance Serv., Inc. v. Mercy Hosp. of Laredo*,
    No. 04-02-00188-CV, 2003 WL 21972724 (Tex. App.—San Antonio Aug. 20, 2003) .........18

*Schiff v. Liberty Mut. Fire Ins.*,
    542 P.3d 1002 (Wash. 2024)...............................................................................11

*Schoellkopf v. Pledger*,
778 S.W.2d 897 (Tex. Civ. App.—Dallas 1989) ................................................18

*State ex rel. Shikada v. Bristol-Myers Squibb Co.*,
526 P.3d 395 (Haw. 2023) ................................................................................13

*Sykes v. Health Network Sols., Inc.*,
828 S.E.2d 467 (N.C. 2019) ........................................................................16, 17

*State ex rel. Woodard v. May Dep't Stores Co.*,
No. 89 CV 9274, 1990 WL 322653 (Colo. Dist. Ct. June 27, 1990), *rev'd on other grounds*, 849 P.2d 802 (Colo. App. 1992) ..........................................................11

**Federal Statutes**

21 U.S.C. § 337(a) ...............................................................................................8, 19

21 U.S.C. § 353a(a) ...................................................................................................4

21 U.S.C. § 353a(a)(2)(A) ..........................................................................................1

21 U.S.C. § 353a(b)(1)(D) ...........................................................................................1

21 U.S.C. § 353a(b)(3)(B) ............................................................................................1

21 U.S.C. § 355(a) ....................................................................................................11

**State Statutes and Codes**

ALASKA STAT. § 17.20.110(a)(2) ..............................................................................14

ALASKA STAT. § 45.50.471(b) ..................................................................................14

ALASKA STAT. § 45.50.471(b)(3) ..............................................................................14

ALASKA STAT. § 45.50.471(b)(4) ..............................................................................14

ALASKA STAT. § 45.50.471(b)(6) ..............................................................................15

ALASKA STAT. § 45.50.471(b)(48) ............................................................................14

ALASKA STAT. § 45.50.481(a)(1) ..............................................................................14

ALASKA STAT. § 45.50.481(c) ..................................................................................14

COLO. REV. STAT. § 12-280-131(1) ..........................................................................11

CONN. GEN. STAT. § 20-633b(c) .............................................................................12

CONN. GEN. STAT. § 20-633b(d)(1) ..................................................................13

CONN. GEN. STAT. § 20-633b(d)(2) ..................................................................13

CONN. GEN. STAT. § 21a-110(a)(1) ..................................................................11

CONN. GEN. STAT. § 42-110c(b) ......................................................................11

HAW. REV. STAT. § 328-17(a)(1) .....................................................................14

Haw. Rev. Stat. § 481A ....................................................................................13

HAW. REV. STAT. § 481A-5(a)(1) .....................................................................13

N.C. GEN. STAT. § 75-1.1(a) ...........................................................................16

N.C. GEN. STAT. § 75-1.1(b) .......................................................................16, 17

N.C. GEN. STAT. § 75-1.1(d) ...........................................................................16

S.C. CODE § 39-5-40 .......................................................................................11

S.C. CODE § 39-23-30(a)(2)(B) ........................................................................12

S.C. CODE § 39-23-70(a) ..................................................................................11

S.C. CODE § 40-43-86(CC)(2)(b) .....................................................................13

S.C. CODE § 40-43-86(CC)(2)(g) .....................................................................13

TENN. CODE § 47-18-111(b) .............................................................................11

TENN. CODE § 53-1-110(a) ...............................................................................11

TENN. CODE § 63-10-204(6)(A) .......................................................................13

TENN. CODE § 63-10-204(6)(B) .......................................................................13

TENN. CODE § 63-10-216(c) .............................................................................12

TEX. HEALTH & SAFETY CODE ANN. § 431.060 ...............................................19

TEX. HEALTH & SAFETY CODE ANN. § 431.060(a) ..........................................18

WASH. REV. CODE § 18.64.011(6) ...................................................................13

WASH. REV. CODE § 18.64.011(24)(a) .............................................................13

WASH. REV. CODE § 18.64.270(2) ...................................................................12

WASH. REV. CODE § 69.04.570 ...................................................................................................11

**State Regulations**

3 COLO. CODE REGS. § 719-1:21.00.20(b) ..................................................................................12

3 COLO. CODE REGS. § 719-1:21.21.10(b) ..................................................................................12

CONN. AGENCIES REGS. § 20-576-66(b) ....................................................................................12

HAW. REV. R. § 16-95-110(a)(17) ...............................................................................................14

TENN. COMP. R. & REGS. § 1140-01.01(41) ..............................................................................13

TENN. COMP. R. & REGS. § 1140-07-.02(1) ..............................................................................12

TENN. COMP. R. & REGS. § 1140-07-.04(1) ..............................................................................12

WASH. ADMIN. CODE § 246-945-100(1) ....................................................................................12

**Rules**

Fed. R. Civ. Proc. 12(b)(6) ....................................................................................................8, 12

L.R. 7.1(B) ...................................................................................................................................38

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Court should deny Empower's motion to dismiss. For nearly a century, drug manufacturers have had to obtain approval from the U.S. Food and Drug Administration (FDA) before selling their product to patients. This premarket approval process ensures that Americans receive only clinically studied medicines that FDA has determined to be both safe and effective for use under defined conditions. Accordingly, Eli Lilly and Company ("Lilly") invested billions of dollars and years of effort to develop some of the most remarkable scientific breakthroughs in recent medicine, including the medicines Mounjaro® and Zepbound® containing the macromolecule tirzepatide as their active ingredient. Because Lilly followed FDA's rules—at great cost—Lilly is the only company with FDA approval to sell tirzepatide-based medicines.

Various states' laws reinforce this premarket approval requirement by independently prohibiting the sale of any unapproved drug within that state. Yet Empower Clinic Services, LLC ("Empower") sells mass-manufactured, unapproved, and untested tirzepatide drugs on a national scale in violation of these laws—and lies to consumers to do it. Empower is one of the largest, and most brazen, "compounders" in the country. Lawful compounding means preparing a clinically necessary drug "in limited quantities" for "an identified individual patient" when commercially available products cannot be used. 21 U.S.C. § 353a(a)(2)(A). Under this limited exception to FDA's drug-approval requirements, a retail pharmacist may make a patient-specific, medically necessary adjustment, like removing an allergen, to an FDA-approved drug. By definition, compounders may not sell "drug products that are essentially copies of a commercially available drug product," *id.* § 353a(b)(1)(D), manufacture drugs in large quantities, or ship more than 5% of their drugs across state lines, *id.* § 353a(b)(3)(B). But that is exactly what Empower does, in violation of state and federal law.

1

Empower's business model is simple: it mass manufactures knock-off, untested variants of Lilly's FDA-approved medications, and sells them at extraordinary scale—without state or federal approval. In doing so, Empower avoids the costs and burdens of federal drug regulation—like clinical trials, applications, preapproval inspections, compliance with current Good Manufacturing Practice ("cGMP"), and post-marketing vigilance to track and report adverse events—while exposing patients to the safety risks that FDA regulation exists to prevent. That permits Empower to profit from Lilly's investments and scientific ingenuity, at the expense of Lilly's sales, goodwill, and patients' safety—all by competing unfairly with Lilly.

To remedy this harm, Lilly brought this case against Empower, asserting two types of claims: (1) unfair competition claims to stop Empower's sale of its unapproved drugs; and (2) a Lanham Act claim to stop Empower's false advertising. Empower seeks dismissal of both.

Empower first contends that "several federal district court judges reminded Lilly that Congress did not allow it to enforce Section 503A," the federal exception allowing limited compounding. Motion to Dismiss Dkt. 34 ("Mot.") 2. But Empower ignores the federal judges sitting on the Fifth Circuit, which just blessed a manufacturer's ability to bring state-law unfair competition claims to stop the sale of unapproved drugs under the guise of compounding. *Zyla Life Scis., LLC v. Wells Pharma of Houston, LLC*, 134 F.4th 326 (5th Cir. 2025). The defendant moved for rehearing en banc, and the Fifth Circuit unanimously denied the motion. *Zyla Life Scis.*, No. 23-20533 (5th Cir. June 5, 2025), Dkt. 113. The *Zyla* Court **reversed** a district court's dismissal of nearly identical claims against a so-called compounder to stop the sale of its unapproved drugs under four of the same state laws at issue here, explaining that "[i]f anyone sells drugs in violation of these state laws, competitors may bring suit under traditional state unfair-competition law." *Zyla*, 134 F.4th at 330–31. Empower's motion buries this controlling law, devoting ***a single***

*sentence* to *Zyla* in the **last paragraph** of its brief. Mot. 40. It spends pages rehashing the exact arguments that the Fifth Circuit rejected. But no amount of ignoring *Zyla* can wish it away.

Empower's attempt to dismiss Lilly's false advertising claims fares no better. Empower advertises its mass-produced, standardized drugs as "personalized" for individual patients, claims it complies with "stringent" regulatory standards, and asserts its drugs are proven safe and effective. Complaint Dkt. 1 ("Compl.") ¶ 91. None of these claims is true. Empower deceives customers about its products, luring them away from Lilly's safe, clinically tested medicines, in violation of the Lanham Act. *Id.* ¶¶ 90–92.

Empower claims that Lilly—the only seller of FDA-approved tirzepatide—lacks standing to challenge false advertising by a direct competitor selling knock-off tirzepatide. That is not the law. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 138 (2014). Indeed, in the same breath, Empower accuses Lilly of bringing this lawsuit to "bolster Lilly's profits," Mot. 1—tacitly conceding that the parties compete for sales, the heartland of Lanham Act standing. *See Lexmark*, 572 U.S. at 138. Empower's remaining arguments are that its statements are actually true (a classic fact dispute) or precluded by the federal Food, Drug and Cosmetic Act ("FDCA") (another argument rejected by binding precedent). Because Empower's attacks on the sufficiency of the Complaint fail, the Court should deny Empower's Motion to Dismiss in its entirety.

## <u>NATURE OF THE PROCEEDING</u>

### I. Lilly and Its Medicines

Lilly is an international medicine company that has pioneered life-changing discoveries for 150 years. Compl. ¶ 65. Lilly's Mounjaro® and Zepbound® medicines are two groundbreaking examples of Lilly's commitment to developing innovative treatments to meet critical patient needs. *Id.* ¶¶ 69–70. Mounjaro® is FDA-approved to treat type 2 diabetes in adults and Zepbound® is FDA-approved to treat chronic weight management and obstructive sleep apnea in certain adults.

*Id.* ¶ 70. Mounjaro® and Zepbound® are the only two FDA-approved medicines containing the macromolecule called tirzepatide, which Lilly discovered. *Id.* ¶¶ 69, 71. Lilly manufactures Mounjaro® and Zepbound® under strict controls. *Id.* ¶ 66.

Developing a new FDA-approved medicine is an arduous and costly process, typically taking 10–15 years and costing, on average, $2.6 billion per approved medicine. *Id.* ¶ 29. The process begins with years of work to identify a promising drug candidate, followed by extensive preclinical testing to ensure safety before human trials. *Id.* ¶¶ 30–31. Clinical trials are rigorous and risky, with more than 90% of candidates ultimately failing to reach approval; only 52% of drugs entering Phase I progress to Phase II, and even fewer advance further. *Id.* ¶¶ 29, 33–34. Each phase of clinical trials is designed to eliminate unsafe or ineffective candidates, making the journey from discovery to approval both time-intensive and fraught with the risk of failure. *Id.* ¶¶ 35–36.

## II.    Empower

Empower bills itself as a compounding pharmacy "tailoring medications to meet [patients'] unique needs." *Id.* ¶ 113. Empower manufactures and sells drug products that contain tirzepatide, including injectable tirzepatide in a fixed-dose combination with the additive niacinamide, and oral tirzepatide in tablet form. *Id.* ¶ 4. Empower's tirzepatide drugs are not FDA-approved. *Id.* ¶¶ 8–9. The state laws cited by Lilly prohibit the sale of unapproved drugs, mirroring the federal FDCA's ban on unapproved drugs, Section 505. *Id.* ¶¶ 168, 182, 194, 207, 219, 231, 244, 259, 272. Empower contends, however, that its activities are expressly permitted under another section of the federal FDCA, Section 503A. Empower argues that it engages in lawful compounding and is therefore exempt from pre-market approval requirements. Mot. 3.

Compounding is a practice in which a licensed pharmacist prepares a drug for an individually identified patient. Compl. ¶ 51; 21 U.S.C. § 353a(a). For example, if a patient is allergic to a medication ingredient, a compounding pharmacy could produce a version without the

allergen. Compl. ¶ 51. Unlike Lilly's medicines, compounded drugs are not reviewed by FDA, not clinically studied, and often not produced under cGMP. *Id.* ¶¶ 52–53. FDA warns that compounded drugs "do not have the same safety, quality, and effectiveness assurances as approved drugs. Unnecessary use of compounded drugs … exposes patients to potentially serious health risks." *Id.* ¶ 54. FDA also advises that "compounded drugs should only be used to meet a patient's needs if the patient's medical needs cannot be met by an available FDA-approved drug." *Id.*

FDA's concerns are well-founded. Unapproved, compounded drugs have caused serious injury and even death. In 2012, for example, a compounding pharmacy's contaminated steroid injection killed over one hundred patients and sickened hundreds more. *Id.* ¶ 62. In 2017, forty-one patients received contaminated compounded injections and reported septic arthritis. *Id.* ¶ 63. And in 2021, at least sixty-eight patients were injected with adulterated compounded drugs and experienced adverse events, including permanent blindness. *Id.*

Empower fits neatly into this troubling history, with an extensive track record of violating safety standards and regulatory requirements. *Id.* ¶¶ 122–56. FDA has observed safety and quality issues at Empower's facilities on many occasions for *years*, including bacterial contaminations that were "too numerous to count," "[r]epeated failures [to] demonstrate … control over the manufacture of drugs," and use of non-pharmaceutical ingredients in purportedly sterile drugs. *Id.* ¶¶ 132–33, 144, 156. Empower has been disciplined in at least eight states, including for unlawful compounding of a commercially available drug, failure to maintain quality of sterile compounded preparations, and failure to obtain active ingredients from FDA-registered suppliers. *Id.* ¶¶ 128–29, 156. Empower has initiated at least four nationwide recalls of its own injectable drugs, three of which were for a "lack of assurance of sterility." *Id.* ¶¶ 76, 135, 145. And its own employees

have accused it of making injectable pharmaceutical products with "food or animal grade" ingredients and "illegally producing impure GLP-1s." *Id.* ¶¶ 150–155.

Empower does all of this at massive scale. Far from being a retail pharmacy, Empower boasts about manufacturing at a commercial scale, producing over 70,000 drugs per week—more than 3.6 million drugs per year—using automated, commercial-scale equipment in an 86,000-square foot facility. *Id.* ¶¶ 19, 75, 76. Empower ships its unapproved, untested drugs into Alaska, Colorado, Connecticut, Hawaii, North Carolina, South Carolina, Tennessee, Texas, and Washington (among others), without FDA approval and in violation of those states' laws. *Id.* ¶ 21.

Despite its track record, Empower falsely advertises its untested, unapproved tirzepatide products as safe and effective options for both diabetes and weight management. *Id.* ¶¶ 93–105. For example, Empower explicitly claims its injectable tirzepatide with a niacinamide additive "significantly reduces body weight," "help[s] people with non-alcoholic fatty liver disease," "support[s] cellular function," "contribute[s] to overall metabolic health," and acts as "a second-line defense against type 2 diabetes for glycemic control." *Id.* ¶¶ 100, 102, 107. Similarly, Empower claims that its oral tirzepatide "activates both glucagon-like peptide-1 (GLP-1) and glucose-dependent insulinotropic polypeptide (GIP) receptors," "enhances insulin production and secretion," "support[s] glycemic control after meals," and "influence[s] fat metabolism." *Id.* ¶ 94. Empower attempts to support these claims by citing *Lilly's* clinical trials, referencing "recent *clinical studies*," "*demonstrated* [] function," and "proven" results. *Id.* ¶¶ 106–08. These statements necessarily communicate that Empower's drugs have been similarly tested and proven safe and effective. Yet Empower's drugs have never been clinically tested, their results have never been studied, and they have never been reviewed by FDA for safety or effectiveness. *Id.* ¶ 5. There are no clinical studies demonstrating that tirzepatide combined with niacinamide—or any other

additive—provides better results than tirzepatide alone, or even that it works at all. *Id.* ¶¶ 12, 73–74, 100. Likewise, there are no clinical studies of Empower's oral tirzepatide. *Id.* ¶ 94.

Empower falsely advertises its products as "personalized" and "tailored to fit individual patients," *id.* ¶¶ 112, 115, when they are actually sold in standardized, fixed-dose formulations, and cannot be altered to individual patients' needs. *Id.* ¶¶ 116–17. Finally, despite its continual safety and regulatory violations, Empower also claims it "adheres to stringent regulations set by State Boards of Pharmacy, the FDA, and [the United States Pharmacopeia ("USP")] standards" and that its "multi-pronged quality process adheres to stringent regulatory standards across every step" so that its medications "are of the highest caliber *every* time." *Id.* ¶ 123 (emphasis added).

## III.    Stage of the Proceedings

Lilly filed this lawsuit on July 25, 2025. Lilly asserts claims under consumer protection statutes or common law in nine states—Alaska, Colorado, Connecticut, Hawaii, North Carolina, South Carolina, Tennessee, Texas, and Washington—because Empower unlawfully sells unapproved tirzepatide drugs in violation of those states' laws. *Id.* ¶¶ 161–281. Lilly also challenges Empower's false advertising under the Lanham Act, alleging Empower falsely promotes its untested, unapproved tirzepatide products as safe and effective, as "personalized" when they are mass-manufactured in fixed dosages, and as compliant with regulations when Empower in fact flouts regulatory and safety standards. *Id.* ¶¶ 282–90. Empower moved to dismiss this Complaint on September 29, 2025.

## STATEMENT OF THE ISSUES AND STANDARD OF REVIEW

The Court must decide whether Lilly's Complaint, accepted as true and viewed in the light most favorable to Lilly, states a claim for unfair competition under the laws of Alaska, Colorado, Connecticut, Hawaii, North Carolina, South Carolina, Tennessee, Texas, and Washington and a claim for false advertising in violation of the federal Lanham Act. It does.

"A motion to dismiss for failure to state a claim concerns the 'formal sufficiency of the statement of the claim for relief,' not a lawsuit's merits." *Sewell v. Monroe City Sch. Bd.*, 974 F.3d 577, 582 (5th Cir. 2020). A claim should survive a Rule 12(b)(6) motion when it "state[s] plausible grounds for relief." *Emps.' Ret. Sys. v. Whole Foods Mkt., Inc.*, 905 F.3d 892, 899 (5th Cir. 2018). When reviewing a Rule 12(b)(6) motion, the court must "assum[e] the truth of all the plaintiff's nonconclusory allegations and view[] them in the light most favorable to the plaintiff." *Id.*[1]

## ARGUMENTS AND AUTHORITIES

### I. Empower Violates State Unfair Competition Laws by Selling Unapproved Compounded Tirzepatide

#### A. The Fifth Circuit Has Rejected Empower's Preemption Argument

Empower argues that Lilly's state-law claims, asserted in causes of action 1 through 9 and seeking to stop the sale of unapproved tirzepatide, are preempted by the federal FDCA. Mot. 38–40. The Fifth Circuit recently rejected exactly that argument, in exactly this context. In *Zyla*, the manufacturer of FDA-approved medicine sued a compounding pharmacy under state unfair competition statutes because it sold unapproved new drugs under the guise of compounding. 134 F.4th at 330–31. Like Lilly, the manufacturer alleged this violated state laws that mirror Section 505 of the FDCA, which requires drugs to have pre-market approval. *Id.* at 331. Like Lilly, the manufacturer relied on the state laws of Colorado, Connecticut, South Carolina, and Tennessee.[2]

The *Zyla* defendant, like Empower, argued that Section 337(a) of the FDCA preempted state-law claims that mirror federal requirements. *Zyla*, 134 F.4th at 331, n.2, 338; Mot. 38–40.

---

[1] Throughout its Motion, Empower impermissibly relies on sources from outside Lilly's Complaint. On a motion to dismiss, the court "must limit itself to the contents of the pleadings." *Don Stevenson Design, Inc. v. TBP Enters. I, Ltd.*, 2018 WL 1902688, at *2 (W.D. Tex. Apr. 19, 2018). The court also may not take judicial notice of facts that are in "reasonable dispute." *Miller v. Stroman*, 2020 WL 2494576, at *3 (W.D. Tex. May 14, 2020).

[2] These states' laws mirror the FDCA's drug approval requirements. Because Empower sells into more states than the defendant in *Zyla*, Lilly also brings claims under the laws of additional states—Alaska, Hawaii, North Carolina, and Washington, all of which also mirror or incorporate the FDCA's drug approval requirements.

When the district court in *Zyla* agreed with defendant's positions and dismissed the case, the Fifth Circuit reversed, rejected each argument, and unanimously denied the defendant's petition for rehearing. *Zyla Life Scis.*, No. 23-20533, Dkts. 113, 121.

Empower's preemption arguments here simply cannot survive the Fifth Circuit's decision in *Zyla*. Empower emphasizes that the federal "FDCA contains an unambiguous prohibition against non-federal enforcement." Mot. 38. *Zyla* explained that prohibition is "beside the point" because it "says nothing about the States' authority to provide remedies for violations of state law." 134 F.4th at 338 n.8. Empower contends a state claim can only avoid preemption if it is "an independent state law duty," which does "not depend on [] federal requirements." Mot. 39. *Zyla* held that there is "no preemption" of state-law claims that "make federal law their own." 134 F.4th at 332; *see also Wyeth v. Levine*, 555 U.S. 555, 574–75 (2009) (Congress expressly preempted state law on medical devices but not prescription drugs, which is "powerful evidence" of non-preemption). And Empower relies on *Buckman Co. v. Pls.' Legal Comm.*, 531 U.S. 341, 352 (2001), which *Zyla* distinguished; *Buckman* held preempted claims "to vindicate a wrong committed *against the Federal Government*," and a manufacturer's claim against a purported compounder "is different." 134 F.4th at 337.

Empower almost completely ignores that binding precedent. It discusses *Zyla once*, on the last page of its brief. Mot. 40. To avoid *Zyla*, Empower claims that Lilly is not enforcing "new drug approval requirements" at all. Mot. 39–40. Since those laws are "only relevant if Empower's compounded medications do not comply with Section 503A," Empower claims Lilly is "actually seeking to … enforce Section 503A" of the FDCA and so its claim is preempted. Mot. 40. *Zyla* rejected that argument, too. The defendant in that case also argued that it "did not need to obtain approval if it satisfied" federal compounding regulations. 134 F.4th at 331 n.2. But in the Fifth

Circuit's words, "[t]hat's a big if." *Id.* The Court explained that "to establish this theory of preemption," the *defendant* must "have proven that it satisfies [federal law's] many requirements." *Id.* Since it had "only moved to dismiss under 12(b)(6)," it "cannot have" made that showing. *Id.*

Empower is in the exact same posture. As in *Zyla*, Section 503A is relevant only as a possible *defense* Empower may invoke. *Id.* Empower may, at a later stage of the case, argue that it "satisfied" federal law regarding compounding and therefore "did not need to obtain" "prior approval from the FDA." *Id.* But "[a]t this stage of the litigation," Empower "cannot have proven that it satisfies" federal compounding requirements. *Id.* Accordingly, this Court, like the Fifth Circuit, must reject its preemption argument.

## B. Empower's Conduct Is Not Protected by State-Law Safe Harbors

According to *Zyla*, Lilly's unfair competition claims asserted in causes of action 1 through 9—that Empower is unlawfully peddling unapproved tirzepatide—must proceed. Wishing to ignore *Zyla*, Empower tries to invoke narrow state-law exceptions and affirmative defenses. Mot. 8–10. But those arguments run aground on the same reef: the Fifth Circuit held that a defendant "cannot have proven" an affirmative defense applies "at this stage of the litigation," so Empower's argument must be rejected. *Zyla*, 134 F.4th at 331 n.2.

### 1. *Empower's Conduct Is Actionable Under Colorado, Connecticut, South Carolina, Tennessee, and Washington Law*

Empower argues that its conduct is exempt from Colorado, Connecticut, South Carolina, Tennessee, and Washington's consumer protection laws, because (according to Empower) "conduct that is permitted by regulatory agencies cannot form the basis of an unfair competition or deceptive practice claim" and "state exemptions permit[ ] state-sanctioned activity," citing state statutory safe harbors. Mot. 31–33. But the fact that there are regulations governing drug sales and drug compounding is not sufficient to invoke these safe harbors; Empower must show that it

*complies* with those regulations. *See, e.g.*, *Hall v. Walgreens Boots All., Inc.*, 565 P.3d 564, 568 (Wash. 2025) (defendant's "action must be specifically and actively permitted").

This is a fact question that Lilly hotly disputes. The crux of the Complaint is precisely that Empower is *not* complying with these state regulatory regimes governing drug sales. In fact, Lilly alleges in detail that Empower is manufacturing and selling drugs in huge quantities without ever applying for, much less receiving, FDA approval, Compl. ¶¶ 3–5, 75–76, 164–65, 180–82, 194–95, 207–08, 231–32, 244–45, 272–73, and that the state laws require such approval before Empower sells its drugs in that state, 21 U.S.C. § 355(a); COLO. REV. STAT. § 12-280-131(1); CONN. GEN. STAT. § 21a-110(a)(1); S.C. CODE § 39-23-70(a); TENN. CODE § 53-1-110(a); WASH. REV. CODE § 69.04.570; *see Zyla*, 134 F.4th at 330–31 (explaining that Colorado, Connecticut, South Carolina, and Tennessee "mirror federal law by making it illegal to sell any new drug that has not been approved under 21 U.S.C. § 355"). The Court must "assum[e] the truth" of Lilly's allegations, *Emps.' Ret. Sys.*, 905 F.3d at 899, and "cannot draw factual inferences" in Empower's favor, *Zyla*, 134 F.4th at 331 n.2.

In any event, these safe harbors—specifically, that Empower's conduct is lawful under state regulations—are *affirmative defenses*, and the burden of establishing the defense is on Empower, as the party claiming it. *State ex rel. Woodard v. May Dep't Stores Co.*, 1990 WL 322653, at *9 (Colo. Dist. Ct. June 27, 1990), *rev'd on other grounds*, 849 P.2d 802 (Colo. App. 1992) (affirmative defense); CONN. GEN. STAT. § 42-110c(b); S.C. CODE § 39-5-40; TENN. CODE § 47-18-111(b); *Schiff v. Liberty Mut. Fire Ins.*, 542 P.3d 1002, 1004 & n.1 (Wash. 2024) (affirmative defense). Against Lilly's well-pleaded allegations about how and why Empower's conduct is unlawful, Compl. ¶¶ 180–82, 194–95, 231–32, 244–45, 272–73, the Court cannot decide whether Empower has met its burden to establish these affirmative defenses on a motion to dismiss.

*See, e.g.*, *United States v. Medoc Health Servs. LLC*, 470 F. Supp. 3d 638, 651 (N.D. Tex. 2020) (holding that the "safe harbor" was an "affirmative defense[]" and not "appropriate to assert in a motion to dismiss"); *In re Dollar Gen. Corp. Motor Oil Mktg. & Sales Pracs. Litig.*, 2017 WL 3863866, at *23–24 (W.D. Mo. Aug. 3, 2017) (rejecting safe harbor defense; "it is beyond the scope of the present Rule 12(b)(6) motion to determine whether the Defendants' [conduct] complies with" relevant regulations); *Perkins v. Johnson*, 551 F. Supp. 2d 1246, 1255–56 (D. Colo. 2008) (denying summary judgment for same reason).

Empower's remaining argument is that (according to Empower) it does not need FDA approval because its conduct "is expressly permitted by" state and federal "statutes and regulations" regulating compounding. Mot. 32–33. But that is the same factual assertion that was rejected in *Zyla* when the Fifth Circuit reversed dismissal of the manufacturer's claims. As the Fifth Circuit explained, a defendant "cannot have proven that it satisfies" compounding regulations at the motion to dismiss stage. *Zyla*, 134 F.4th at 331 n.2. In fact, Lilly has alleged facts showing "Empower is not 'compounding' tirzepatide" and does not meet the strict requirements for either federal or state compounding exemptions. *See e.g.*, Compl. ¶¶ 1, 8, 75–76, 80–82. "Empower fails to follow pharmacy compounding standards established by the [USP]," and "fail[s] to comply with cGMP," *id.* ¶¶ 81, 131, 144—separate requirements that state laws impose on compounders.[3] Empower also ignores that in most relevant states, compounding is permitted based only on a prescription order for an individual patient[4]—otherwise such conduct constitutes "manufacturing."

---

[3]  3 COLO. CODE REGS. § 719-1:21.21.10(b) ("Ingredients used in a compounded preparation shall either originate from FDA-approved sources, when available, or be USP/NF grade substances when such sources are not available and identified on the FDA drug shortage list."); CONN. GEN. STAT. § 20-633b(c) ("A sterile compounding pharmacy shall comply with the USP chapters."); CONN. AGENCIES REGS. § 20-576-66(b) (same); TENN. CODE § 63-10-216(c) (requiring compliance with USP standards adopted by rule); TENN. COMP. R. & REGS. § 1140-07-.02(1) (requiring compliance with USP standards); *id.* § 1140-07-.04(1) (same); WASH. REV. CODE § 18.64.270(2) (same); WASH. ADMIN. CODE § 246-945-100(1) (same); *see also* S.C. CODE § 39-23-30(a)(2)(B) (requiring compliance with cGMP).

[4]  *E.g.*, 3 COLO. CODE REGS. § 719-1:21.00.20(b) (requiring "patient-specific prescription orders" in order to

S.C. CODE § 40-43-86(CC)(2)(g). Empower "fails to obtain necessary prescriptions," Compl. ¶ 81, and mass-manufactures drugs, *id.* ¶¶ 1, 8, 75–76. These are all factual allegations that must be taken as true and are fatal to Empower's motion to dismiss. *Emps.' Ret. Sys.*, 905 F.3d at 899.

### 2. *Empower's Conduct Is Actionable Under Hawaii Law*

Empower next contends that Lilly's Hawaii claim fails under the safe harbor in Hawaii Title 26 Chapter 481A. Mot. 31 n.24. But Lilly is not asserting a claim under chapter 481A. The Complaint is clear that Lilly brings its claim under Chapter 480. Compl. ¶¶ 205–16. Chapter 481A expressly limits the scope of its safe harbor to "[t]his chapter," and Chapter 480 has no applicable safe harbor. *See Daly v. Harris*, 215 F. Supp. 2d 1098, 1122–23 (D. Haw. 2002), *aff'd*, 117 F. App'x 498 (9th Cir. 2004) ("Chapter 480 provides express exceptions" only for labor organizations, insurers, certain cooperative organizations, federally approved mergers, and social service providers); *Aquilina v. Certain Underwriters at Lloyd's Syndicate #2003*, 407 F. Supp. 3d 1016, 1027, 1038–44 (D. Haw. 2019) (distinguishing the chapters and their safe harbors). Of course, a safe harbor derived from a different law is not grounds for dismissal of Lilly's Chapter 480 claim. *Goran Pleho, LLC v. Lacy*, 439 P.3d 176, 203 (Haw. 2019) ("This court may not take it upon itself to add an additional exception that the legislature has declined to adopt."). And even if that chapter were applicable, that safe harbor only shields conduct that complies with applicable law. Empower could not invoke it for the reasons described in Section I.B.1.[5]

---

compound); CONN. GEN. STAT. §§ 20-633b(d)(1)–(2) (compounding pharmacies "may only provide patient-specific" drugs, otherwise they are manufacturing); S.C. CODE §§ 40-43-86(CC)(2)(b), (CC)(2)(g) (requiring "a pharmacist/patient/practitioner relationship" and "valid prescription" (or in limited circumstances, expected prescription) "for an individual patient" in order to compound); TENN. CODE §§ 63-10-204(6)(A)–(B) (defining "compounding" based on the receipt of a prescription or, in certain circumstances, an anticipated prescription); TENN. COMP. R. & REGS. § 1140-01.01(41) (defining "sterile manufacturing" as producing sterile products for distribution "not pursuant to a prescription or medical order"); WASH. REV. CODE §§ 18.64.011(6), (24)(a) (defining "compounding" based on "a prescription," and defining "manufacture" to include compounding not based "on or in anticipation of an order").

[5] *See* HAW. REV. STAT. § 481A-5(a)(1) (conduct exempt when it *complies* with applicable law); *State ex rel. Shikada v. Bristol-Myers Squibb Co.*, 526 P.3d 395, 414 (Haw. 2023) (conduct exempt if "specifically allowed or required" by state or federal laws or regulations); *Bristol-Myers Squibb Co. v. Connors*, 444 F. Supp. 3d 1231,

### 3. *Empower's Conduct Is Actionable Under Alaska Law*

Empower's conduct is not shielded by any safe harbor under Alaska law, either. The Alaska Unfair Trade Practices and Consumer Protection Act ("UTPA") safe harbor exempts conduct that is already regulated and prohibited by another state statutory or regulatory scheme. Mot. 33–34 (citing ALASKA STAT. § 45.50.481(a)(1)). But Alaska's safe harbor provision does not apply to conduct that is defined as *per se* unfair or deceptive under Alaska's UTPA. *See* ALASKA STAT. §§ 45.50.471(b), 45.50.481(c). And Empower's conduct is *per se* unfair and deceptive.[6]

*First*, the safe harbor does not apply because "violating a labeling or advertising provision of AS 17.20 (Alaska Food, Drug, and Cosmetic Act)" is *per se* deceptive under the Alaska UTPA. ALASKA STAT. § 45.50.471(b)(48). The Alaska FDCA provides that for new drugs not already approved under the federal FDCA, the proposed labeling must be submitted to the Alaska Commissioner before the drug can be sold. *Id.* § 17.20.110(a)(2). Lilly's Complaint alleges that Empower's conduct violates the Alaska FDCA's labeling requirements since the label has not been approved prior to sale. Compl. ¶¶ 168–69. This violation of the Alaska FDCA's labeling requirements constitutes a *per se* violation of the UTPA, and removes any safe harbor protection.

*Second*, and independently, the safe harbor does not apply because conduct that causes a likelihood of confusion "as to the … approval … of goods" is *per se* deceptive, and thus exempt from the safe harbor. ALASKA STAT. § 45.50.471(b)(3) (prohibiting "causing a likelihood of confusion or misunderstanding as to the … approval … of goods"); *id.* § 45.50.471(b)(4) (barring "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses,

---

1238 (D. Haw.), *aff'd*, 979 F.3d 732 (9th Cir. 2020) (safe harbor an affirmative defense); HAW. REV. STAT. § 328-17(a)(1) (prohibiting sale of unapproved drugs); HAW. REV. R. § 16-95-110(a)(17) (requiring compliance with USP standards adopted by rule).

[6] If Alaska's legislature wanted to exempt the pharmaceutical industry, it could have; it created such exemptions for the publishing, insurance, and banking industries. *See* ALASKA STAT. §§ 45.50.481(a)(2)–(3). It did not create one that could cover Empower's conduct.

benefits, or quantities that they do not have"); *id.* § 45.50.471(b)(6) (outlawing "representing that goods or services are of a particular standard, quality, or grade … if they are of another"). Here, because state and federal law require pre-market approval to sell prescription drugs, consumers are likely to assume that the tirzepatide drugs Empower sells in Alaska have received such approval, when in fact they have ***never*** been approved by FDA or any state agency. Compl. ¶¶ 3, 5, 164–65, 196. Thus, based on Lilly's well-pleaded complaint, Empower's conduct is *per se* deceptive under this prong of the statute, too, and the safe harbor cannot apply.

Even if Alaska's safe harbor *could* apply, Empower would need to prove it *does*—which requires factual evidence not cognizable at this stage. "[M]ere citation to a broad regulatory scheme is insufficient to support dismissal of a UTPA claim." *White v. NYLIFE Sec., LLC*, 551 F. Supp. 3d 974, 983, 985 (D. Alaska 2021); *see also Matanuska Maid, Inc. v. State*, 620 P.2d 182, 186 (Alaska 1980) (holding that Alaska Restraint of Trade Act did not support safe harbor); *Alaska Interstate Constr., LLC v. Pac. Diversified Invs., Inc.*, 279 P.3d 1156, 1167 (Alaska 2012) (same, Federal Aviation Regulations); *Alaska v. Express Scripts, Inc.*, No. 3:23-CV-00233-JMK, 2024 WL 2321210, at *8–9 (D. Alaska May 22, 2024) (same, Alaska Controlled Substances Act). Empower also must prove that the scheme is *enforced* in an ongoing, careful way. *White*, 551 F. Supp. 3d at 986 (defendant's "lack of analysis as to state enforcement of the [regulatory scheme], combined with [its] mere passing gesture to the [scheme] is not sufficient for [defendant] to carry its burden on its motion to dismiss"). Empower submits no evidence about "state enforcement of the" FDCA—and cannot do so on a motion to dismiss. *Id.* (denying dismissal).

4.      *Empower's Conduct Is Actionable Under North Carolina Law*

Empower seeks to avoid liability under North Carolina law by arguing that its conduct falls within the "learned profession" exemption to the North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA"). Mot. 34–35. The NCUDTPA bans unfair competition "in or

affecting commerce," and defines "commerce" to include "all business activities" but not "professional services rendered by a member of a learned profession." N.C. GEN. STAT. § 75-1.1(a)–(b). As the party claiming the exemption, Empower has the burden to prove that two statutory criteria are satisfied. *Id.* § 75-1.1(d). First, "the person or entity performing the alleged act must be a member of a learned profession." *Sykes v. Health Network Sols., Inc.*, 828 S.E.2d 467, 472 (N.C. 2019). Second, "the conduct in question must be a rendering of professional services." *Id.* Empower has not met that burden on a motion to dismiss.

Empower claims it engages in the learned profession of "pharmacy services." Mot. 34. But Lilly alleges that Empower is not acting as a pharmacy at all: "Empower is *not 'compounding'* tirzepatide," Compl. ¶ 8 (emphasis added), but "instead is mass-manufacturing its untested tirzepatide products at commercial scale," *id*. ¶¶ 8, 19, 75–76 (using automated, commercial-scale equipment to produce 70,000 drugs per week). The conduct in question is drug manufacturing, not drug compounding, and drug manufacturing is not exempt from the NCUDTPA. *Sheet Metal Workers Loc. 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 418–20 (E.D. Pa. 2010) (denying motion to dismiss NCUDTPA claim against drug manufacturer). Even if Empower could ignore Lilly's well-pleaded allegations that it is not acting as a pharmacy, "the mere status of a defendant as a member of a 'learned profession' does not shield that defendant from any claim under [the NCUDTPA] regardless of how far removed the claim is from that defendant's professional practice." *Sykes,* 828 S.E.2nd at 473; *see also Hamlet H.M.A., LLC v. Hernandez*, 821 S.E.2d 600, 608 (N.C. App. 2018), *aff'd, ordered not precedential*, 835 S.E.2d 436 (N.C. 2019) (finding exception not applicable; "the fact that [defendant] is a physician does not change the nature of" the conduct); *Reid v. Ayers*, 531 S.E.2d 231, 236 (N.C. App. 2000) ("[N]ot all services performed by" members of a learned profession "fall within the exemption.").

Manufacturing and selling drugs are "entrepreneurial" acts, like advertising, *id.*, that are "business activities," not "professional services," N.C. GEN. STAT. § 75-1.1(b); *cf. Feldman v. Lederle Lab'ys*, 479 A.2d 374, 382 (N.J. 1984) ("Drug manufacturers, unlike doctors and dentists, do not render to consumers professional services involving skills in judgment and diagnosis."); *Transportes Ferreos de Venez. II CA v. NKK Corp.*, 239 F.3d 555, 564 (3d Cir. 2001) ("The exclusion for professional services is … appropriately associated with a specialized knowledge and a mental or intellectual endeavor, not production, manufacture or supply of goods and manufacturing."). To invoke this safe harbor, Empower has the burden to *prove* that its conduct complies with the regulations on compounding, which it cannot do on a motion to dismiss. *See Zyla*, 134 F.4th at 331 n.2. For that reason, this challenge fails.[7]

### 5. *Empower's Conduct Is Actionable Under Texas Law*

Empower also challenges Lilly's Texas common-law claim. As Empower admits, Texas common law creates a claim against a defendant that commits an "illegal act … which interfered with the plaintiff's ability to conduct its business." Mot. 35 (quoting *Taylor Publ'g Co. v. Jostens, Inc.*, 216 F.3d 465, 486 (5th Cir. 2000)). Empower claims Lilly has not "plead[ed] facts to establish … an illegal" act. Mot. 36. But Lilly alleges that "Empower has engaged in an illegal act by selling unapproved new drugs in Texas in violation of … the Texas Food, Drug, & Cosmetic Act, Tex. Health & Safety Code Ann. § 431.114(a)" and that conduct hurts Lilly's business. Compl. ¶¶ 259, 263. Empower responds that it has "a license to sterile compound" in Texas, Mot. 37, but there is no exemption for licensed pharmacies. Empower does not even purport to cite one. Selling unapproved new drugs is illegal whether or not Empower holds a pharmacy license.

---

[7] Empower relies on *Sykes v. Health Network Solutions, Inc.*, where the court found that defendant directly controlled the rendering of professional services because it allegedly forced chiropractors to limit "the number of treatments provided to their patients." 828 S.E.2d at 473. That control over patient treatment bears no resemblance to Empower's mass-manufacturing of unapproved drugs.

Empower next argues that a Texas FDCA violation "cannot establish the [] 'illegal act' necessary to support [Lilly's] 'unfair competition' claim" under Texas common law. Mot. 36–38. That is incorrect: "Texas courts have acknowledged that a statutory violation could serve [as] the illegal act" that supports an unfair competition claim. *Decorative Ctr. of Houston, L.P. v. Direct Response Publications, Inc.*, 208 F. Supp. 2d 719, 735 n.32 (S.D. Tex. 2002).[8]

The single case Empower cites, *Reliable Ambulance Serv., Inc. v. Mercy Hosp. of Laredo*, No. 04-02-00188-CV, 2003 WL 21972724, at *2 (Tex. App.—San Antonio Aug. 20, 2003), does not help its argument. Mot. 37–38. That case holds a plaintiff can bring a claim premised on a statutory violation that interferes with its business, *unless* that claim would be "inconsistent with legislative intent" in the context of the particular statute. *Reliable*, 2003 WL 21972724, at *3.

*Reliable* found a private right of action would be inconsistent with legislative intent for two reasons that do not apply here. *First*, "no other jurisdiction … has recognized an action" based on the federal anti-kickback statute at issue there. *Id.* at *6. Here, Empower cannot dispute that at least the eight other state laws cited in Lilly's Complaint permit actions based on state-law FDCA violations, *see also Zyla*, 134 F.4th at 331 ("If anyone sells drugs in violation of [six] state[s'] laws, competitors may bring suit under traditional state unfair-competition law."). *Second*, *Reliable* relied on an enforcement scheme "reserved" to federal agencies. 2003 WL 21972724, at *4–5. The Texas FDCA is not similarly exclusive. It allows enforcement by "the attorney general, or a district, county, or municipal attorney" (TEX. HEALTH & SAFETY CODE § 431.060(a)), and does not grant exclusive authority to any one entity. The federal FDCA, by contrast, mandates that

---

[8]     *See also Schoellkopf v. Pledger*, 778 S.W.2d 897, 904–05 & n.10 (Tex. Civ. App.—Dallas 1989) (recognizing plaintiff may bring a claim to protect "[its] business and his right to conduct the same" from "unlawful interference or injury"); *Featherstone v. Indep. Serv. Station Ass'n of Tex.*, 10 S.W.2d 124, 125 (Tex. App.—Dallas 1928) (allowing a claim alleging that plaintiff's "business and the right to operate the same without unlawful interference … were violated by [a] lottery scheme conducted by defendants" which "violat[ed] the penal statutes of the state"); *Taylor Publ'g Co.*, 216 F.3d at 486 ("[t]he tort requires that the plaintiff show an illegal act by the defendant which interfered with the plaintiff's ability to conduct its business.").

"all such proceedings for the enforcement … shall be by and in the name of the United States." 21 U.S.C. § 337(a). The Texas legislature could have used similar language, as it often incorporated federal FDCA provisions, but it did not. This legislative rejection of exclusivity confirms there is no "inconsisten[cy] with legislative intent" that would override Texas's default rule that "an illegal act [that] interfere[s] with the plaintiff's ability to conduct its business" is actionable, *W. Rsrv. Medtec Servs., LLC v. Stryker Corp.*, No. 4:18-CV-2604, 2019 WL 13191641, at *8 (S.D. Tex. May 13, 2019).

Empower's argument that Lilly "seeks to deputize itself as the enforcer of Texas pharmacy statues and TFDCA" misunderstands Lilly's claim. Mot. 37. Lilly is not acting as the attorney general; it cannot recover civil penalties or bring criminal charges, as Texas' own authorities could. TEX. HEALTH & SAFETY CODE § 431.060. But Texas law allows Lilly to recover for the harm Empower's unfair competition has caused its business. *Taylor Publ'g Co.*, 216 F.3d at 486.

## II. Empower's False Advertising Violates the Lanham Act

Lilly's Complaint alleges that Empower made multiple false statements of fact about its tirzepatide products in commercial advertisements, including claims that its unapproved oral and combination tirzepatide drugs are safe and effective, that they are "personalized" for individual patients, and that Empower complies with regulatory standards. Compl. ¶¶ 10–17. In reality, Empower's products are not clinically tested and are mass-manufactured in unsafe, non-compliant conditions. *Id.* ¶¶ 75–76, 112. All of this is sufficient to state a claim under the Lanham Act. Empower contends that Lilly has failed to state a claim under the Lanham Act because, according to Empower, (i) Lilly lacks standing and cannot prove harm, (ii) Lilly's claims are precluded, (iii) Lilly has failed to prove deception, and (iv) the challenged advertising statements are either true or puffery. None of Empower's arguments has any merit.

**A.     Lilly Has Standing to Redress Injuries Caused by Empower's False Advertising**

As the Supreme Court has held, a party has standing to bring a claim under the Lanham Act when its injuries fall within the "zone of interests" protected by the Lanham Act and "are proximately caused by violations of the statute." *Lexmark*, 572 U.S. at 132, 134. Lilly's injuries are precisely the type described in *Lexmark*. First, Lilly alleges injuries that fall within the zone of interests protected by the Lanham Act—specifically, lost sales and damage to its brand and customer goodwill. Compl. ¶¶ 159–60; *Lexmark,* 572 U.S. at 134. Empower all but admits this when it accuses Lilly of suing to "bolster [its] profits"—in other words, to protect its sales, as the Lanham Act intended. Mot. 1. Second, Lilly alleges that these injuries are proximately caused by Empower's false advertisements, which lure patients away from Lilly's FDA-approved tirzepatide medicines in favor of Empower's untested, unapproved products. Compl. ¶ 159.

Indeed, Lilly's Complaint is a "classic Lanham Act false-advertising claim" "in which one competitor directly injures another by making false statements about his own goods … inducing customers to switch." *Lexmark*, 572 U.S. at 137 (citations omitted). That is exactly what Lilly has alleged: Empower's tirzepatide-based drugs directly compete with Lilly's tirzepatide-based medicines, luring Lilly's customers away. *See* Compl. ¶¶ 92, 112, 159, 209, 235, 248, 264. That is sufficient to show Lanham Act standing under Fifth Circuit law. *Colorado Biolabs, Inc. v. Three Arrows Nutra, LLC*, No. 3:25-CV-0601-D, 2025 WL 2524313, at *15 (N.D. Tex. Sept. 2, 2025) ("competitor whose position in the marketplace has allegedly been damaged by CBL's false advertising … plausibly allege[d] statutory standing"). A court in California recently reached the same conclusion, albeit under Ninth Circuit law, when assessing similar claims brought against another seller of compounded tirzepatide. *Eli Lilly & Co. v. Adonis Health, Inc.*, No. 25-CV-

03536-JST, 2025 WL 2721684, at *3 (N.D. Cal. Sept. 24, 2025) (finding direct competition between Lilly and seller of compounded tirzepatide).[9]

Empower nonetheless makes four meritless arguments that Lilly failed to adequately plead proximate causation. *First*, it contends that Lilly does "not allege direct harm to Lilly from Empower's alleged consumer deceptions" because, it claims, Lilly relies on a "multi-step causation theory" supported by "absolutely" no facts. Mot. 14. That is wrong. Lilly's Complaint alleges *direct* harm to Lilly: "[s]ome sales made by Empower of its compounded tirzepatide products would have been made by Lilly *but for* Empower's unlawful and unfair competition" and false advertising, *id*. ¶ 158 (emphasis added); *see also id*. ¶ 175. There is nothing "multi-step" about this; consumers sometimes choose Empower's compounded products over Lilly's due to its false statements. These allegations directly link Empower's conduct to Lilly's loss of sales and goodwill, adequately pleading a direct causation theory.

*Second*, Empower claims that a physician's "independent" decision to prescribe its products is "an intervening factor that breaks any purported connection between Empower's advertisements and alleged Lilly lost sales." Mot. 15–16. To begin with, Lilly alleges that "Empower falsely advertises to providers"—not just patients. Compl. ¶ 156; *see also id*. ¶ 109 ("Empower … deceives providers and consumers …."). Empower has been successful in

---

[9]  Another federal court also recently confirmed that compounded tirzepatide products directly compete with Lilly's FDA-approved tirzepatide medicines. *Eli Lilly & Co. v. Willow Health Servs., Inc*., No. 2:25-CV-03570-AB-MAR, 2025 WL 2631620, at *4 (C.D. Cal. Aug. 29, 2025) (same). Although the *Willow* court correctly found that commercial injury to Lilly can therefore be presumed, it found Lilly did not have standing because it did not plead lost sales. *Willow Health Servs.,* 2025 WL 2631620, at *5. That was error; Lilly is not required to plead its lost sales. *See, e.g.*, *Colorado Biolabs*, 2025 WL 2524313, at *5, 13 (finding Lanham Act standing even where "[plaintiff] does not allege that it lost a single sale, or otherwise suffered any direct pecuniary loss, as a result of [defendant's] statements"); *Greater Houston Transp. Co. v. Uber Techs., Inc.*, No. CIV.A. 4:14-0941, 2015 WL 1034254 at *20 (S.D. Tex. Mar. 10, 2015) ("While Plaintiffs have not offered the precise amount of business they have lost … [i]t is sufficient that they pleaded that customers were induced by false advertising to offer their business to Plaintiffs' competitors instead of Plaintiffs."). And in any case, it has pled such lost sales here, Compl. ¶¶ 158, 174, 200, 223.

deceiving providers, who "have repeated Empower's false and deceptive claims," advertising its drugs "as … 'offer[ing] the same powerful benefits' as Lilly's approved medicines" and claiming they are "clinically effective treatment for type 2 diabetes …." *Id.* ¶¶ 98, 105.

But more fundamentally, Empower's argument would eliminate Lanham Act standing for any prescription drug. That is not the law. "Courts have routinely found that Lanham Act claims can be maintained for prescription drugs, where the prescriber is the gatekeeper for the product." *Adonis Health*, 2025 WL 2721684, at *4; *see also Healthpoint Ltd. v. Allen Pharm., LLC*, No. SA-07-CA-0526-XR, 2008 WL 728333, at *2 (W.D. Tex. Mar. 18, 2008) (denying motion to dismiss Lanham Act false advertising claim involving prescription drugs); *see also Allergan USA Inc. v. Imprimis Pharms., Inc.*, SACV171551DOCJDEX, 2017 WL 10526121, at *1 (C.D. Cal. Nov. 14, 2017) (finding Lanham Act standing where prescription drugs were at-issue); *Genus Lifesciences Inc. v. Lannett Co., Inc.*, No. 18-CV-07603-WHO, 2019 WL 4168958, at *4–10 (N.D. Cal. Sept. 3, 2019) (similar). Empower cites only one case in support of its position—*Willow*, 2025 WL 26312620, at *6. But the *Willow* court reached its erroneous decision *sua sponte*, and cited no authority. The *Adonis Health* court, acknowledging the long history of Lanham Act cases involving prescription drugs, subsequently declined to follow it. 2025 WL 2721684, at *4 (rejecting argument that "the provider's decision to prescribe" breaks the causal chain).

Empower also misleadingly quotes Lilly's learned intermediary arguments from *products liability* cases, where—unlike the claims at issue in this case—the doctrine actually applies. Mot. 17 n.17. In those cases, the doctrine holds that a manufacturer has a duty to adequately warn prescribing physicians of the risks of its drug. *See, e.g.*, Br. of Appellee Eli Lilly & Co., *Boehm v. Eli Lilly and Co.*, 747 F.3d 501 (8th Cir. 2014) ("Lilly had an obligation to provide Plaintiff's doctors with an adequate warning."); Br. of Resp. Eli Lilly & Co. on Certified Question at 21–22,

*Dearinger v. Eli Lilly & Co*, No. 99956-2 (Wash. Oct. 25, 2021) ("Like every pharmaceutical manufacturer, Lilly has implemented physician warnings in the FDA-approved label as the ultimate vehicle for providing appropriate warnings about the risks of its prescription medicine."). If the manufacturer fulfills its duty to warn to the physician, then the physician's fully informed judgment protects the manufacturer from liability. *See, e.g.*, *Dearinger v. Eli Lilly & Co.*, 510 P.3d 326, 329 (Wash. 2022) ("In the context of prescription drugs, the learned intermediary doctrine provides [that where] the manufacturer satisfies its duty to warn the patient of the risks of its product … [t]he manufacturer's duty to provide warnings to patients transfers to the doctor[.]"); *Saavedra v. Eli Lilly & Co.*, No. 2:12-CV-9366-SVW-MAN, 2013 WL 3148923, at *4 (C.D. Cal. June 13, 2013) ("Defendant must establish that it adequately warned prescribing physicians of the effects of Cymbalta withdrawal[.]"); *Boehm v. Eli Lilly & Co.*, 747 F.3d 501, 507–08 (8th Cir. 2014) (affirming dismissal of failure-to-warn claim where physicians "knew all these risks" but still prescribed the drug). As those cases make evident, the learned intermediary doctrine is a gloss on a manufacturer's legal duty to warn, which is not at issue in Lanham Act causes of action. Even if it were, Empower does not warn physicians of the falsity of its advertising and certainly does not provide the FDA-approved warnings that accompany Lilly's products. Compl. ¶¶ 125, 169, 195, 208, 220, 232, 245, 260, 273. The learned intermediary doctrine is inapposite here.

*Third*, Empower contends that "compounded tirzepatide and FDA-approved tirzepatide serve different parts of the market." Mot. 18. That argument ignores Lilly's Complaint, which specifically alleges that Lilly and Empower target the *same* customer base—type 2 diabetes and weight management patients. Compl. ¶¶ 93–94. That allegation alone defeats Empower's argument and establishes Lilly's standing. *Austin's Nat. Frozen Pops, Inc. v. Jonny Pops, LLC*, No. 1:24-CV-716-RP, 2025 WL 888560, at *1, 4 (W.D. Tex. Mar. 13, 2025) (denying dismissal

of Lanham Act claim where plaintiff alleged "[b]oth parties target consumers seeking 'better-for-you' treat options").

Rather than deal with the allegations in this case, Empower goes well beyond the pleadings to Lilly's statement in a different case that "*much of* the market for compounded tirzepatide would not translate to future demand for Lilly's FDA-approved products." Mot. 18 (emphasis added) (quoting *Outsourcing Facilities Ass'n v. FDA*, No. 4:24-cv-953 (N.D. Tex. Apr. 17, 2025) (ECF No. 138)). But that was because compounded products are sometimes "promoted for uses *different* from the indications FDA has approved." *Id*. (emphasis added) (quoting *Outsourcing Facilities*, No. 24-953 (ECF No. 138)).[10] Here, as explicitly alleged in Lilly's Complaint, Empower is promoting its compounded products for the *same* indications—weight management and diabetes management—as Lilly's FDA-approved medicines. Compl. ¶¶ 93–94, 98, 100, 102, 107, 110, 112, 114; *see also* Mot. 26 (asserting Empower's drugs provide "weight management support"). As Lilly's Complaint alleges, Empower "vie[s] for the same dollars from the same consumer group" as Lilly. *Adonis Health*, 2025 WL 2721684, at *3; Compl. ¶¶ 17, 93–94, 159. Accordingly, Lilly has properly alleged its standing. *Adonis Health*, 2025 WL 2721684, at *3 (finding standing); *Jonny Pops, LLC*, 2025 WL 888560, at *1, 4 (finding standing where plaintiff alleged both parties "target the same … consumers").

Empower's cited cases are easily distinguishable. In *Blue Star Press, LLC v. Blasko*, the plaintiff failed to allege that the parties competed, or that defendant's false statements diverted customers from plaintiff. No. SA17CA111OLGHJB, 2018 WL 1904835, at *6 (W.D. Tex. Mar.

---

[10] Empower's argument that Lilly is "judicially estoppe[d]" from stating that unapproved, compounded tirzepatide products serve different patient populations than Lilly's approved drugs therefore fails because Lilly's positions are not "plainly inconsistent." Mot. 19. In *Outsourcing Facilities*, Lilly noted that some compounded tirzepatide is used for different or off-label purposes but did not contend there is no market overlap. *See Outsourcing Facilities*, No. 24-953 (ECF No. 138).

6, 2018). Lilly alleged both. Compl. ¶¶ 2, 17, 90–121, 157–60. Empower's reliance on *IQ Products* is similarly off-base. There, the court found that the plaintiff "presented no competent summary judgment evidence that … consumers would have bought [plaintiff's product] instead of [defendant's]." *IQ Prods. Co. v. Pennzoil Prods. Co.*, 305 F.3d 368, 376 (5th Cir. 2002). Setting aside the different evidentiary standard there, Lilly *has* alleged that "Empower's practices lure consumers away from Lilly's safe and effective FDA-approved medicines in favor of Empower's untested and unapproved products." Compl. ¶¶ 17; *see id.* 2, 90–121, 157–60.

*Fourth*, Empower argues that Lilly does "not allege direct harm" because Lilly's allegations of reputational harm are "speculative." Mot. 14. But as Empower acknowledges, Lilly's allegations of lost sales and reputational harm are both independently sufficient bases for Lanham Act standing. Mot. 13; *see also Lexmark*, 572 U.S. at 137 (holding that "damage to its business reputation" is an injury to "precisely the sort[] of commercial interest[] the [Lanham] Act protects"). So, even if Lilly had not pled reputational injury, it would have standing because it pled economic injury (and vice versa).

Regardless, Lilly's reputational harm allegations are more than sufficient. To sufficiently allege reputational harm at this stage, Lilly need only allege that its reputation "is *likely* to be damaged by" defendant's false advertising—not that its reputation *was* harmed. *Crystaphase Prods*, 2018 WL 4266237, at *7, 11 (emphasis added). And Empower's false advertising is likely to damage Lilly's reputation. As just one example, Empower is falsely advertising unapproved compounded oral tirzepatide products that have never been clinically tested. Compl. ¶¶ 94, 100. Oral tirzepatide absorbs differently into the body than Lilly's injectable tirzepatide medicine—if it absorbs at all, and consumers have found that Empower's tirzepatide drugs do not work. *Id.* ¶¶ 94, 105, 111. Consumers could reasonably believe that tirzepatide in general—including Lilly's

25

FDA-approved medicines—does not work. This more than establishes the kind of "reasonable inference" of reputational harm that the Court may draw during the motion to dismiss analysis. *Jonny Pops*, 2025 WL 888560, at *2 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

Empower argues consumers will not make that inference, claiming its advertisements are "completely unrelated to Lilly and its medications." Mot. 14. But that argument ignores Lilly's well-pleaded allegations, which must be accepted as true. *Jonny Pops*, 2025 WL 888560, at *4. Lilly alleged that Empower *equates* its knockoff tirzepatide drugs with Lilly's medicines. Empower, for instance, repeatedly cites Lilly's clinical trials of Mounjaro® and Zepbound® (Compl. ¶¶ 106–08) and claims equivalence or even superiority to injectable tirzepatide like Lilly's (*id*. ¶¶ 109–11). Empower's statements have misled the market into believing its drugs "offer[] the same … benefits" as Lilly's medicines. *Id.* ¶ 98. "[D]amag[ing] the product's reputation by … equating it with an inferior product" is a classic example of reputational harm. *Lexmark*, 572 U.S. at 138 (finding standing). And allegations like Lilly's are regularly held sufficient at the motion to dismiss stage. *See, e.g.*, *Crystaphase Prods*, 2018 WL 4266237, at *11 (finding standing and denying motion to dismiss where consumers might "equate[]" defendant's "poorer-performing" product with plaintiff's); *Obesity Rsch. Inst., LLC v. Fiber Rsch. Int'l, LLC*, 165 F. Supp. 3d 937, 947 (S.D. Cal. 2016) (finding standing and denying motion to dismiss where defendant was "passing off" its products "as the same … as that studied in clinical trials" of plaintiff's).

None of Empower's cited cases hold otherwise. In *Blue Star Press*, the court explained that plaintiff could establish standing "by alleging, for example, that some of [defendant's] claimed 'knock-off' [products] mimicked" plaintiff's—exactly as Lilly has alleged. 2018 WL 1904835, at *5; Compl. ¶¶ 4, 7, 93–121. And in *Eli Lilly and Co. v. Mochi Health Corp.*, the court acknowledged that comparison to an inferior product can damage reputation but said that "the

mere fact a medication is compounded" does not make it inferior. 2025 WL 2998166, at *3 (N.D. Cal. Oct. 24, 2025). Setting aside whether that factual finding was appropriate on a motion to dismiss, correct, or accurately characterized Lilly's allegations, Lilly alleges more.[11] Empower's drugs are inferior not merely because they are compounded, but also because, unlike Lilly's approved products, they are manufactured under hazardous conditions using substandard ingredients (*see, e.g.*, Compl. ¶¶ 15, 126–56), contain experimental additives whose safety and efficacy when combined with tirzepatide are unknown (*id.* ¶ 3), and are administered orally without any evidence oral administration is safe and effective (*id.* ¶ 94). In short, Empower's products are also inferior because they risk patients' safety (*id.* ¶ 86) and may not even work (*id.* ¶ 105). That is sufficient to establish standing. *See Crystaphase Prods*, 2018 WL 4266237, at *11.

## B.     Lilly Adequately Pleads That Empower's Advertising Is False

Lilly's Complaint contains detailed and well-pleaded allegations regarding three categories of Empower's false promotional statements: (1) Empower's claims that its products are "personalized"; (2) Empower's claims that it complies with regulations; and (3) Empower's claims that its products are proven safe and effective. Empower sets forth two defenses for these statements: (1) that Lilly's Lanham Act claims are precluded by the regulatory scheme established by FDA and the FDCA, Mot. 20–21, 24–25, 28–29; and (2) that its advertising statements are "literally true." Mot. 20–22, 25–27, 29. Neither provides a basis for dismissal.

### 1.     *Lilly's Complaint Properly Challenged Empower's Personalization Claims*

Lilly's Complaint properly alleges that Empower is falsely advertising its tirzepatide products as "personalized" or "customized." To resolve that claim, the factfinder will need to

---

[11]    FDA has warned and studies have shown that compounded drugs are inherently riskier than—and therefore by definition inferior to—approved medicines. Compl. ¶¶ 54, 86. The *Mochi* court also misread Lilly's Complaint to allege "only *reputational* harm to itself." 2025 WL 2998166, at *3. Here, Lilly has also alleged that Empower's false advertising "lure[s] consumers away from" Lilly's products. Compl. ¶ 159.

determine whether Empower's advertising is true or false—specifically, whether Empower's tirzepatide products are in fact "personalized," "custom," "patient specific," or "tailored to fit individual needs," as Empower claims, or are mass-manufactured in predetermined dosages and formulations without tailoring them to individual patients, as Lilly alleges. *See* Compl. ¶¶ 112–21.

Empower argues that "drugs compounded pursuant [to] Section 503A are per se 'personalized,'" making its advertising "literally true" and Lilly's claim "precluded." Mot. 21. That is incorrect. Section 503A does not mention the terms "personalized," "tailored," "custom," or "personalization," and FDA has warned 503A compounders that using those terms is misleading.[12] In *Eli Lilly and Co. v. Adonis Health, Inc.*, the court considered a nearly identical argument and context—a seller of compounded tirzepatide advertising its products as "individualized," "tailored," and "patient-specific." 2025 WL 2721684, at *8 (N.D. Cal. Sept. 24, 2025); *compare with* Compl. ¶¶ 112–21 (Empower advertises its products as "personalized," "custom," "patient specific," and "tailored to fit individual needs"). As that court explained, "FDCA compliance is irrelevant to whether the advertising of 'patient-specific' 'tailored' or 'individualized treatment' is false." 2025 WL 2721684, at *8. The relevant inquiry is how a "linguistically competent person" would interpret the advertising, *id.*, not whether Empower technically complies with Section 503A. "'[A]ny linguistically competent person … would … belie[ve] that [Empower] specifically creates individualized medication plans for each patient." *Id.* (quotations omitted). Because Empower does not do so, its advertising is literally false, and Lilly's claims are not precluded. *POM Wonderful, LLC v. Coca-Cola Co.*, 573 U.S. 102, 116–17 (2014) (Lanham Act claims only precluded if they seek to "enforce … the FDCA or its

---

[12] *See, e.g.*, FDA Warning Letter to Elevate Your Wellness LLC, d/b/a Elevated (Sept. 09, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/elevate-your-wellness-llc-dba-elevated-09092025.

regulations").

The only case that Empower cites for its position, *FedEx Ground Package Sys., Inc. v. Route Consultant, Inc.*, is unrelated to prescription drugs, compounding, or preclusion. 97 F.4th 444, 453 (6th Cir. 2024). *Healthpoint, Ltd. v. Ethex Corp.*, 273 F. Supp. 2d 817, 843–44 (W.D. Tex. 2001), is also inapposite. There, the court found preclusion because "equivalent to" or "alternative to" are FDA-defined terms of art. "Personalization," by contrast, is not an FDA-defined term of art. It is a matter of fact—dependent on how a linguistically competent person would understand the term compared to Empower's actual practices—and there is no risk of "undercut[ting] national uniformity" within FDA's regulatory scheme, and no basis for preclusion.

Empower chides Lilly for using what Empower calls Lilly's "unilateral definition" of "personalization," which "means making compounded medications one-by-one after the receipt of a prescription for a specific patient, and does not include 'predetermined dosages.'" Mot. 20. Empower can present evidence supporting its own definition later in the proceedings, but at this stage, the court must "assum[e] the truth" of Lilly's allegations, including consumers' interpretation of the term. *Emps.' Ret. Sys.*, 905 F.3d at 899.

> 2. *Lilly Has Properly Challenged Empower's Regulatory Compliance Claims*

Empower also falsely advertises that it "adheres to stringent regulatory standards across every step," including those "set by State Boards of Pharmacy," "USP standards," and "voluntary quality testing," and that its adherence ensures that its drugs "are of the highest caliber every time." Empower's arguments for dismissal of these literally false claims fail, too.

*First*, Empower argues that Lilly's Lanham Act claim is "precluded" because it would contravene FDA enforcement choices. Mot. 28. That argument has been rejected by the Supreme Court: only attempts to enforce "the FDCA or its regulations" via the Lanham Act are precluded. *POM Wonderful*, 573 U.S. at 116–17. Lilly's claims do not attempt to enforce the FDCA or other

29

regulations; they only challenge Empower's false claims about its safety record. Empower's long record of regulatory violations and noncompliance are evidence of the falsity of those statements.

*Second*, Empower argues that "neither a Form 483 nor a Warning Letter is a final determination that a violation of the FDCA has occurred." Mot. 28. That may be so, but they are certainly irrelevant to whether Empower's claims of regulatory compliance are false or misleading. Multiple FDA inspections, warning letters, state disciplinary actions, recalls, and whistleblower allegations of illegal and unsafe conduct—regardless of their finality—give rise to a "reasonable inference" that such claims are false or misleading. *AHBP LLC v. Lynd Co.*, 649 F. Supp. 3d 371, 384 (W.D. Tex. 2023) (citing *Ashcroft*, 556 U.S. at 678). The case Empower cites, *Pros & Patients for Customized Care v. Shalala*, 847 F. Supp. 1359, 1365 (S.D. Tex. 1994), contemplates whether FDA communications are final agency actions and not whether a history of regulatory violations belie claims of compliance. It is beside the point.

*Third*, Empower claims its statements about compliance are true because, according to Empower, it "currently" complies with regulations. Mot. 28. That unsupported factual claim cannot justify dismissal. For one thing, Empower's advertisements are backwards-looking, stating that it "adheres to stringent regulations across *every* step" and its products are of the "highest caliber *every time*." Compl. ¶ 123 (emphasis added). The necessary implication of these statements, taken in the context in which they appear, is that *at all times* Empower's products met those "stringent regulations." *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 495 n.5 (5th Cir. 2000) ("[T]he statement must be viewed in the light of the overall context in which it appears[.]"). These statements are literally false even if Empower is "currently" in compliance.

And in any event, Empower cannot defeat Lilly's complaint by asserting it is "currently" in compliance. Lilly's Complaint alleges a long history of violations running through the present

day that must be taken as true. Lilly's allegations detail flagrant and fundamental failures, including that Empower has "no quality control unit," (Dec. 22, 2023 Form 483, *id*. ¶ 147), bacterial contaminations that were "too numerous to count," (Oct. 4. 2024 Form 483, *id*. ¶ 133), "serious deficiencies … which put patients at risk," and "[r]epeated failures [to] demonstrate … control over the manufacture of drugs" (Apr. 2, 2025 Warning Letters, *id*. ¶¶ 134, 144).

Lilly also cited four nationwide recalls: one for "misbranded" drugs on May 12, 2023, and three for "lack of assurance of sterility" on August 2, 2024, September 5, 2024, and May 2, 2025 (FDA Enforcement Reports, *id*. ¶¶ 135, 144–45). And Lilly alleged Empower was the subject of disciplinary proceedings by eight states, resulting in settlement agreements with California (January 2023), Colorado (August 2023), Pennsylvania (January 2024), and Florida (November 2024) for charges related to "failure to maintain the quality of sterile compounded preparations, failure to obtain active ingredients from an FDA-registered supplier, compounding and dispensing prescriptions without the prescriber's approval for use of a compounded drug, assigning unsupported Beyond Use Dates, and falsifying records of patient allergies." *Id*. ¶¶ 89, 129–31. Empower also settled with Iowa in January 2025 for "deficiencies related to sterile, nonsterile, and hazardous drug compounding" following a period of license suspension. *Id*. ¶ 131.

Lilly also cited the reports of whistleblowers. Empower's former Director of Supply Chain and another employee have alleged a multitude of failures to comply with FDA regulations, including "us[e] of adulterated and contaminated products when compounding for consumer use (including injectable medications)," "fail[ures] to properly sterilize equipment," "fail[ure] to conduct sample checks to ensure quality of products," and "illegally producing impure GLP-1s and distributing them to thousands of consumers," to name just a few. *Id*. ¶¶ 151, 155. They describe how Empower "*intentionally*" circumvents regulations "to cut costs," "[a]ctively creat[es]

and enforc[es] a culture of disguise," and uses intimidation tactics to prevent employees from speaking out. *Id.* ¶¶ 152 (emphasis added), 154. These allegations are taken as true at this stage and are more than sufficient to avoid a motion to dismiss. *AHBP LLC,* 649 F. Supp. 3d at 395–96 (allegations of false regulatory compliance claims sufficient to survive dismissal); *Allergan*, 2017 WL 10526121, at *8 (allegations "demonstrat[ing] that [compounder's] statements about the legality of its business operations are false" sufficient to survive dismissal).

*Fourth*, Empower contends that its statements are nonactionable opinion statements. Mot. 29. To be nonactionable, statements must be "so vague that [they] can be understood as nothing more than a mere expression of opinion." *Pizza Hut, Inc.*, 227 F.3d at 497. Empower's statements are not vague at all. Empower states that it "adheres to stringent regulations set by State Boards of Pharmacy, the FDA, and USP standards" and that it "adheres to stringent regulatory standards across every step" of the manufacturing process. Compl. ¶ 123. These are objective statements— they either adhere to these standards or they do not—and here, they do not.

Empower relies on two distinguishable cases in which the relevant agencies *had not yet interpreted the governing regulations*—so it was "not knowable" whether the statement was false. *See Coastal Abstract Servs., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731–32 (9th Cir. 1999) (no actionable statement where unclear if conduct was covered under regulations); *Dial A Car v. Transp. Inc.*, 82 F.3d 484, 488–89 & n.3 (D.C. Cir. 1996) (no actionable statement where law or governing regulation was ambiguous when statements were made, regardless of later interpretive guidance). Here, it is "knowable"—and *known*—that Empower does not "adhere[] to stringent regulations across every step." At this stage, Lilly's allegations that Empower violated clear regulatory standards must be accepted as true. *AHBP LLC*, 649 F. Supp. 3d at 384.

3.    *Lilly Has Properly Challenged Empower's Safety and Effectiveness Claims*

Empower also falsely advertises that its untested and unapproved drugs are safe and

effective, including that (i) its oral tirzepatide acts as a safe and effective treatment for weight management and type 2 diabetes, although Empower has not conducted clinical trials of these products, or even determined whether they are absorbed by the body, Compl. ¶¶ 93–94; (ii) its tirzepatide with niacinamide is a safe and effective treatment for the same conditions, again without having conducted any clinical trials and deceptively citing to *Lilly's* clinical studies to support its claims, *id*. ¶¶ 100, 108; and (iii) its oral tirzepatide is *superior* to Lilly's injectable products, again falsely communicating to patients that it offers the same health benefits as Lilly's medicines, *id*. ¶ 109. Empower seeks dismissal with four unavailing arguments.

*First*, Empower contends Lilly's challenge to its advertising is precluded. But resolving the truth or falsity of Empower's safety and effectiveness claims does not require any application or interpretation of the FDCA or FDA regulations. Those statements—such as that its tirzepatide products "significantly reduce[] body weight," provide "a second-line defense against type 2 diabetes for glycemic control," have "proven" or "demonstrated" impacts on hemoglobin levels and weight, or any other therapeutic benefit—necessarily imply that clinical studies have established these characteristics of Empower's drugs. *See* Compl. ¶¶ 100, 102, 107–08. These statements can be proven false by showing that Empower's drugs have never been clinically tested. That inquiry does not require an "open-ended analysis" of FDCA advertising law. Mot. 24. It is a "binary factual determination," not a regulatory one. *See Allergan*, 2017 WL 10526121, at *7.[13]

Empower claims "FDA has oversight of compounded drug advertisements" and "FDA has not promulgated regulations or issued guidance interpreting Section 352(bb)," which purportedly "prohibit[s] the advertising or promotion of a compounded drug [if it] is false or misleading in any

---

[13] Empower attempts to recast Lilly's claim as enforcing the FDCA by arguing that it complies with an FDCA provision that "specifically authorizes compounders to utilize active pharmaceutical ingredients that are a component of a drug approved by FDA." Mot. 24 (quotations omitted). That provision has nothing to do with whether Empower's drugs are safe, effective, or superior to Lilly's, and so is irrelevant to Lilly's claim.

particular." Mot. 24 (quotation omitted). The Supreme Court has explicitly held that such FDA oversight does not preclude Lanham Act claims. *POM Wonderful*, 573 U.S. at 114 (rejecting preclusion argument and holding "Congress did not intend FDA oversight to be … exclusive"). Moreover, Empower's argument would mean a plaintiff may never bring a false advertising claim against a compounder, which is clearly not the law. *See, e.g.*, *Adonis Health, Inc.*, 2025 WL 2721684 (claims surviving dismissal); *Pacira Biosciences*, 2024 WL 4329142, at *2 (same). Empower's reliance on *Healthpoint, Ltd. v. Stratus Pharmaceuticals, Inc.*, 273 F. Supp. 2d 769 (W.D. Tex. 2001), is misplaced. Mot 24–25. The *Stratus* court refused to "address statements about drug safety and mislabeling" because finding those statements false would have required the court to determine whether the FDCA allowed the defendant to market the product as "generic." 273 F. Supp. 2d at 788, 793 n.147, 797–99. Lilly's claims do not require application of the FDCA.

*Second*, Empower argues that its claims are not literally false because the clinical studies it discusses in its advertisements "do not involve these specific compounded medications." Mot. 25–26. Empower claims it is just "discussing tirzepatide and niacinamide alone—not Empower's combined tirzepatide/niacinamide, and not Empower's oral formulation."[14] *Id.* 25. But as Empower admits, its advertising "must be viewed in the light of the overall context in which it appears." *Id.* at 26 n.21 (citing *Pizza Hut, Inc.*, 227 F.3d at 495 n.5). And in context, Empower plainly makes claims about its own products. As set forth in Lilly's Complaint, the claims appear on Empower's website and in particular on its "Product Overview" pages. Compl. ¶ 107. Empower adds the subheadings "*About* Tirzepatide / Niacinamide Injection" and "*About* Tirzepatide [Oral

---

[14] Empower does not and could not argue that the results of these studies are transferable to Empower's product. They were, for example, conducted on injectable tirzepatide. Compl. ¶ 13. Empower's oral tirzepatide drug has a different route of administration, and differences in route of administration can significantly change a medication's bioavailability and effect. *Id.* ¶ 111.

Disintegrating Tablet].”[15] In that context, the claims can only be understood as being *about* Empower's own products. *McCracken v. KSF Acquisition Corp.*, 2023 WL 5667869, at *1, 5 (C.D. Cal. Apr. 4, 2023) (rejecting argument that accurate identification of clinical studies' subject meant "no reasonable consumer would be deceived" and denying dismissal); *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1144 (9th Cir. 1997) (reversing holding that bar chart was not literally false; although it accurately "indicate[d] that it is based on data accumulated during a limited time period at a particular location," context implied broader claims).

*Third,* Empower contends that its statements about the "convenience" of oral tirzepatide— that it "offers the benefit of '[n]o needles, no refrigeration, no preparation' and [is] '[j]ust an easy, consistent routine,'" Compl. ¶ 109—are literally true. Mot. 26. But this argument, too, ignores the "context" of Empower's campaign. *Pizza Hut, Inc.*, 227 F.3d at 501–02; *Southland Sod Farms*, 108 F.3d at 1139–40. Empower's advertising necessarily implies that its oral product is not only "in a more convenient format" than Lilly's injectable tirzepatide, but also that "[patients] can receive the same health benefits," such that its product is overall superior. Compl. ¶ 109. As Lilly alleges, there is no evidence oral tirzepatide offers the same benefits, so Empower's claims of superiority are false. *Id*. ¶ 111. Empower cites no cases dismissing similar claims.

## C.     Lilly Has Adequately Pled Deception And Materiality

Empower argues that Lilly fails to state a Lanham Act claim for each category of advertising claims because it has not alleged that Empower's advertising "actually or tend[s] to deceive a substantial portion of the intended audience" and is "material and influences consumers'

---

[15] Empower Pharmacy Tirzepatide ODT Product Page (Apr. 17, 2025), https://web.archive.org/web/20250417204005/https://www.empowerpharmacy.com/compoundingpharmacy/tirzepatide-odt/ (emphasis added); Empower Pharmacy Tirzepatide/Niacinamide Injection Product Page (Mar. 21, 2025), https://web.archive.org/web/20250321033524/https://www.empowerpharmacy.com/compounding-pharmacy/tirzepatide-niacinamide-injection/ (emphasis added).

purchasing decisions." Mot. 22, 26–27, 30. This misstates Lilly's burden at the pleading stage in two independent ways. *First*, when a statement is alleged to be literally false, deception and materiality are both presumed. *See, e.g.*, *Boltex Mfg. Co., v. Galperti, Inc.*, 2018 WL 1535199 at *6 (S.D. Tex. Mar. 29, 2018) ("If the statement at issue is shown to be literally false, the court must assume that it actually mislead[s] consumers, without requiring any evidence of such deception from the plaintiff.") (quotations omitted); *El Paso Disposal, LP v. Ecube Labs Co.*, 2025 WL 1766310, at *2, 6 (W.D. Tex. June 26, 2025) ("a statement that is literally false satisfies … [the] third element[] of a Lanham Act claim," that "the deception was material insofar as it is likely to influence a consumer's purchasing decision"). Here, Lilly has alleged that Empower's advertising is literally false, *e.g.*, Compl. ¶ 123, and the Court should presume deception and materiality. Empower cites no authority to the contrary.

*Second*, even without the presumption, at this stage Lilly need only allege the statements have "the capacity to deceive," not prove actual consumer confusion. *See, e.g., Tempur-Pedic Int'l Inc. v. Angel Beds LLC*, 902 F. Supp. 2d 958, 969 (S.D. Tex. 2012) (denying dismissal where statements were at least "misleading" and "had the capacity to deceive a substantial segment of potential customers"); *Decorative Ctr. of Houston*, 208 F. Supp. 2d at 728 (denying dismissal where it was "feasible" that consumers "could have been confused" by the "misleading" statements). Thus, when Empower asserts that Lilly "pleads no facts that any customer was confused or deceived by Empower's website," Mot. 22, it applies the wrong standard. Neither of the two cases Empower cites requiring a showing of actual consumer confusion resolved a motion to dismiss. Mot. 22 (citing *Pizza Hut, Inc.*, 227 F.3d at 497 (post-verdict motion)); *S. Snow Mfg. Co. v. Snow Wizard Holdings, Inc.*, 829 F. Supp. 2d 437, 455 (E.D. La. 2011) (summary judgment). In any event, Lilly has alleged actual consumer confusion. Compl. ¶¶ 98, 104–05 & nn.68–70, 117

& n.84, 125 & n.89. Similarly, with respect to materiality, the standard at the pleading stage is not whether the statements *have* "influenced consumer's purchasing decisions," Mot. 30, but whether the statements are "*likely* to influence a consumer's purchasing decision." *Boltex*, 2018 WL 1535199 at *6 (emphasis added) (denying motion to dismiss).[16]

Here, Lilly has adequately alleged that each category of Empower's false statements has the capacity to deceive consumers and is likely to influence purchasing decisions. Empower's personalization advertising necessarily implies that its products are "personalized" and "tailored" to each patient's "unique needs," Compl. ¶¶ 112–13, when in fact Empower provides the same drug to every patient. Lilly identified consumer complaints about how Empower's products were not tailored to their needs, showing personalization is material to consumers. Compl. ¶ 119. Empower's compliance advertising is false because while Empower claims that it "adheres to stringent regulatory standards across every step," it actually intentionally violates those standards. *Id*. ¶¶ 122–56. And Empower claims that its products are "prove[n]" or "demonstrate[d]" to be safe and effective, even though no studies on its products exist, *id*. ¶¶ 94–96, 100–03, 106–08. Providers have repeated Empower's claims, demonstrating both that they were deceived and that the claims were material. Compl. ¶¶ 98, 105. Consumers have also complained about the ineffectiveness of Empower's products, showing that effectiveness is material. Compl. ¶ 105. These are more than "conclusory statements," Mot. 30, and they are more than sufficient at the motion to dismiss stage. *See, e.g.*, *Tempur-Pedic*, 902 F. Supp. 2d at 970; *Decorative Ctr. of Houston*, 208 F. Supp. 2d at 728; *Boltex*, 2018 WL 1535199 at *6. *Pacira Biosciences*, 2024 WL

---

[16] Empower nonetheless argues Lilly has not alleged materiality, repeating its proximate cause argument that doctors, not consumers, determine what medications are prescribed such that they are an intervening cause precluding Empower's advertisements from materially influencing consumers' purchasing decisions or causing Lilly any harm. Mot. 30. That argument fails again, and for the same reasons. *See supra*, Section II.A (Proximate Causation). Moreover, Lilly alleged that consumers actively participate in their purchasing decisions, discussing "the need to change pharmacies." Compl. ¶¶ 119 & n.84.

4329142, at *2 (materiality sufficiently alleged; defendant "knowingly induced healthcare providers to purchase [its product] based on misrepresentations of its efficacy").

### D. Empower's False Advertising Is Not Puffery

Finally, Empower argues that it cannot be held accountable for its false claims because some are either "puffery" or "opinion." Mot. 19–20, 23, 27–28. As a preliminary matter, since Empower does not claim that all the statements Lilly challenges are puffery—only its "personalized" and "safe and effective" advertising, *see* Mot. 19–29, this is not a basis for dismissal. *See, e.g.*, *Ford v. NYLCare Health Plans of the Gulf Coast, Inc*., 1997 U.S. Dist. LEXIS 24377, at *2 (S.D. Tex. Jan. 3, 1997) (denying dismissal where "at least some of the statements alleged in the complaint do not constitute puffery and are therefore actionable"); *Safoco, Inc. v. KLX Energy Servs., LLC*, 2023 WL 4281243, at *4 (E.D. Tex. June 10, 2023) (denying dismissal where "many of the statements appear to concern factual matters"). The argument also fails on its merits. Each of Empower's statements is a "specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact," and so is not puffery. *See, e.g.*, *Greater Houston*, 155 F. Supp. 3d at 686 (finding statements that "allow[] for concrete empirical verification" to not be puffery).

***First,*** Empower conclusorily asserts that for its personalization claims, "*no* empirical metric exists and Empower's personalization statements are non-actionable puffery." Mot. 23. Such conclusory assertions are insufficient at a motion to dismiss. *See* L.R. 7.1(B) (requiring opposed motions to include or be accompanied by authority); *see also Clark v. Carter*, 768 F. Supp. 3d 927, 937 n.3 (S.D. Ind. 2025) ("[P]erfunctory and undeveloped arguments … that are unsupported by pertinent authority[] are waived.") (citation omitted). Empower is mistaken on the merits too: its statements *are* capable of being falsified. If, as Lilly alleges, Empower's products are actually "mass-produced" in "predetermined," "standardized formulations" without being

changed or designed for individual patients, *see* Compl. ¶¶ 14, 112, 116–20, Empower's statements will be "proved false," and therefore are not puffery. *Greater Houston*, 155 F. Supp. 3d at 693. Unsurprisingly, courts have found statements about "personalized" products just like Empower's to be actionable false advertising. *See, e.g.*, *Blue Buffalo*, 2015 WL 3645262, at *12 (promises of "[p]ersonalized nutrition" and "a personalized blend" were actionable); *Philippi-Hagenbuch, Inc. v. W. Tech. Servs. Int'l, Inc.*, 2015 WL 13590400, at *2 (C.D. Ill. Feb. 2, 2015) (promises of manufacturing "customized truck bodies" were actionable). Empower has no contrary authority, and simply repeats that "general," "vague," and "[un]verifiable" descriptions cannot sustain a false-advertising claim. Mot. 27 & n.22. Empower's personalization claims are neither general nor unverifiable, unlike the claims at issue in Empower's cited cases. *Id.* at 23 (citing *Schwinner v. Presidio Industries LLC*, 2011 WL 13089398, at *3 (N.D. Tex. 2011) (general claims of "revolutionary" and "unique" medical practice "merely puffery"); *Yoshikawa v. Exxon Mobil Corp.*, 2022 WL 4677621, at *15 (N.D. Tex. Sept. 29, 2022) (general statements of "on track," "decent," and "optimized" production goals were non-actionable puffery)).

**Second**, Empower's statements that its tirzepatide drugs are safe and effective are verifiable and thus actionable. Empower cites Lilly's clinical trials to claim its products "enhance insulin production and secretion from pancreatic beta cells," "contribute to a … reduction in appetite," "significantly reduce[] body weight," and "decrease[] hemoglobin A1C levels more effectively than a placebo." Compl. ¶¶ 94, 100, 107. These claims "allow[] for concrete empirical verification." *Greater Houston*, 155 F. Supp. 3d at 693. Either Lilly's studies prove Empower's drugs do these things, or they do not.

Further, Empower advertises its oral products as *more* convenient than Lilly's—*e.g.*, Compl. ¶ 109 ("[n]o needles, no refrigeration, no preparation," and "[j]ust an easy consistent,

routine"), while offering the "same health benefits"—and superiority claims are also actionable. Again, its drugs either offer these benefits or they do not—which can be verified. *See, e.g.*, *Univ. Loft Company v. Blue Furniture Sols., LLC*, 2017 WL 876312, at 4 (W.D. Tex. Mar. 3, 2017) (comparative statements that "only difference" is the "price" were actionable); *Dyson, Inc. v. Oreck Corp.*, 2009 WL 537074, at *6 (E.D. La. Mar. 4, 2009) (statement that Dyson's vacuum was "too bulky" in comparison to Oreck's slimmer vacuum was "specific and measurable"). These measurable comparisons to Lilly's *injectable* tirzepatide products, Comp. ¶ 109 ("[n]o needles, no refrigeration, no preparation"), refute Empower's argument that it "has not included any measurable indicator of 'convenience' or ease that would mislead consumers as to the characteristics and quality of its ODT tirzepatide." Mot. 27-28.[17]

Empower's cited cases, which lack product comparisons or an objective frame of reference, are inapt. *See* Mot. 27–28 and n.22 (citing *Riviana Foods*, 2020 WL 6153602, at *10 (no objective standard for "prime grade" rice); *Davis v. Allstate Ins. Co.*, 2009 WL 122761, at *6 (E.D. La. Jan. 15, 2009) ("You're in good hands"); *Bridal Expo., Inc. v. Van Florestein*, 2009 WL 255862, at *7 (S.D. Tex. Feb. 3, 2009) ("# 1 Bridal Show") (preliminary injunction)). The safety and effectiveness of medications can be and are routinely studied and quantified, particularly in comparison to other products. Compl. ¶¶ 93–111.

## **CONCLUSION**

Lilly respectfully requests that the Court deny Defendant's Motion to Dismiss.

---

[17] Empower relies on cases that do not concern similar comparisons. Mot. 27-28 (citing *Pizza Hut, Inc.*, 227 F.3d at 496-98 ("Better Ingredients, Better Pizza" alone is non-actionable puffery since "[w]hat makes one food ingredient 'better' than another comparable ingredient, without further description, is wholly a matter of individual taste or preference"); *Riviana Foods, Inc. v. Golden Star Trading, Inc*., 2020 WL 6153602, at *10 (S.D. Tex. Apr. 6, 2020) (no comparison to a third-party's product); *Presidio Enters., Inc. v. Warner Bros Distrib. Corp.*, 784 F.2d 674, 686 (5th Cir. 1986) (words like "easy, prime, amazing, perfect, wonderful, excellent" standing alone are not comparative statements)).

Dated: November 17, 2025

Respectfully submitted,

/s/ *James John Lomeo*
James John Lomeo (*attorney-in-charge*)
Texas Bar No. 24118993
Southern District No. 3511238
KIRKLAND & ELLIS LLP
401 Congress Avenue
Austin, Texas 78701
Telephone: (512) 678-9101
Facsimile: (512) 678-9101
james.lomeo@kirkland.com

James F. Hurst (*pro hac vice*)
Diana M. Watral (*pro hac vice*)
Robin A. McCue (*pro hac vice*)
Ryan J. Moorman (*pro hac vice*)
James R.P. Hileman (*pro hac vice*)
Nicholas M. Ruge (*pro hac vice*)
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
james.hurst@kirkland.com
diana.watral@kirkland.com
robin.mccue@kirkland.com
ryan.moorman@kirkland.com
jhileman@kirkland.com
nicholas.ruge@kirkland.com

Joshua L. Simmons (*pro hac vice*)
Jeanna M. Wacker (*pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.simmons@kirkland.com
jeanna.wacker@kirkland.com

David I. Horowitz (*pro hac vice*)
KIRKLAND & ELLIS LLP
2049 Century Park East, 38th Floor
Los Angeles, CA 90067
Telephone: (310) 552-4200
dhorowitz@kirkland.com

Eugene Temchenko
Texas Bar No. 24118928
Southern District No. 3929004
KIRKLAND & ELLIS LLP
4550 Travis Street
Dallas, Texas 75205
Telephone: (214) 432-5072
Facsimile: (214) 972-1771
eugene.temchenko@kirkland.com

*Counsel for Plaintiff Eli Lilly and Company*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 17, 2025, a true and correct copy of this document was served via the Court's electronic case filing system (CM/ECF) to all parties registered to receive such notice in the above captioned case.

*/s/ James John Lomeo*
James John Lomeo